# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

AT&T MOBILITY LLC,

                Plaintiff,

    vs.

CELLCO PARTNERSHIP d/b/a
VERIZON WIRELESS,

                Defendant.

Case No. 09-CV-3057-TCB

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER

Kenneth A. Plevan
  (admitted pro hac vice)
Lauren E. Aguiar
  (admitted pro hac vice)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York , NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Email:
kenneth.plevan@skadden.com
Email: lauren.aguiar@skadden.com

L. Joseph Loveland
  (Ga. Bar No. 459350)
Jill Wasserman
  (Ga. Bar No. 739662)
C. Suzanne Johnson
  (Ga. Bar No. 321398)
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: jloveland@kslaw.com
Email: jwasserman@kslaw.com
Email: suzanne_johnson@kslaw.com

*Attorneys for Defendant Cellco Partnership d/b/a Verizon Wireless*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS ..................................................................... 8

    A.  TECHNICAL BACKGROUND ................................................. 8

    B.  AT&T'S AGGRESSIVE PROMOTION OF ITS 3G NETWORK ..................... 9

    C.  AT&T FAILS TO PROVIDE 3G COVERAGE MAPS ................................. 12

    D.  VERIZON'S ADVERTISEMENTS ACCURATELY COMPARE VERIZON'S AND AT&T'S 3G NETWORK COVERAGE ........................... 13

        1.  Verizon's "There's A Map for That" Advertisements ............... 14

        2.  Verizon's "Holiday" Ads ................................................. 16

    E.  PROCEDURAL POSTURE ...................................................... 19

ARGUMENT ..................................................................................... 20

  I.  A TRO IS AN EXTRAORDINARY AND DRASTIC REMEDY, ESPECIALLY WHEN SPEECH IS AT ISSUE ................................... 20

  II.  AT&T HAS FAILED TO PROVE THAT THIS EXTRAORDINARY RELIEF IS WARRANTED ..................................... 23

    A.  AT&T IS NOT LIKELY TO SUCCEED ON THE MERITS IN PROVING THAT VERIZON'S ADS ARE FALSE OR MISLEADING ............... 23

        1.  Verizon's Advertisements Are Literally True ................... 25

        2.  Verizon's Advertisements Are Not "False by Necessary Implication" ................................................. 25

        3.  Verizon's Advertisements Are Not Misleading ................ 31

    B.  AT&T HAS FAILED TO SHOW AN EMERGENCY RISK OF IRREPARABLE HARM ...................................................... 38

    C.  THE RELIEF AT&T DEMANDS WOULD CAUSE SUBSTANTIAL HARM TO VERIZON .......................................................... 40

    D.  THE PUBLIC INTEREST IN THE FREE EXCHANGE OF TRUTHFUL INFORMATION WEIGHS HEAVILY AGAINST THE RELIEF AT&T SEEKS ........................................................................ 42

**III. AT&T MUST POST APPROPRIATE SECURITY** ................................................. **44**

**CONCLUSION** .................................................................................................. **44**

# TABLE OF AUTHORITIES

**CASES**

*Am. Express Travel Related Servs. Co. v. Mastercard Int'l Inc.*,
 776 F. Supp. 787 (S.D.N.Y. 1991) ................................................................30, 32

*Am. Home Prods. Corp. v. Procter & Gamble Co.*,
 871 F. Supp. 739 (D.N.J. 1994) ........................................................................32

*Amstar Corp. v. Domino's Pizza, Inc.*,
 615 F.2d 252 (5th Cir. 1980) .............................................................................34

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009) .......................................................................................22

*AstraZeneca LP v. Tap Pharm. Prods., Inc.*,
 444 F. Supp. 2d 278 (D. Del. 2006) ..................................................................32

*BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*,
 425 F.3d 964 (11th Cir. 2005) ...........................................................................38

*Bellsouth Telecomms. v. Hawk Comms., LLC*,
 No. 1:04-CV-280-MHS, 2004 WL 1085324 (N.D. Ga. Apr. 12, 2004) ......25, 38

*Citizens Financial Group, Inc. v. Citizens National Bank of Evans City*,
 2003 WL 24010950 (W.D. Pa. Apr. 23, 2003), *vacated in part and
 remanded on other grounds*, 383 F.3d 110 (3d Cir. 2004) ................................37

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
 468 F. Supp.2d 1181 (C.D. Cal. 2007) ................................................. 34-35, 37

*Coors Brewing Co. v. Anheuser-Bush Co.*,
 802 F. Supp. 965 (S.D.N.Y. 1992) ....................................................................26

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*,
 441 F. Supp. 2d 695 (M.D. Pa. 2006) ................................................................31

*eBay, Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006).................................................................... 38-39

*Energy Four v. Dornier Med. Sys., Inc.*,
  765 F. Supp. 724 (N.D. Ga. 1991)..............................................31, 38

*Ferrero v. Assoc. Mats. Inc.*,
  923 F.2d 1441 (11th Cir. 1991) .........................................................38

*Hickson Corp. v. N. Crossarm Co.*,
  357 F.3d 1256 (11th Cir. 2004) .................................................23, 31

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*,
  512 U.S. 136 (1994)...........................................................................21

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
  299 F.3d 1242 (11th Cir. 2002) .......................................20, 23, 25, 31

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ........................................................41

*Mead Johnson & Co. v. Abbott Labs.*,
  209 F.3d 1032 (7th Cir. 2000) ...................................................27, 31

*Munaf v. Geren*,
  128 S. Ct. 2207 (2008)...............................................................20, 22

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*,
  522 F.3d 1211 (11th Cir. 2008) .............................................23, 39, 42

*Nken v. Holder*,
  129 S. Ct. 1749 (2009)............................................................ 20, 22-23

*Procter & Gamble Co. v. Bankers Trust Co.*,
  78 F.3d 219 (6th Cir. 1996) ..............................................................21

*Scotts Co. v. United Industries Corp.*,
  315 F.3d 264 (4th Cir. 2002)..............................................................25

*Smith v. Wal-Mart Stores, Inc.*,
  537 F. Supp. 2d 1302 (N.D. Ga. 2008)................................... 24, 33-35

*Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
No. 01-CIV 2775, 2001 WL 588846 (S.D.N.Y. June 1, 2001) ................... 23, 31

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
No. 09 Civ. 3741, 2009 WL 2390245 (S.D.N.Y. Aug. 4, 2009) ....................... 26

*Thompson v. Western States Med. Ctr.*,
535 U.S. 357 (2002) ..................................................................... 20, 42

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
497 F.3d 144 (2d Cir. 2007) ............................................................. 25

*Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*,
626 F.2d 1171 (5th Cir. 1980) .......................................................... 42

*United Indus. Corp. v. Clorox Co.*,
140 F.3d 1175 (8th Cir. 1998) ..................................................... 21, 26, 30

*Winter v. Natural Res. Def. Council*,
129 S. Ct. 365 (2008) .................................................................... 20, 38

## STATUTES

Lanham Act, 15 U.S.C. § 1125 ............................................................. 18

## RULES AND REGULATIONS

16 C.F.R. § 14.15(c) ....................................................................... 42

Fed. R. Civ. P. 12(b)(6) ................................................................... 22

Fed. R. Civ. P. 65(c) ...................................................................... 44

## OTHER AUTHORITIES

5 J. THOMAS MCCARTHY, TRADEMARKS & UNFAIR COMPETITION § 27:38
(4th ed. 2009) ........................................................................ 30

Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon") respectfully submits this memorandum of law in opposition to the motion of Plaintiff AT&T Mobility LLC ("AT&T") for a temporary restraining order ("TRO"). For the reasons set forth below, AT&T is not entitled to extraordinary preliminary relief, and the TRO motion should be denied. Verizon respectfully submits that, at a minimum, preliminary relief should not be awarded before Verizon has 90 days to conduct discovery on the factual issues underlying AT&T's motion.

## INTRODUCTION

AT&T did not file this lawsuit because Verizon's "There's A Map For That" advertisements are untrue; AT&T sued because Verizon's ads are true and the truth hurts. For well over a year, the battle lines in wireless communications have been drawn around the "3G" (third generation) wireless data capabilities of each carrier, as measured by coverage, speed, and reliability. In recent years wireless carriers have upgraded their first and second-generation networks (capable of transmitting voice calls and limited data services) to 3G, enabling far higher transmission speed and therefore a far broader range of data products and services, such as faster music and video downloads, high-resolution games, and other software applications. Verizon Wireless has invested billions of dollars since 2004 upgrading nearly its entire network across the continental United States and Hawaii to 3G, and today

covers five times more of the United States than AT&T's 3G network. Despite the far smaller size of its 3G network, AT&T has spent tens of millions of dollars making its 3G network, which it dubs the "Nation's Fastest 3G Network," the centerpiece of its national advertising since at least the summer of 2008. AT&T now is attempting to silence Verizon's ads that include maps graphically depicting the geographic reach of AT&T's 3G network as compared to Verizon's own 3G network because AT&T does not like the truthful picture painted by that comparison.

AT&T seeks the extraordinary and drastic remedy of a TRO prohibiting Verizon from showing five television advertisements — and related print and radio advertisements — that focus expressly on the geographic reach of AT&T's 3G network as compared to Verizon's. AT&T then asks that the Court bar *any use* of such coverage maps. Remarkably, AT&T *admits that the 3G coverage maps — the one thing that is common to all five ads — are accurate and that the ads' express statement that Verizon has "5X More 3G Coverage" than AT&T is true.* (*See* First Amended Complaint ("Am. Compl.") ¶ 88.) Nonetheless, AT&T asserts that Verizon's ads about 3G coverage are "false and misleading" because they allegedly imply a message that confuses consumers regarding AT&T's *non-3G* coverage. (*See* Am. Compl. Introductory Paragraphs.)

AT&T's request for a TRO is meritless for several reasons.

*First,* AT&T cannot demonstrate that it is likely to succeed on the merits. The coverage maps in Verizon's advertisements are accurate; Verizon does in fact offer "5X More 3G Coverage Than AT&T."  Because the ads are expressly truthful, AT&T is forced to attack them under two different, but equally faulty theories.  For the first time in its amended complaint, AT&T claims that the ads are "literally false" or "false by necessary implication" because they supposedly lead to only one plausible conclusion — that AT&T's phones do not work at all outside of the 3G coverage area.  (*See* Am. Compl. ¶¶ 17, 21.)[1]  This claim makes no sense.  Not only can the ads be interpreted to refer to the comparatively limited geographic scope of AT&T's 3G service, they cry out for that interpretation:  each ad speaks of 3G coverage repeatedly, the maps used in each are clearly labeled "3G," and as Professor Joel Cohen, a leading expert in both marketing and consumer surveys explains, the clear and inescapable message of the ads is that they are comparing the 3G coverage of the two networks.  (*See* Declaration of Joel Cohen ("Cohen Decl.") ¶ 11;  Transmittal  Declaration  of  Kenneth  Plevan  ("Plevan  Decl.")  Ex.  1;

---

[1]   It is telling that AT&T did not advance this claim in its original Complaint challenging two of the ads.  Nothing about those ads has changed, and AT&T tacitly recognized in its original Complaint that they contained no false statement and no "necessary implication" that is false.

Supplementary Declaration of Joel B. Cohen ("Supp. Cohen Decl.") ¶¶ 7, 13; Plevan Decl. Ex. 2.)  It is more than "plausible" that the advertisements mean what they say; this is their obvious meaning.

AT&T alternatively argues that, although the ads expressly and consistently convey truthful information about 3G service, they imply the misleading impression that AT&T has no coverage whatsoever outside of the 3G area.  This claim cannot be accepted without convincing evidence that consumers are actually misled.  Especially where literally true speech is at stake, the First Amendment, the Lanham Act, and basic equity require actual proof that ads are misleading.

*As to four of the five challenged ads*, AT&T has presented no evidence of consumer deception.  This alone is a sufficient basis to deny AT&T's motion as to these ads.  As to one ad (the "Bench" ad), AT&T commissioned a consumer survey (the "Guideline" or "Reitter" survey).  (*See* Balser Decl. Ex. A.)  But this survey is riddled with errors.  The survey consists of the wrong questions asked to the wrong audience — including consumers with no interest in or knowledge of 3G services — and this flawed data was gathered, analyzed, and reported inaccurately.  Prof. Cohen concludes that the Guideline survey is "fatally flawed [] in virtually every respect" and "deserves to be given no weight whatsoever."  (*See* Cohen Decl. ¶ 38.)  Such flimsy evidentiary support cannot justify an extraordinary court order commanding

Verizon to cease engaging in truthful speech. And, as for the two original ads, "College" and "Bench" (the only ad for which AT&T conducted a survey) the TRO motion is moot. Because they have run their normal course as the introductory ads for the "There's a Map for That" Campaign, Verizon is no longer showing those ads, and has no plans to do so. Nevertheless, Verizon does intend to continue this ad Campaign, including the use of the comparative 3G coverage maps that are the centerpiece of both the Campaign and AT&T's complaint.

*Second*, there is no emergency that would justify an immediate prohibition on showing the ads without Verizon first having an opportunity to conduct discovery and introduce evidence relating to consumers' understanding of its ads. Verizon's ads featuring 3G coverage maps have been running on television for more than a month. (*See* Declaration of Jerome Karnick ("Karnick Decl.") ¶ 3.) After Verizon's current campaign appeared, AT&T protested and Verizon promptly made changes to the commercials. (*See id.* ¶¶ 5-8.) AT&T made no further complaint and waited several weeks before filing this action and claiming an emergency in its TRO motion. (*See id.* ¶¶ 9-10.)[2] For an advertising campaign that has been running since a month before this suit was filed, the TRO AT&T seeks cannot be seen as

---

[2] AT&T has been aware for more than a year that maps comparing Verizon's and AT&T's 3G coverage areas appear on Verizon's website. (*See* Karnick Decl. ¶ 11.)

preserving the status quo; it would fundamentally alter the status quo and create an unbalanced playing field. This Court should see AT&T's TRO effort to gain "emergency relief" for what it is: an attempt on short notice and without opportunity for discovery or deliberation to stop Verizon's accurate comparative advertising campaign to gain a tactical advantage during the critical holiday shopping season. (*See* Declaration of Joe Saracino ("Saracino Decl.") ¶ 51.)

*Third*, Verizon and the consuming public would suffer considerable harm from an order muzzling Verizon's truthful speech, and this harm to Verizon and the public outweighs the alleged harm to AT&T. The speed and reach of 3G service has been the centerpiece of advertising in the marketplace for "smartphones" for more than a year. (*See* Saracino Decl. ¶ 9.) During that time, neither AT&T nor any other competitor has suggested that "1G," "2G," or "2.5G" service were adequate substitutes for 3G service. (*See id.*) In fact, AT&T has been one of the loudest voices in this advertising battle, spending many millions of dollars to market its 3G network as the "Nation's Fastest 3G Network" and, with its exclusive partner Apple, naming the latest iPhone (only available on AT&T's network) the "iPhone 3GS." (*See id.* ¶¶ 12, 17.)

The stark truth, as revealed by the concededly accurate coverage maps in Verizon's advertising, is that the geographic reach of AT&T's 3G network is far less

extensive than AT&T would have the public believe — and far less extensive than Verizon's 3G network. (*See id.* ¶¶15-19.) Consumers who are interested in smartphones have a strong interest in knowing the comparative 3G coverage offered by Verizon and AT&T. (*See id.* ¶ 8.) Cutting off the free flow of information about Verizon's more extensive 3G coverage would harm consumers in a way that could not be redressed. (*See id.* ¶¶ 48-50.) And because injury to First Amendment rights is by definition irreparable, suppressing Verizon's speech on an "emergency" basis before a definitive and fair adjudication would irreparably injure Verizon and its goodwill in addition to costing Verizon customers. Any harm to AT&T, in contrast, is merely speculative.

In the final analysis, AT&T seeks emergency relief because Verizon's side-by-side, apples-to-apples comparison of its own 3G coverage with AT&T's confirms what the marketplace has been saying for months: AT&T failed to invest adequately in the necessary infrastructure to expand its 3G coverage to support its growth in smartphone business, and the usefulness of its service to smartphone users has suffered accordingly. AT&T may not like the message that the ads send, but this Court should reject its efforts to silence the messenger.

## STATEMENT OF FACTS

### A.    Technical Background

The market for wireless communications services evolves rapidly with the constant introduction of new technology.  In the current market, battle lines have been drawn around the "3G" capabilities of the major competitors:  Verizon, AT&T, T-Mobile, and Sprint.  (*See* Saracino Decl. ¶ 9.)

3G networks are a significant advance over earlier wireless telecommunication technologies.  (*See id.* ¶ 4.)  First generation ("1G") wireless networks carried only voice signals over an analog network.  Second generation ("2G") networks allowed digital transmission of voice signals, as well as text messages and emails.  "2.5G" networks improved somewhat upon the speed of 2G data transmission.  Third generation ("3G") networks, however, greatly increase transmission bandwidth and thus support more diverse applications for wireless communications devices, particularly "smartphones."  (*See id.* ¶¶ 4-5.)  Even AT&T's Andy Wilson, in his initial Declaration, explains that "[o]ne of *the critical differences* between a '3G' network and other wireless networks is the speed by which a customer can perform certain data functions."  (*See* Wilson Decl. ¶ 5 (emphasis added).)

Today's smartphones combine cellular telephone service, music, video, Internet, and other data functions in a single handheld device, such as Apple's iPhone3G or Verizon's newly-released Motorola Droid, and these data and Internet functions work far better on fast 3G networks than on older, slower networks, such as 2G or 2.5G. (*See* Saracino Decl. ¶¶ 4-5.) Purchasers of smartphones tend to be younger and savvy about technology. (*See id*. ¶ 8.) Having grown up in a world of Internet connectivity, smartphone users demand technology that gives them the optimum use of mobile data applications and the Internet. (*See id*. ¶¶ 5, 8.) Recognizing this fact, AT&T has stated in other litigation that "[t]he primary reason that wireless service providers have invested substantial resources to upgrade to 3G wireless networks *(and have emphasized that capability in advertisements to the public)* is that 3G wireless networks offer significantly increased data transmission speed." (*See* Plevan Decl. Ex. 4 (emphasis added).)

### B.    AT&T's Aggressive Promotion of its 3G Network

AT&T has aggressively promoted its 3G coverage separately and distinctly from its other voice/data coverage, such as its older 2.5G and 2G networks. (*See* Saracino Decl. ¶ 13.) More than a year ago, in an effort to capitalize on the rapidly increasing market for smartphone wireless services, AT&T began an advertising campaign asserting that it has the "Nation's Fastest 3G Network." (*See id*. ¶ 11.) In

July 2008, AT&T announced: "*For customers who want access to blazing-fast wireless broadband service*, there's one clear choice among all U.S. carriers. AT&T Inc....today announced it *offers the nation's fastest third-generation (3G) network*[.]" (*See id.* ¶ 11, Ex. 7) (emphasis added).)

AT&T also claimed to have the infrastructure to support the "Nation's Fastest 3G Network." (*See id.* ¶ 14.) For example, in May 2009, Ralph de la Vega, President and CEO, AT&T Mobility and Consumer Markets, announced that "*AT&T's network infrastructure gives us a tremendous advantage*. ...With the array of smartphones, laptops and emerging devices taking advantage of AT&T's 3G network today, we know that customers are excited to experience higher mobile broadband speeds, and we are deploying the right technologies at the right times to help them get the most from that experience." (*See id.* Ex. 10) (emphasis added).)

While AT&T now contends that its non-3G coverage allows consumers to perform all the tasks they can on 3G (Am. Compl. ¶ 85), AT&T has consistently touted the importance of 3G coverage. In its 2008 Annual Report, AT&T stated:

> **Fast connections in a wireless world** Today's consumers expect two things. They want to stay connected wherever they are. And they want to do that at broadband speeds. So *mobility and speed are the cornerstones of our consumer wireless business.*
>
> It starts with the best wireless coverage worldwide — available in more than 210 countries for voice and more than 160 for data. *It continues*

*with the nation's fastest 3G network — available in nearly 350 major metropolitan areas.*

AT&T 2008 Annual Report (emphasis added), *available at* http://www.att.com/gen/investor-relations?pid=13106.  AT&T also informs visitors to its website that its 3G network provides "accelerated data speeds, simultaneous voice and data capabilities, "an amazing wireless voice and data experience," "faster on-demand viewing of high quality video clips," "faster" Internet browsing "significantly lowe[red] . . . wait for page loads"; "faster" email and file downloads; and the ability to "[m]ulti-task while you are on a call — search for movies times, look up directions, or send messages."  *See* http://www.wireless.att.com/ learn/why/technology/3g-umts.jsp.

AT&T also emphasized the importance of 3G, as distinct from any other network, in an advertising challenge against Verizon at the National Advertising Division of the Council of Better Business Bureaus.  (*See* Saracino Decl. ¶ 6.)  In its submission, AT&T explained why 3G is so important:

> By increasing the speed of data transmission, *3G Networks offer increased bandwidth, which significantly improves customers' experience when downloading and uploading data* to and from their wireless devices.  Thus, the primary advantage of 3G Networks over earlier generations of wireless network technology is the enhanced data speed 3G Networks provide.  *This enhanced speed makes downloading data from the Internet like pictures, music, videos, and other multimedia on wireless devices* a *more satisfying consumer experience.*

(*See id.* Ex. 5) (emphasis added).)

AT&T has spent many millions of dollars advertising its 3G network capabilities. (*See id.* ¶ 12.) In addition, the newest Apple iPhone — available exclusively from AT&T — is named "iPhone 3GS," and AT&T features its claim to have the "Nation's Fastest 3G Network" in ads for the iPhone 3GS. (*See id.* ¶ 17.)

### C.    AT&T Fails To Provide 3G Coverage Maps

While AT&T has spent millions advertising its 3G services extensively and touts its flagship iPhone 3GS, AT&T does not readily provide consumers with national 3G coverage maps or comparable information showing the geographic scope of its 3G coverage, even when such a map is requested at an AT&T store. (*See* Saracino Decl. ¶¶ 16–19.) In iPhone brochures available at AT&T retail stores, AT&T heralds its network as the "Nation's Fastest 3G Network." (*See* Saracino Decl. ¶ 17, Ex. 12.) But in this very brochure, AT&T includes a nationwide "Coverage Area Map" that depicts its *entire* combined and overlapping data and voice network (2G, 2.5G, and 3G), without showing where 3G is available. (*See id* Ex. 12*.*) Instead, in small print under its "Coverage Area Map" the brochure states: "3G not available in all areas." (*See id.* Ex. 12.)

On its website, AT&T makes available to consumers maps of its total nationwide "voice" and "data" coverage. *See id.* ¶ 18; *see also* "AT&T Coverage

Viewer," *available at* http://www.wireless.att.com/coverageviewer.   When it suits

AT&T's purpose, these website coverage maps use "blank" space to denote where a

particular service is not available.   *See* AT&T Coverage Map for "Go Phone" or

"Mobile TV."   But if consumers want to learn about 3G coverage specifically,

AT&T directs them not to a nationwide 3G map, but to a list of metropolitan areas.

*See* Saracino Decl. ¶ 18; *see also* CNNMoney.com "The iPhone Wars:  AT&T v.

Verizon," Nov. 13, 2009 ("AT&T's 3G service, when it works, is zippy enough.

But EDGE (a 2.5G service) is considerably slower, and GPRS (2G) is slower still.

A more accurate AT&T map would distinguish among the three services.  You can

get that from AT&T here, but it takes some effort (and a Photoshop session) to get

one map that shows the entire lower 48 states.")  In short, Verizon's coverage map

ads may well have struck a nerve with 3G consumers, as well as AT&T, because

they represent the only readily-available source for consumers to see the limited

scope of AT&T's 3G coverage.

> **D.     Verizon's Advertisements Accurately Compare Verizon's and AT&T's 3G Network Coverage**

Through the investment of billions of dollars over several years, Verizon

actually did what AT&T wants the world to believe it did:  Verizon constructed a

truly nationwide network for 3G services.  For more than a year, Verizon's website

has included nationwide coverage maps accurately comparing the scope of its 3G

coverage to the scope of AT&T's 3G coverage.  (*See* Karnick Decl. ¶ 11.)  AT&T does not dispute that these maps are accurate.

### 1. Verizon's "There's A Map for That" Advertisements

In early October of this year, Verizon launched its "There's a Map for That" advertising campaign featuring the "College" and "Bench" advertisements comparing the geographic reach of Verizon's 3G coverage to AT&T's.  (*See* Saracino Decl. ¶ 20; Karnick Decl. ¶ 3.)  After AT&T complained that certain aspects of the ads were not true, Verizon released revised television commercials on October 7, deleting the phrase "out of touch"[3] from the "Bench" ad, and adding a "super" underneath the maps in both the "Bench" and "College" ads to clarify that they did not deal with non-3G voice or data coverage.  (*See* Karnick Decl. ¶¶ 6–7.)

The version of "College" that AT&T now claims is "false" shows a Verizon subscriber walking through a suburban college campus using his Verizon smartphone to watch streaming video and download games at 3G speed while a Red Verizon 3G Map is superimposed above him.  (*See* Saracino Decl. ¶ 28, Ex. 14.)  At the same time, a voiceover states:  "If you wanna know why your 3G coverage

---

[3]     Despite the fact that the phrase "out of touch" was dropped from the "Bench" ad (it was not used in the "College" ad) at AT&T's request, AT&T continues to suggest to the Court that the phrase is included in the "Bench" ad.  (*See* Pl. Supp. Br. 2, 8.)  In addition, AT&T incorrectly claims that Verizon "conceded" that the original ads were false.  (*See* Am. Compl. ¶ 16.) Verizon did not.

works so well on Verizon Wireless, there's a map for that. Or why you can watch videos at 3G speed, almost anywhere, there's a map for that." (*See id*.) The ad next shows an AT&T subscriber, apparently frustrated in his efforts to run an Internet-enabled application. (*See id*.) The Blue AT&T Map appears superimposed above him and the voiceover says: "And if you want to know why some people have spotty 3G coverage, there's a map for that too." (*See id*.) The ad then presents a side-by-side, apples-to-apples comparison of AT&T's 3G network and Verizon's 3G network. (*See id*. Ex. 14.) The ad further emphasizes the focus on 3G by displaying the legend: "5X More 3G Coverage." (*See id*.) A second Verizon map then appears with the words: "5X More 3G coverage." (*See id*.) A "super" then states: "Comparison based on square miles covered with 3G. Voice and data services available outside 3G coverage areas." (*See id*.) The "College" ad thus conveys that Verizon has 3G coverage throughout most of the country, while AT&T's coverage is much more limited.

The revised version of "Bench" is substantially similar. It, too, is set in a non-urban location and features a Verizon subscriber and an AT&T subscriber using their respective smartphones for Internet applications. (*See* Saracino Decl. ¶ 33, Ex. 15.) As the Verizon subscriber uses her smartphone, the red Verizon 3G coverage map appears above her, and a voiceover states: "If you wanna know why your 3G

coverage works so well on Verizon Wireless, there's a map for that. Or why you can make plans on the go at 3G speed, there's a map for that."[4] (*See id.*) In contrast, the AT&T subscriber is shown sitting alone on a bench looking down at her smartphone with an unhappy expression, while the Blue AT&T 3G Map floats above her. (*See id.*) The voiceover states: "And if you want to know why your friend's 3G coverage is so spotty, there's a map for that too." (*See id.*) Like the "College" ad, the "Bench" ad then shows the comparative 3G coverage maps and the Verizon 3G coverage map along with the "5X More 3G Coverage" legend, as well as the "super" stating "Comparison based on square miles covered with 3G. Voice and data services available outside 3G coverage areas." (*See id.* Ex. 15.)

### 2. Verizon's "Holiday" Ads

In early November, Verizon introduced three "Holiday" ads featuring the same geographic comparison of 3G services. (*See* Saracino Decl. ¶ 36.) The first ad, "Blue Christmas," features a business traveler in transit — arriving at a motel, waiting in a train station, and then riding in a taxi. (*See id.* ¶ 37, Ex. 16.) He is

---

[4]     At least four times, AT&T misquotes the "Bench" commercial as stating that, with Verizon, "you can make plans on the go," allegedly suggesting, AT&T claims, that, without Verizon, consumers cannot make plans on the go. (*See* Pl. Br. at 8; Compl. ¶ 42; Am. Compl. ¶ 51; Wilson Decl. ¶ 23.) Consistent with its unmistakable focus on 3G service, the ad actually states that, with Verizon, "you can make plans on the go *at 3G speed.*" (*See* Saracino Decl. ¶ 34 (emphasis added).)

16

holding his smartphone in front of him horizontally, shaking it, and otherwise appearing frustrated with the device's inability to browse Internet sites or download other data at 3G speed. (*See id.*) The fact that he is holding the phone horizontally shows that he is trying to view something on the screen. (*See id.*) Not once is he shown holding the device to his ear as if to make or receive a call. (*See id.*) In each scene, the blue AT&T 3G Map appears above his head. (*See id.*) When the business traveler arrives home, he hugs his son and sees a red gift box on the table, with the Red Verizon 3G Map above it. (*See id.*) The man smiles as the announcer says, "Want *3G browsing* in more places? There's a map for that." (*See id.* (emphasis added).) As the spot closes, the announcer says, "With 5 times more 3G coverage than AT&T, Verizon Wireless is your destination for great gifts." (*See id.*)

The second holiday television commercial, "Misfits," is set on the "Island of Misfit Toys" — a place for imperfect toys. (*See id.* ¶ 40, Ex. 17.) A smartphone appears on the island, surprising the toys and prompting one to ask "What are you doing here? You can download apps and browse the web!" (*See id.*) Another adds, "Yeah, people will love you!" (*See id.*) The Blue AT&T 3G Coverage Map then appears above the smartphone, causing the toys to realize that the device uses AT&T for its 3G service, and to reply "Ohhh…." (*See id.*) One toy adds "[y]ou're gonna fit right in here. Ha, ha, ha, ha…." (*See id.*) The smartphone bends forward while

its screen "fades in embarrassment" — as does the Blue AT&T 3G map. (*See id.*) The Red Verizon 3G Map and the Blue AT&T 3G Map then appear side-by-side, while the announcer says: "With five times more 3G coverage than AT&T, Verizon Wireless is your destination for great gifts." (*See id.*)

In the third Holiday ad, "Naughty/Nice," elves are working on the assembly line in Santa's factory, packing smartphones and netbooks into boxes on a conveyor belt. (*See id.* ¶ 43, Ex. 18.) The first several boxes are for recipients who are "nice." (*See id.*) For those recipients, the Red Verizon 3G Map appears above red gift boxes. (*See id.*) When a recipient is identified as "naughty," the Blue AT&T 3G Map appears above a blue gift box and an elf wisecracks "good luck browsing the web with that one."[5] (*See id.*) The announcer at the end of the commercial states: "With five times more 3G coverage than AT&T, Verizon Wireless is your destination for great gifts." (*See id.*)

Even though these ads do not refer to general voice or data coverage, AT&T complains that the coverage maps in each ad include blank space where AT&T lacks 3G service but has older types of coverage. (*See id.* ¶ 25.) But the same is true of

---

[5]     AT&T objects to this statement in particular. While Verizon does not agree that this line, in context, is false or misleading, the line does not refer to "3G" expressly. Accordingly, in the next several days, that line will be removed, and replaced with a specific reference to 3G. (*See id.* ¶ 44.)

the Verizon coverage map, which depicts only Verizon's 3G coverage.  (*See id.*

¶ 27.)  The maps thus convey the same information — the critical difference is that

the white spaces are far larger on the map of AT&T's coverage because AT&T has

far less 3G coverage.

### E.     Procedural Posture

On November 3, 2009, AT&T filed this action, raising one count under the

Lanham Act, 15 U.S.C. § 1125, and two counts under Georgia law.  The action

asserted that two of Verizon's television commercials — the "Bench" and the

"College" ads — were "misleading."  On November 11, 2009, AT&T filed a First

Amended Complaint, which raises the same three counts.  Although the "Bench"

and "College" ads had not changed between the filing of the original and amended

complaints, AT&T changed its theory of liability, arguing for the first time that

those ads are "false" as well as "misleading."[6]  The amended complaint also

challenged the three Holiday ads, alleging that they too are false.  Notwithstanding

this shift in legal labels, AT&T does not dispute that the core, explicit message of all

---

[6]     The First Amended Complaint's new claim is that the ad is false.  AT&T
assumedly delayed filing the original Complaint for four weeks because AT&T
knew it needed to conduct the survey of "Bench" if it hoped to show that it was
"misleading."  No survey is needed if an ad is literally false.

five ads is true:  the coverage maps accurately reflect the companies' 3G coverage, and Verizon's 3G network really is five times the size of AT&T's.

AT&T also asked the Court, both through a TRO and through preliminary and permanent injunctions, to prohibit Verizon from displaying any of the five television ads, or any other advertisement that includes "a map of AT&T's [3G] coverage in which AT&T's non-'3G' coverage areas are depicted by 'white' or 'blank' space, or otherwise claiming that AT&T customers cannot communicate or use their wireless devices in large areas of the country."  (*See* Am. Compl. ¶ 25.)  For the reasons explained in detail below, there is no basis for this emergency relief.

## ARGUMENT

### I.    A TRO IS AN EXTRAORDINARY AND DRASTIC REMEDY, ESPECIALLY WHEN SPEECH IS AT ISSUE

Recently, the Supreme Court has emphasized that preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008); *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 375–76 (2008); *see also Nken v. Holder*, 129 S. Ct. 1749, 1757–59 (2009) (twice characterizing injunctions as "extraordinary").  To obtain such relief, AT&T must make a "clear showing" that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.

*Winter*, 129 S. Ct. at 374; *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002); Pl. Br. at 10.

A court also must be particularly wary of barring the publication of truthful information. Indeed, the First Amendment generally prohibits prior restraints. Although commercial speech has been afforded somewhat lesser protection, the Supreme Court has emphasized that, even in the context of commercial speech, "[i]f the First Amendment means anything, it means that regulating speech must be a last — not first — resort." *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 373 (2002). A potential to mislead does not warrant suppression of an advertisement without close First Amendment scrutiny; to avoid rigorous review, the ad must actually be false or misleading. *See, e.g., Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994) (finding restriction on attorney's commercial speech improper where statement was only "potentially misleading").

At the TRO or preliminary injunction stage, where an ad has not been adjudicated to be false or misleading — and where the ad's express message is true — these First Amendment principles strongly counsel against enjoining an ad based only on a preliminary, uncertain allegation that an ad is false or misleading. *See, e.g., United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1182 (8th Cir. 1998) (explaining in the context of a particular type of advertising statement, "[t]o ensure

vigorous competition and to protect legitimate commercial speech, courts applying this standard should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion."); *cf. Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996) (stating that in pure speech context, "the prerequisites for emergency, temporary injunctive relief in the First Amendment realm differ dramatically and appropriately").

AT&T does not — and cannot — deny that all five of Verizon's ads convey an express message that is literally true. The coverage maps accurately reflect the 3G networks of each company and are prominently and accurately labeled as such. The map for Verizon shows only its 3G coverage, with blank spaces where it has no 3G coverage, just as the map for AT&T shows blank spaces where AT&T has no 3G coverage, even though both companies may have other, non-3G coverage in those areas. Indeed, AT&T includes on its website national coverage maps for various services that use "blank" space where that specific service does not exist. AT&T cannot be the arbiter of which services can be separately and directly compared and which should not. AT&T's belated resort to the allegation that the ads are "false" should not obscure the fact that their explicit, central message is true. Conclusory allegations, legal labels, and implausible inferences cannot support the sufficiency of a complaint even for purposes of a motion to dismiss under Fed. R.

Civ. P. 12(b)(6).  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–52 (2009).  It follows with even greater force that they cannot justify a TRO suppressing speech.

## II.  AT&T HAS FAILED TO PROVE THAT THIS EXTRAORDINARY RELIEF IS WARRANTED

### A.  AT&T Is Not Likely to Succeed on the Merits in Proving that Verizon's Ads Are False or Misleading

To be eligible for a TRO, AT&T must establish it has a "likelihood" of success on the merits.  *Munaf*, 128 S. Ct. at 2219.  This requires "more than a mere 'possibility' of relief."  *Nken*, 129 S. Ct. at 1761.  Along with irreparable harm, likelihood of success is the "most critical" factor.  *Id*. at 1761.  A court should "asses[s] the harm to the opposing party and weig[h] the public interest" only "[o]nce an applicant satisfies the[se] first two factors."  *Id*. at 1762.  AT&T falls well short of this demanding standard.

Not surprisingly in light of First Amendment principles, where an advertisement is not literally false, the Lanham Act requires concrete proof that the ad is misleading.  To prevail on its Lanham Act claim, AT&T bears the burden of proving:

> (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been — or is likely to be — injured as a result of the false advertising.

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224-25 (11th Cir. 2008) (*quoting Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1247).

To make such a showing, a Lanham Act plaintiff must offer "expert testimony or other evidence" showing consumer deception, typically through surveys. *Johnson & Johnson*, 299 F.3d at 1247; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004). The Court must consider the claim of consumer deception in view of the overall context and message of the advertisement, its intended audience, and common sense and logic. *See Johnson & Johnson*, 299 F.3d at 1248; *Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, No. 01-CIV 2775, 2001 WL 588846, at *9 (S.D.N.Y. June 1, 2001). This inquiry is detailed, involved, and heavily factual, with the Court closely examining the plaintiff's proffered testimony and the methodology underlying its conclusions, and weighing this evidence against any contrary expert testimony the defendant presents. *See Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008). At the TRO stage, however, the defendant has not yet had a meaningful opportunity to review thoroughly or to rebut the plaintiff's expert testimony and other support for its claim. It is thus peculiarly inappropriate to grant a TRO to suppress a truthful advertisement that one party asserts — largely without support — is misleading.

### 1. Verizon's Advertisements Are Literally True

As noted, AT&T does not contest that the coverage maps accurately reflect the 3G networks of each company and are prominently and accurately labeled as such. The map for Verizon shows only its 3G coverage, with blank space where it has no such coverage (but may well have coverage over its non-3G networks) (*see* Saracino Decl. ¶ 27), just as the map for AT&T shows blank spaces where AT&T has no 3G coverage. And AT&T admits that the central message that Verizon has "5 X More 3G Coverage" is true. (*See* Am. Compl. ¶ 88.) Nor can AT&T take issue with the fact that the literal message in the 3G coverage map campaign is highly material to smartphone users. AT&T has itself repeatedly underscored how important 3G coverage is to consumer satisfaction.

### 2. Verizon's Advertisements Are Not "False by Necessary Implication"

AT&T argues that Verizon's three Holiday ads are "false by necessary implication" pursuant to §43(a) of the Lanham Act. (*See* Pl. Supp. Br. 6-13.) AT&T resorts to this doctrine, which the Eleventh Circuit has not addressed, in an effort to circumvent the Lanham Act's requirement that AT&T present evidence of actual consumer deception. *See Johnson & Johnson*, 299 F.3d at 1247 (holding that unless an ad is literally false, a plaintiff must introduce evidence of consumer deception); *but see Bellsouth Telecomms. v. Hawk Comms., LLC*, No. 1:04-CV-280-

MHS, 2004 WL 1085324, at *12 (N.D. Ga. Apr. 12, 2004) (finding that "the defendant's unqualified advertisements necessarily implied" a false claim). But the "false by necessary implication" extension of the concept of literal falsity applies only if the words or images, considered in the context of the entire advertisement, *unavoidably and unambiguously imply only one plausible message and that message is false*. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (emphasis added). If an ad is susceptible to *any reasonable truthful interpretation*, the doctrine does not apply and the advertisement cannot be deemed literally false. *See*, *e.g.*, *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 275 (4th Cir. 2002) (holding that the literal falsity argument failed where the product packaging viewed as a whole could reasonably convey multiple messages); *Clorox Co.*, 140 F.3d at 1181 (finding side-by-side comparison ad not literally false because the message was "susceptible to differing, plausible interpretations"); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, No. 09 Civ. 3741, 2009 WL 2390245, *17 (S.D.N.Y. Aug. 4, 2009) (finding comparative ad was not literally false because it was open to two interpretations); *Coors Brewing Co. v. Anheuser-Bush Co.*, 802 F. Supp. 965, 969 (S.D.N.Y. 1992) (holding the term "concentrate" was "ambiguous at most" and therefore could not be found literally false).

AT&T cannot show that Verizon's ads are "false by necessary implication" because the ads are plausibly interpreted to have a truthful meaning. Indeed, the ads' truthful message is not merely plausible, it is crystal clear: Verizon offers five times more 3G coverage than AT&T, and therefore offers consumers a better option for 3G service. (*See* Saracino Decl. ¶ 21.)

The cases are consistent with theories of consumer psychology. According to Prof. Cohen, "[i]n the context of psychological research on inference making, for an inference to be 'necessary' implies being able to predict a very high uniformity of response because the words used could hardly mean something different. Such inferences have been described as 'facially evident' in that most people behaving in a reasonable fashion would make the same inference." (Supp. Cohen Decl. ¶ 6.)

AT&T's contention that the ads unambiguously convey that consumers cannot use wireless devices *at all* in most of the country is contrary to the ads' text, context, and common sense. Verizon's ads explicitly and repeatedly address 3G coverage. The differences between 3G and previous networks are important and widely recognized in technical media. (*See* Saracino Decl. Ex. 19.) AT&T's own promotion of its 3G service targets smartphone users who are primarily interested in 3G coverage. And there is no reason to believe that AT&T's customers, some of whom live in or travel to areas lacking 3G coverage, are unaware of AT&T's non-

3G service.  (*See id.* ¶ 26.)  Thus, it is implausible that Verizon ads that pointedly focus on 3G coverage mislead consumers into believing that AT&T offers no coverage of any kind where its 3G service is unavailable.  *See Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000) (stating that under the Lanham Act, when the main message is truthful, "'[m]isleading' is not a synonym for 'misunderstood'").  The Holiday ads themselves demonstrate this.

### (a)  "Blue Christmas"

In the first holiday television commercial to which AT&T objects ("Blue Christmas"), a frustrated-looking business traveler attempts to use his AT&T smartphone to perform data functions while on the road (a fact that is manifest from where and how he is holding the phone), with AT&T's Blue 3G map appearing above his head and Elvis Presley singing "Blue Christmas" in the background.  (*See* Saracino Decl. ¶ 37, Ex. 16; *see also* Supp. Cohen Decl. ¶ 15 (observing that the business traveler might be displeased by slower than expected service, as opposed to a complete lack of service).)  He arrives home and notices a red gift box with a Red Verizon 3G Map hovering above it as the announcer says, "Want 3G browsing in more places? There's a map for that."  (*See* Saracino Decl. ¶ 37.)  The ad then includes the side-by-side comparison of AT&T's and Verizon's 3G coverage.  (*See id.* Ex. 16.)  Verizon's message:  a business traveler's smartphone will be able to

perform data functions at 3G speeds in more geographic locations with Verizon's extensive 3G coverage. (*See id.* ¶ 45.) That message is true.

### (b) "Misfits"

In "Misfits," a smartphone joins the original group of "misfit toys," who express surprise and inquire why it is there. (*See* Saracino Decl. ¶ 40, Ex. 17.) When the Blue AT&T 3G Map appears above the smartphone, the misfit toys realize that the smartphone is on the island because of where AT&T provides its 3G service. (*See id.*) The voiceover then announces: "With five times more 3G coverage than AT&T, Verizon Wireless is your destination for great gifts." (*See id.*) Again, Verizon's message in this advertisement is equally clear and truthful: the smartphone's imperfection is that it uses AT&T for its 3G service, which is not nearly as extensive as the 3G coverage offered by Verizon. (*See id*. ¶ 45.) Prof. Cohen agrees with this analysis. (Supp. Cohen Decl. ¶¶ 9, 13.)

### (c) "Naughty/Nice"

In the final TV holiday spot ("Naughty/Nice"), Santa's elves are working in Santa's factory, packing smartphones into gift boxes on a conveyer belt. (*See* Saracino Decl. ¶ 43, Ex. 18.) "Nice" children receive smartphones that will have Verizon's 3G coverage, which is shown by the Red Verizon 3G Map above the red gift boxes. (*See id.*) The "Naughty" child receives a smartphone with AT&T's 3G

coverage, and the Blue AT&T 3G Map appears above the blue gift box.  (*See id.*)[7]

The announcer states:  "With five times more 3G coverage than AT&T, Verizon

Wireless is your destination for great gifts. . . ."  (*See id.*) Verizon's message:

"Nice" children receive smartphones with Verizon's 3G coverage, which covers five

times more U.S. areas than AT&T's 3G coverage.  (*See id.*)  As with the other ads,

the message is clear: Verizon's more extensive 3G coverage is more desirable.  (*See*

*id.* ¶ 45.)

The core message in each of these ads is not changed by the fact that

Verizon's ads are humorous.  (*See* Supp. Cohen Decl. ¶ 10 ("Much of modern

advertising uses narrative devices of this type to attract attention, create humor, and

make advertising more memorable."))  Indeed, under the Lanham Act (and the First

Amendment), advertisers are given "considerable leeway to craft their statements."

5 J. THOMAS MCCARTHY, TRADEMARKS & UNFAIR COMPETITION § 27:38 (4th ed.

2009) (*quoting American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387,

391 (8th Cir. 2004)); *see also Clorox Co.*, 140 F.3d at 1178, 1181 (holding an

advertisement for insecticides showing "animated roaches happily danc[ing] about"

when treated with the competitor's product did not convey a literally false message,

---

[7]    As noted in the Statement of Facts, Section D.2, Verizon is changing
language in the "Naughty/Nice" ad to which AT&T specifically objects.  Prof.
Cohen therefore did not evaluate this ad.  (Supp. Cohen Decl. ¶ 18.)

but instead conveyed the truthful message that defendant's product killed cockroaches in 24 hours); *Am. Express Travel Related Servs. Co. v. Mastercard Int'l Inc.*, 776 F. Supp. 787, 791-92 (S.D.N.Y. 1991) (holding humorous and exaggerated presentation did not render false the defendant's truthful claim that MasterCard holders could more easily find locations to obtain cash).

Verizon's advertisements convey a clear and truthful message about the difference between Verizon's 3G coverage and AT&T's 3G coverage. It is unreasonable for AT&T to suggest that consumers will "necessarily" interpret them to convey the message that AT&T offers no coverage at all where it lacks 3G coverage. Accordingly, AT&T is not entitled to a TRO absent proof that Verizon's ads mislead consumers.

### 3. <u>Verizon's Advertisements Are Not Misleading</u>

Because Verizon's ads are neither literally false nor false by necessary implication, AT&T must present persuasive evidence of consumer deception to demonstrate that the ads are "misleading." *See Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004); *see also Energy Four v. Dornier Med. Sys., Inc.*, 765 F. Supp. 724, 732 (N.D. Ga. 1991) (declaring that when an advertisement is "literally true," plaintiff must show that relevant customers are deceived). The Court must consider AT&T's claim of consumer deception in view

31

of the overall context and message of the advertisement, its intended audience, and common sense and logic. *See Johnson & Johnson*, 299 F.3d at 1248; *Smithkline Beecham Consumer Healthcare, L.P.*, 2001 WL 588846, at *9. The mere fact that some customers may misunderstand the advertisement does not make it misleading. *See Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000) ("Section 43(a)(1) forbids misleading as well as false claims, but interpreting 'misleading' to include factual propositions that are susceptible to misunderstanding would make consumers as a whole worse off by suppressing truthful statements that will help many of them find superior products."); *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 710-11 (M.D. Pa. 2006) (*quoting Mead Johnson & Co.*)

AT&T cannot meet this exacting burden, and has not even attempted to do so in a way that justifies the TRO it seeks. AT&T's only "evidence" that consumers were deceived by Verizon's truthful comparative 3G coverage maps is an unsworn report of a survey by Robert Reitter of ORC Guideline that purports to establish that *one* of the *five* television commercials in the Verizon campaign ("Bench") conveys an *implied* message (that AT&T has no service in the "blank" areas of the AT&T coverage map) that is not true. As to the other four television ads and the related print, direct mail, and Internet ads that AT&T seeks to suppress on an emergency

basis, AT&T has not even attempted to present evidence of consumer deception. It is well established that a consumer survey of one ad cannot support a claim that another ad is "misleading." *See Am. Express Travel Related Servs. Co.,* 776 F. Supp. at 790; *Am. Home Prods. Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739, 762 (D.N.J. 1994); *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 296 (D. Del. 2006).

Even as to the one ad addressed by the survey ("Bench"), AT&T's evidence is so defective that it amounts to no evidence at all. This Court explained that a consumer survey is instructive and probative only if:

> (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured.

*Smith v. Wal-Mart*, 537 F. Supp. 2d at 1322. "Failure to satisfy any of the listed criteria may seriously compromise the survey's impact on a court's likelihood of confusion evaluation." *Id.* The Guideline survey flunks most, if not all, of them.

Prof. Cohen[8] has reviewed the Guideline survey and concludes that it "is a fatally flawed survey in virtually every respect from respondent selection criteria to control condition design and execution, and particularly the design of the questionnaire." (*See* Cohen Decl. ¶ 38.) The survey is unpersuasive because it is based on a survey of the wrong consumers, it asks them leading questions, and their answers were improperly gathered and analyzed.

### (a) Wrong Universe

The Guideline survey flunks the first element of the *Smith v. Wal-Mart* list because it studies the wrong universe of wireless consumers. A valid survey universe "should include a fair sampling of those purchasers *most likely to partake of the alleged infringer's goods or services*." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (emphasis added).

While the Verizon "Bench" commercial addressed 3G coverage specifically (*see* Cohen Decl. ¶¶ 11–14), and thus targeted smartphone users and others who are interested in 3G coverage, the Guideline survey did not restrict "the universe of

---

[8] Professor Cohen has more than 40 years' experience in marketing and consumer issues. He has served as Chairman of the University of Florida's Marketing Department, and was the founder of the University's Center for Consumer Research. He has served as a consultant and expert witness for the Federal Trade Commission and has conducted consumer research for the National Cancer Institute. (*See* Cohen Decl. ¶¶ 2–6.)

people being studied...to those who have ever heard of a 3G network or know what it is." (*Id.* ¶ 15.) Instead, Guideline improperly included people who use only ordinary cellphones, and even included people who do not use cellphones but who "might" be interested in doing so.[9] (*See id.*) Prof. Cohen explains, "surveys must correctly and adequately represent the universe of consumers for whom they are to be drawn, and this survey fails that key test." (*Id.*)

The use of the wrong universe here is particularly disturbing because AT&T is well aware that smartphone users and others knowledgeable of 3G networks constitute a different population from ordinary cellphone users. Earlier this year, AT&T commissioned a consumer survey with *two separate groups of respondents* — one with "wireless phones with 3G capability [who] have used in the past 30 days their 3G networks," and a second "voice only comparison group [who] have wireless phones but they do not use their wireless phones" for data or Internet

---

[9] Guideline also failed to eliminate improper respondents by means of screening or filter questions. Thus, the Guideline survey included consumers who could not identify either Verizon or AT&T — *even after watching the advertisement twice*. Respondents who could not identify the carriers are unreliable and should have been excluded. (*See* Cohen Decl. ¶ 30.) *See Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp.2d 1181, 1193 (C.D. Cal. 2007) (excluding Reitter survey in Lanham Act case for, *inter alia*, failure to properly screen subjects and failure to account for order bias).

purposes.  (*See* Plevan Decl. Ex. 3.)  In other words, AT&T knew better than to compare apples to oranges, as its expert did here.

### (b)    Improper Questions

The Guideline survey also flunks the *Smith v. Wal-Mart* requirement that the questions be appropriately framed.  Prof. Cohen explains that the questions suffer from numerous design deficiencies, which he describes in detail.  (*See* Cohen Decl. ¶¶ 16–33.)  But the "most egregious" of these defects is the survey's "failure [] to directly address AT&T's legal challenge to this commercial":  3G coverage.  (*See id.* ¶ 16.)  "Not a single question ever contained the words '3G.'" (*Id.*)  And, in fact, "[t]he survey does almost everything possible to avoid the 3G topic." (*Id.*)  As a result, "respondents had a right to assume that the people designing the study had no specific interest in any of their opinions about 3G service" and there was "no reason for respondents to refer to 3G service on their own." (*Id.*)  Because the survey questions are so poorly written, it is impossible to know whether responses about geographic coverage refer to 3G service, ordinary cell phone service, or something else entirely.  (*See id.* ¶¶ 24-25.)[10]

---

[10]    Prof. Cohen explains, moreover, that responses to "the one question that sheds any light at all on the matter before the Court provides no evidence for deception," and actually "suggests that the vast majority of study participants [76%] formed the

*(cont'd)*

## (c) Failure to Gather and Report Data Accurately

The Guideline survey was designed to have a control group of consumers who were shown an ad that was basically identical to "Bench," except with the AT&T coverage map removed. As Prof. Cohen explains, this design was improper in the first place, undermining the reliability of the survey's results. (*See id.* ¶ 32-33.) Compounding this error, Prof. Cohen also found that many of the respondents in the control cell expressly referred to the AT&T coverage map, that is, the map the "control" group was *not* supposed to see. (*See id.* ¶ 34.) In addition to being improperly designed, therefore, the survey was apparently improperly conducted.

Each of these flaws would be sufficient to reject the survey's findings. Cumulatively, the impact is overwhelming. As Prof. Cohen concludes, "[w]hile there are typically some weaknesses or flaws in any study, occasionally a study is so fatally flawed that it serves no useful function. That is the case here." (*See id.* ¶ 10.) Indeed, several other courts have found surveys conducted by Mr. Reitter to be seriously flawed. For example, in *Citizens Financial Group, Inc. v. Citizens National Bank of Evans City*, 2003 WL 24010950, at *3–5 (W.D. Pa. Apr. 23, 2003), *vacated in part and remanded on other grounds*, 383 F.3d 110 (3d Cir.

_____
*(cont'd from previous page)*
accurate belief that the 'commercial communicated that AT&T does not have coverage of a particular type in certain areas of the country.'" (*See id.* ¶ 26.)

2004), a federal court in a Lanham Act case rejected a study conducted by Mr. Reitter because it surveyed the wrong population. And in *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181 (C.D. Cal. 2007), a California court deemed a report by Mr. Reitter to have only "limited evidentiary value" because of "several flaws in its methodology." *Id.* at 1193.[11]

### B. AT&T Has Failed to Show an Emergency Risk of Irreparable Harm

To prevail in this motion, AT&T also must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 129 S. Ct. at 375. A mere "possibility" of irreparable injury is insufficient. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Assoc. Mats. Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). The primary "harm" the advertisements allegedly cause here is economic, and it is well-settled that "economic losses alone do not justify a preliminary injunction." *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005).[12]

---

[11] In addition, the court in *Malletier v. Dooney & Bourke, Inc.*, excluded from evidence a study conducted by Mr. Reitter because, "[t]aken cumulatively, the methodological flaws...and the fundamentally flawed reasoning" of the study meant that it "cas[t] no light" on the critical issue and "pose[d] a real threat of unfair prejudice and of misleading the jury." 525 F. Supp. 2d 558, 575 (S.D.N.Y. 2007).

[12] AT&T asserts that it is also losing "customers and goodwill," but unlike in *Bellsouth*, where the record showed that the movant "was losing about 3200

*(cont'd)*

AT&T argues that a "court may presume that any false or misleading statements" made by a competitor "will injure the other." (*See* Pl. Br. at 21 (*quoting Energy Four*, 765 F. Supp. at 734)). But the Supreme Court's recent decision in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), establishes that this is no longer good law. In *eBay*, the Supreme Court rejected the position that presumptions could be used in determining whether to grant or deny injunctions in patent actions. *Id*. at 393–94. Rather, the Supreme Court held that courts must apply each factor of the traditional four-factor test to the particular circumstances of the case at hand. *See id*. at 391. In *North American Medical Corp.*, the Eleventh Circuit held that *eBay* "is applicable" in the Lanham Act context, although it "decline[d] to express any further opinion with respect to [its] effect." 522 F.3d at 1228. Following *eBay*, however, this Court should decline AT&T's invitation for it to depart from traditional equitable principles and presume irreparable harm.

Any harm to AT&T is the natural and appropriate response of the marketplace to the truthful information in Verizon's advertisements. For almost a year, Verizon's website has displayed maps comparing Verizon's and AT&T's 3G coverage, and since September those maps have been comparable to the maps in the

_____
(cont'd from previous page)
customers per week," *id*., AT&T cites no evidence that Verizon's advertisements are causing the loss of customers or goodwill.

39

challenged ads.  (*See* Karnick Decl. ¶ 11.)  AT&T took no action with regard to those maps.  For the very ads it now attacks, AT&T requested almost six weeks ago that Verizon either pull the ads at issue or modify them.  (*See* Compl. ¶ 7; Karnick Decl. ¶ 5.)  After Verizon modified its ads in an effort to address AT&T's objections (*see* Karnick Decl. ¶¶ 6–7), AT&T made no further complaints and sought no further modifications before filing its lawsuit a month later.  (*See id.* ¶¶ 9–10.)

AT&T made a strategic choice to let the advertisements run while it conducted its consumer survey and drafted its legal documents, hoping to gain a hearing on one day's notice.  It is inequitable for AT&T now to argue that the ads are so immediately harmful that it justifies the drastic remedy of an injunction before Verizon has an opportunity for expedited discovery and before the Court has the benefit of a full evidentiary hearing.  Compounding this inequity, while on one hand AT&T demands this Court take down Verizon's truthful comparative advertisements about its 3G coverage, on the other hand AT&T intends to continue airing its own proclaiming that AT&T has the "Nation's Fastest 3G Network."  This relief is not equitable; it is unfair.

## C.     The Relief AT&T Demands Would Cause Substantial Harm to Verizon

If this Court were to grant AT&T's motion, it would cause harm to Verizon far outweighing any harm avoided by AT&T.  First, to the extent Verizon's truthful

advertisements are effective and thus give Verizon an economic benefit to AT&T's detriment, an order forcing Verizon to alter or stop its advertisements would cause Verizon the same economic harm about which AT&T complains. Second, AT&T seeks broad relief requiring Verizon either (1) to remove the AT&T 3G coverage map from its advertising; or (2) to alter the AT&T 3G coverage map in a way that would show non-3G coverage. This relief would gut Verizon's comparative 3G campaign. Verizon has already invested many millions of dollars and anticipates investing a magnitude more in its ad campaign, covering radio, television, Internet and print media. (*See* Saracino Decl. ¶ 50.) If forced to stop or alter its ads, Verizon would lose the benefit of a significant portion of its investment at the beginning of the critical holiday season. (*See id*. ¶ 51.) The current 3G coverage maps are also the best — and perhaps in a 30-second commercial, the only — way to communicate to consumers the fact that Verizon's 3G coverage is so much more extensive than AT&T's. (*See id.* ¶ 32.)

Third, an order mandating that Verizon alter its advertisements also would irreparably infringe upon Verizon's First Amendment rights to truthfully advertise its products and services. "[I]t is well established that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir.

2006) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.))  That harm is real and tangible here, where the inability to run these advertisements could do crippling damage to Verizon during the holiday season.  (*See* Saracino Decl. ¶ 51.) Absent compelling evidence establishing that Verizon's advertisements are misleading and therefore unprotected by the First Amendment — evidence that the Guideline survey surely does not provide — an injunction here would come at a cost both to Verizon's own economic well-being and to its constitutional rights.

### D.  The Public Interest in the Free Exchange of Truthful Information Weighs Heavily Against the Relief AT&T Seeks

It would also "disserve the public interest" for this Court to enjoin Verizon's speech.  *North Am. Med.*, 522 F.3d at 1217.  "[A] particular consumer's interest in the free flow of commercial information . . . may be as keen, if not keener by far, than his interest in the day's most urgent political debate."  *Western States*, 535 U.S. at 366–67 (*quoting Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976)).  The specific public interest in comparative advertising is also "well-recognized."  *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1176 n.13 (5th Cir. 1980).  "Comparative advertising, when truthful and non-deceptive, is a source of important information to consumers and assists them in making rational purchase decisions.  Comparative advertising encourages product improvement and innovation, and can lead to lower prices in the

marketplace." 16 C.F.R. § 14.15(c). Enjoining Verizon's truthful ads would disserve the public by depriving consumers interested in 3G service of the ability to make an informed choice about their wireless provider based on comparative advantages.

AT&T suggests that Verizon's ads somehow raise a matter of public safety because coverage maps "indicate to consumers those areas in which they will, or will not, be able to make emergency 911 calls from wireless phones[.]" (*See* Pl. Br. at 24–25.) This is nonsense. No advertisement for cellphone service would cause a person in distress to not make a 911 call. Unsurprisingly, AT&T has offered no competent support for such speculation. Even assuming this is the message intended by the Poarch affidavit (who has no basis offering such an opinion), coverage maps are "irrelevant to 911-calling ability" because (as long as the technology is compatible) "all wireless carriers are required to route 911 calls to the destination, regardless of whether the caller is a subscriber of that carrier's service." (*See* Declaration of Susan Sherwood ¶ 6.)

In sum, the equitable factors weigh heavily against entry of a TRO here. AT&T has not made a "clear showing" that it is likely to succeed on the merits and any alleged damage to it is purely speculative. Verizon, by contrast, faces a real prospect of irreparable harm to a multi-million dollar advertising campaign at the

most important time of the year.  If a TRO issues but Verizon ultimately prevails, Verizon will have suffered the ultimate irreparable injury — loss of its First Amendment right to speak — and the public interest in the free flow of commercial information will have been similarly harmed.  Considering the manifest weakness of AT&T's position on the merits, the Court should deny the TRO.

## III.    AT&T MUST POST APPROPRIATE SECURITY

Federal Rule of Civil Procedure 65(c) requires a movant to "giv[e] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  As set forth above, Verizon has invested millions of dollars in the advertising campaign that AT&T demands this Court halt, and anticipates spending additional millions.  Were this Court to grant AT&T's TRO motion — which Verizon contends would constitute an abuse of its discretion — Verizon would respectfully request that security be set at $50 million to protect against damage to Verizon's business.

## CONCLUSION

AT&T asks this Court to do the extraordinary:  enter a preliminary order forbidding the publication of Verizon's truthful speech, and to do so without a full hearing.  The First Amendment, the Lanham Act, and traditional principles of equity all indicate that AT&T has not carried its heavy burden of showing that it is entitled

to this relief.  This motion is a blatant effort to ask the Court to do what the marketplace will not do:  shield AT&T from truthful comparative advertisements that Verizon has a right to air and that consumers have a right to see.

For the reasons set forth above, the Court should deny AT&T's motion and its request for a preliminary injunction.

Respectfully submitted,

/s/  L. Joseph Loveland

| | |
|---|---|
| Kenneth A. Plevan | L. Joseph Loveland |
|   (admitted pro hac vice) |   (Ga. Bar No. 459350) |
| Lauren E. Aguiar | Jill Wasserman |
|   (admitted pro hac vice) |   (Ga. Bar No. 739662) |
| SKADDEN, ARPS, SLATE, | C. Suzanne Johnson |
| MEAGHER & FLOM LLP |   (Ga. Bar No. 321398) |
| Four Times Square | KING & SPALDING LLP |
| New York , NY 10036 | 1180 Peachtree Street, N.E. |
| Telephone:  (212) 735-3000 | Atlanta, GA 30309 |
| Facsimile:  (212) 735-2000 | Telephone:  (404) 572-4600 |
| Email: | Facsimile:  (404) 572-5100 |
| kenneth.plevan@skadden.com | Email:  jloveland@kslaw.com |
| Email:  lauren.aguiar@skadden.com | Email:  jwasserman@kslaw.com |
| | Email:  suzanne_johnson@kslaw.com |

*Attorneys for Defendant Cellco Partnership d/b/a Verizon Wireless*

November 16, 2009

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia, that the foregoing complies with the font and point selections approved by the Court in L.R. 5.1B. The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

/s/ L. Joseph Loveland
L. Joseph Loveland

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2009, I electronically filed the foregoing Defendant's Memorandum of Law in Opposition to Motion for Temporary Restraining Order with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record for the Plaintiff:

> David L. Balser
> Nathan L. Garroway
> Tracy Klingler
> McKenna Long & Aldridge LLP
> 303 Peachtree Street, Suite 5300
> Atlanta, Georgia 30308
> Telephone:  (404) 527-400
> Facsimile:  (404) 527-4198
> Email:  dbalser@mckennalong.com
> Email:  ngarroway@mckennalong.com
> Email:  tklingler@mckennalong.com
>
> /s/ L. Joseph Loveland
> L. Joseph Loveland