# EXHIBIT 1

# DECLARATION OF JOEL B. COHEN

JOEL COHEN states as follows:

1.  My name is Joel Cohen.  I am over eighteen years of age and am competent to testify as to the statements made in this declaration.  Unless indicated otherwise, I have personal knowledge of the facts stated below, and if sworn as a witness I would testify to those facts.

2.  I hold a PhD in Business Administration (with a concentration in marketing and a supporting field in social psychology) from UCLA.  I currently serve as Distinguished Service Professor Emeritus at the University of Florida, a position I have held since 2008. My most recent previous positions have been: Visiting Professor at Columbia University, Distinguished Service Professor of Marketing and Adjunct Professor of Anthropology and Director of the Center for Consumer Research at the University of Florida. I served as Chairman of the Marketing Department at the University of Florida from 1974-1983. Immediately prior to that I was Vice President and Director of the Social and Behavioral Science Division of National Analysts (later a division of Booz, Allen & Hamilton), a leading survey research organization. Earlier, I was a member of the faculty at the University of Illinois.

3.  I am a past president of the Association for Consumer Research and a member of the American Psychological Association.   I have been a member of the editorial boards of the <u>Journal of Consumer Research</u>, the <u>Journal of Public Policy and Marketing</u>, and the <u>Journal of Marketing,</u> as well as a frequent reviewer for a number of marketing, psychology and social science journals.   I served as Editor of the <u>Journal of Public</u>

<u>Policy and Marketing,</u> the American Marketing Association's primary outlet for research on how marketing practices and regulatory policies affect consumers, from 2001-2006.  I recently received a lifetime achievement award for distinguished service to the <u>Journal of Consumer Research</u>, the leading scholarly journal in the field, and I continue to serve on its editorial board.

4.  I have chaired or co-chaired 16 doctoral dissertations of students who have been members of the faculty at leading universities including Columbia, the University of Pennsylvania, the University of California, UCLA, Ohio State, McGill, Rochester, Penn State, Georgia and Florida.   In 1981 I received the Exxon Award from the American Assembly of Collegiate Schools of Business, "For Educational Innovation in Graduate Education for Business Administration and Management."

5.  My publications include a number of invited chapters including those in the <u>Annual Review of Psychology,</u> <u>The Handbook of Consumer Behavior,</u> <u>Affect and Social Behavior,</u> <u>The Handbook of Consumer Psychology,</u> <u>Do Emotions Help Or Hurt Decision Making,</u> and <u>Social Marketing: Theoretical and Practical Perspectives</u>.   Among my most highly cited research contributions are articles on psychological processes leading to attitude formation that explain how and when attitudes affect behavior, the role of affect on judgment and decision making, and the role of interpersonal influences.  These papers appear in a number of journals including the <u>Journal of Consumer Research,</u> <u>Journal of Marketing Research,</u> <u>Journal of Experimental Social Psychology,</u> <u>Journal of Applied Psychology, Personality and Social Psychology Bulletin,</u> as well as a number of edited volumes.   I recently received the <u>Journal of Consumer Research</u> 2009 best paper award for my article on attitude formation and the relationship between attitudes and behavior.

6.    I have had active involvement in several public policy arenas including consumer protection and deceptive and misleading advertising, as well as consumer confusion resulting from source misidentification. I am familiar with both FTC and Lanham Act evidentiary requirements.   I served as a consultant and expert witness for the Federal Trade Commission starting in 1972, participating in more than twelve regulatory actions, and I have been recognized as an expert in survey research by the FTC.   I have been an invited witness before committees in both houses of Congress to explain how different types of cigarette advertising can affect beliefs, attitudes and behavior.  Among other projects, I was selected by the National Cancer Institute to design and carry out a national survey to help establish consumers' understanding of cigarette health risks and to present these findings to the President's Cancer Panel.  I provided similar survey research expertise to the Canadian Department of Justice and the National Association of Attorneys General.  Over the course of five decades I have reviewed many hundreds of consumer research studies, with a particular focus on advertising and communications and the formation and change of consumers' beliefs and attitudes.

7.    My curriculum vitae is attached hereto as Exhibit A.

8.    On November 3, 2009, I was contacted by counsel for Verizon Wireless and asked to review certain documents and information in connection with the above captioned case, particularly the ORC Guideline survey and the report submitted by Robert N. Reitter.

9.    There are major methodological problems in the ORC Guideline survey such that it does not constitute suitable evidence to support the claims made by AT&T concerning the misleading nature of the Verizon Wireless commercial that was studied in this survey.

Moreover, since the study only examines one commercial entitled, "Map for that Versa-Rev" it would be inappropriate to generalize beyond the data provided for this single commercial to other commercial executions, even if some similar elements are present. It is well established that people's responses to questions about any aspect of a commercial (such as an exhibit presented in the middle of a commercial) must be captured in the context of the entire commercial. Exposing people to only isolated aspects of a commercial is likely to alter the meaning of the commercial. Psychologists have provided a wealth of evidence that context (such as any story-like features of a commercial) "frame" the central message and can greatly impact people's responses to that message. Part of the context in the present commercial, for example, is the specific portrayal of a Verizon Wireless and an AT&T customer, each of whom are attempting to utilize 3G service on their cellphones. There is no way to know how that (or other contextual features used in a different commercial execution) affect viewers' interpretations of anything they may subsequently be exposed to in a commercial, without studying each commercial in its entirety.

10. While there are typically some weaknesses or flaws in any study, occasionally a study is so fatally flawed that it serves no useful function. That is the case here, and so I will begin by focusing on what I consider these to be.

11. To begin, it is necessary to have a clear picture of the commercial that the study examines. There can be no doubt that Verizon Wireless made it abundantly clear to anyone who saw the commercial that the claims made referred only to so called "3G" cellphone coverage, and not to other types of cellphone coverage. Exhibit B contains the storyboard for this commercial.

12.  The commercial begins by saying," If you wanna know why your 3G coverage works so great on Verizon Wireless, there's a map for that." It then says, "Or why you can make plans on the go at 3G speed. There's a map for that. And if you want to know why your friend's 3G coverage is so spotty, there's a map for that, too." A specific 3G comparison is then drawn between AT&T's 3G coverage and Verizon Wireless's 3G coverage by showing maps in which Verizon Wireless's 3G coverage is compared to AT&T's 3G coverage (with 3G coverage clearly identified using the words, "5X More 3G Coverage"). The commercial says, "Yep. With 5X more 3G coverage than AT&T, there's lots of reasons to switch to Verizon Wireless." A second, and larger map of Verizon Wireless's 3G coverage appears while people hear the above, and that map also uses the words, "5X More 3G coverage." For good measure, a super (shown during exposure to the maps) says, "Comparison based on square miles covered with 3G. Voice & data services available outside 3G coverage areas." The commercial concludes, "Now get new 3G touch-screen phones from LG starting at $29.99" (along with supers explaining the pricing of these phones).

13. If we leave aside the supers and concluding information about the prices of phones (that make added reference to 3G), I count 4 separate audio mentions of 3G and two visuals (maps) that use the words, "5X More 3G Coverage." So this commercial informs viewers that it is providing comparative 3G information 6 separate times. Instead we have the AT&T claim, as repeated by Mr. Reitter on page 1 of his report, that "…consumers who look at these maps will mistakenly believe that the white areas on the map represent areas where AT&T has no coverage at all (as opposed to areas to which

AT&T's 3G network does not extend) and will take away the false message that AT&T wireless subscribers have no service across the majority of the area of the country."

14. Frankly, as a long time student of marketing and advertising communications (please see my resume for details), this claim strikes me as absurd. It's not as if the commercial was vague or subtle or confusing: it's a commercial about 3G service. The maps in question are clearly labeled to specify 3G coverage, and so it would be abundantly clear to consumers who are interested in 3G service that blank or white spaces on a map indicate an absence of 3G service. To my knowledge, AT&T does not contest the truthfulness of the map depictions, so there is no allegation of explicit falsity in the Verizon Wireless commercial. To better appreciate how any survey could possibly find the slightest support for a claim that the commercial is misleading despite its clear and accurate depiction of the facts, we have to look at how the survey was run.

15. First---and a fatal flaw---the universe of people being studied is not restricted to those who have ever heard of a 3G network or know what it is. In fact, as pointed out on page 12 of the report, respondents didn't even need to have cell phones to be included in the study (as long as they said they planned to get one in the next 6 months). Since 3G networks are primarily of interest for people who desire increased bandwidth for uploading and downloading data and video faster, it would have seemed appropriate to screen for that (e.g., demonstrated interest or even use) and to exclude people with little knowledge or interest in this enhanced type of service.  They do not comprise the market for 3G cellphones, and this commercial is not intended for them. As respondent # 11305 put it, "The commercial got me confused because I don't know what a 3G network is." (The verbatim responses provided in the report contain many spelling and grammatical

errors, and it is sometimes difficult to line up responses with participant identification numbers. So when I report these I am doing the best I can to represent them accurately.) It is well established that surveys must correctly and adequately represent the universe of consumers for whom conclusions are to be drawn, and this survey fails that key test.

16. Perhaps the most egregious error, and a fatal flaw, is the failure of the questionnaire to directly address AT&T's legal challenge to this commercial. I will have more to say about the questions that were used, but the more important issue is the questions that were not asked. Not a single question ever contained the words "3G." People were never asked anything about whether the commercial mentioned 3G service or what it said about 3G service. I find it highly unusual that there were no probe type questions designed to see if respondents' answers to any questions were based on cellphone service more generally or specifically on only 3G service. The survey does almost everything possible to avoid the 3G topic. For that reason, respondents had a right to assume that the people designing the study had no specific interest in any of their opinions about 3G service. There was, therefore, no reason for respondents to refer to 3G service on their own. This fundamental flaw in questionnaire construction reflects a key principle in questionnaire design, and so it probably deserves further explanation.

17. As discussed in their classic 1996 book, *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology*, Seymour Sudman, Norman Bradburn and Norbert Schwarz explain how respondents infer the intended meaning and purpose of a question or set of questions. Because of the importance of interpersonal communication to daily life, practically everyone learns some basic communication norms and applies them almost automatically, including in the two-party communication

setting of the survey interview. So, when asked a question, a respondent will try to understand what type of answer is both relevant and sought by (i.e., useful to) the other party. While traveling in Europe, for example, a US citizen might be asked by a shopkeeper, "Where are you from?" Inferring that your hometown (e.g., Allentown, Pennsylvania) is not likely to be relevant to the inquiry by the shopkeeper but that America or United States is, the "respondent" (in that context) provides one of the latter answers. We would not conclude from this that the "respondent" did not know the name of his/her hometown! Consider, however, what answer to the same question might be given when approached, not by a shopkeeper, but by an American-sounding visitor in the shop wearing a University of Pennsylvania sweatshirt. In short, the respondent's inferences about relevance and usefulness (to the person asking the question) will determine the appropriate response. In Mr. Reitter's survey, there is no mention of 3G service, just cellphone coverage in general. Accordingly, this communicates to respondents that the interviewer is seeking answers about general cellphone coverage, and so respondents are encouraged to "play back" competitive superiority in that general context even when they know the commercial dealt exclusively with 3G coverage. Because there are no questions or follow-up probes about 3G service, there is no reason respondents should infer that the interviewer (or survey researcher) has any specific interest in 3G coverage.

18. Indeed, there was no attempt to inquire as to what types of cellphone service the commercial talked about. Had there been, respondents would have understood that this issue was relevant to the study. In short, this study was seemingly designed to have people talk about cellphone service only in a general way (Cellphone "coverage" was

explicitly mentioned in the questions.) but never at the level of 3G or any other type of service. That respondents' answers and, therefore, survey results would mirror the questioning is hardly surprising because of well established principles of two-party (i.e., interviewer-respondent) communication discussed above. This should have been well understood by an experienced survey researcher.

19. Perhaps the key question in the survey (6b) asked, "What did the commercial communicate to you about AT&T's cellphone coverage?" As discussed above, a perfectly accurate and appropriate answer to this question by a respondent who had carefully watched (even studied) the commercial twice would, then, have been: "AT&T's coverage was not as good as Verizon's." Respondents should infer that this is the relevant response. Also, respondents typically play back the main idea of a commercial---which is Verizon superiority---and assume that if the interviewer wants more detail there will be further, more specific, questions. But in interpreting the data, Mr.Reitter assumes that such respondents were mislead because they didn't specifically mention that this was only communicated for 3G service. This is tantamount to believing that our US visitor in Europe didn't know anything about their hometown because they didn't mention their hometown. Here, respondents were never asked whether this superiority was communicated in general or only for a particular type of service. They were never asked any question or given any instruction that remotely suggested they should answer in a more service-specific way, if in fact that was what the commercial communicated. Mr. Reitter's interpretation of this data is inappropriate. He failed to ask the correct questions and, therefore, has no reasonable basis for his interpretation.

20.  So, in discussing "deception" on page 21, Mr. Reitter is "forced" (by the restricted nature of his questionnaire) to build a house of cards. He claims people have been deceived simply because (1) they said that the commercial communicated that AT&T has less coverage than Verizon, (2) they said that the comparative maps made this point, and (3) respondents did <u>not mention</u> 3G or say anything else to indicate that the commercial's message was "limited to a particular level of coverage." He offers no explanation for failing to ask any questions or use any probes that would assess whether people understood what was explicitly and repeatedly communicated about 3G coverage in the commercial.

21. I note that Mr. Reitter did not think it was useful to apply the same logic to address the issue of whether the commercial was misleading because it suggested less AT&T coverage at the 2.5G level----something AT&T at least implicitly argues that consumers will take away from this commercial and, hence, cause AT&T injury. On the basis of the evidence provided, any such claim by AT&T fails. Respondents did not report that the commercial conveyed a lower level of 2.5 G coverage on the part of AT&T. Of course, respondents did not mention 2.5G coverage either, because none of the questioning inquired into <u>any</u> specific type of coverage. By Mr. Reitter's reasoning, however, doesn't that lack of 2.5G responses mean that nobody was mislead into thinking that AT&T has less 2.5G coverage as a result of seeing the Verizon commercial? Inexcusably poor questioning cuts both ways.

22. I'd like to specifically examine answers to one question that may actually shed some light, though not as much as I would prefer, on what respondents may have understood after seeing the Verizon Wireless commercial. The survey contains a pair of

questions (6e and 6f) whose order was randomly rotated. Question 6e reads, "Did the commercial say or show that AT&T has no cellphone coverage at all in certain areas of the country, or did it not, or don't you know?" Question 6f reads, "Did the commercial say or show that AT&T does not have a particular type of cellphone coverage in certain areas of the country, or did it not, or don't you know?" While the survey presents these as separate items, this makes 6e quite confusing since a person might answer, "It did" believing that relevant responses should only address 3G coverage. That's likely to be the case since only 3G coverage was addressed in the commercial and nothing to this point in the questionnaire suggested different types of coverage were relevant.

23.  Substantively, Mr. Reitter might also wish to take into account the truth of the statement that AT&T does not have any cellphone coverage in certain areas of the country (as opposed to every single area in the country), possibly because of business decisions it has made or technical limitations. Respondents may either know that or infer that it likely to be true. Hence, respondents are not "wrong" nor should they be considered "misled" if they answered question 6e (no cellphone coverage at all) by indicating agreement with this proposition.

24.  Good survey procedure would ask these not as two separate questions, because in fact the ideas are joined, but as a single question with two substantive response options. For example, a proper format for asking this question would be: "Did the commercial say or show that AT&T does not have (1) a particular type of cellphone coverage in certain areas of the country, (2) any cellphone coverage in certain areas of the country, or (3) was AT&T's cellphone coverage not addressed in the commercial?"

25. Since the issue was not addressed properly in the survey, question 6e is of no value because (as discussed earlier) its meaning to respondents can't be determined. The order in which these questions are asked may also affect the results. For example putting question 6e after 6f might lead some respondents to understand the distinction that is being drawn between a particular type of service and no cellphone coverage at all. As far as I can determine, the data are not broken out in this way, and so there is nothing further that can be learned from question 6e.

26. We can learn something from question 6f, which is the only question to mention (however vaguely) "coverage of a certain type" (which some respondents may not have understood). On page 27 we see that 109 people answered that the "Commercial communicated that AT&T does not have coverage of a particular type in certain areas of the country." Of the 200 people who saw the actual Verizon commercial (containing the AT&T map), 56 had been disqualified from answering this question because they earlier said that the commercial did not communicate anything about another wireless provider (raising questions about their interest in 3G service and whether this 28% of the group should have been in the study). So, of the 144 people who answered this question, 76% got it right! That is, they correctly understood that the coverage claim was restricted to a certain type of service. Relatively small percentages of respondents said they didn't know (perhaps because the question was confusing) or that the commercial did <u>not</u> communicate that AT&T <u>does</u> not have coverage of a particular type in certain areas of the country. Neither the "don't know" responses nor the latter responses (because of the double negative) indicate that consumers have been misled. In short, the one question that sheds any light at all on the matter before the court provides no evidence for deception

and suggests that the vast majority of study participants formed the accurate belief that the "commercial communicated that AT&T does not have coverage of a particular type in certain areas of the country."

27. I have run across situations where a researcher claimed that he/she was relying on the most general questions often used at the outset of a questionnaire ("What was the main message or messages of the commercial-----what other messages, if any, did the commercial communicate?") Without getting into great detail, that claim falls flat when the goal is to determine if a specific misleading message was communicated. The main message that people typically report is what product was advertised and that the commercial said that one product was better than another or possibly was good for some purpose. When the goal is much more specific, as it is here, the researcher cannot simply expect a type of "memory dump" (of everything the respondent recalls from the commercial). Questions that specifically address the communication of erroneous or misleading information must be asked. They were not asked in this study, and so the results are essentially meaningless.

28. In short, survey conclusions offered by Mr. Reitter largely focus on what respondents failed to say in response to questions that never asked them anything about what type of coverage was addressed in the commercial. There were no probes used to see if answers pertained to any particular type of service. Accordingly, we have no idea what people had in their minds, or what they may have assumed the question meant when they answered questions about AT&Ts "coverage." The commercial, after all, does explicitly and repeatedly address the differences in 3G coverage, and AT&T's 3G coverage is far less. No meaningful conclusions can possibly result from such a study.

29. Earlier I discussed the survey's failure to restrict the sample to people who comprise the relevant universe of consumers and who, therefore, have some interest and familiarity with 3G cellphone service. Once screened into a survey there also needs to be a procedure for eliminating people who have been talked into participating in a study but who do not appear to be paying attention or able to comprehend the most basic aspects of the commercial they have seen. Question 3a asked people who have been shown this commercial twice to identify the wireless service provider the commercial was for (its sponsor---Verizon Wireless). Both those who identified an incorrect sponsor or said they "Don't know" (even after being asked directly, "Was the commercial for Verizon Wireless?") remained in the study. Next, respondents were asked whether the commercial said or showed anything about any other wireless provider (AT&T, of course, was the other provider.). Those saying they didn't know were then asked "Was it AT&T?" Based on the interviewer instructions on the questionnaire (where it is customary to indicate the disposition of all respondents---sent to the next question, sent elsewhere in the questionnaire or terminated from the study), even those who paid so little attention that they didn't realize AT&T was the comparison company appear to have been included in the questioning and results.

30. It is questionable whether respondents should have been allowed to remain in the study if, after just having seen the commercial twice, they were not able to recall either the sponsor (Verizon Wireless) or the comparison company (AT&T) on their own. To then pose two closed-end questions that provide only the correct answer to both questions (followed by a "yes," "no," and "don't know" set of options in each case) is considered to be leading because respondents have only that one company to consider rather than a list

of the leading competitors. Under these conditions, a response bias to answer "yes" is created. The bottom line here is I have seldom seen such disregard for people either getting the message basics (who put out the commercial, what other competitors were mentioned) wrong or saying they simply did not know. Why would we trust their answers on more complex issues in the commercial instead of terminating them from the study?

31. As with most studies of this type, the design includes a control condition. This is based on experimental design principles common to science more generally (e.g., using a placebo as a control to evaluate the efficacy of a new drug). In every case, the purpose of a control group is to rule out threats to the validity of a study's conclusions. So for example, the placebo condition must be as similar to the test condition as possible, except for the drug itself (i.e., there should be no differences in how the two pills are administered). In deceptive advertising inquiries, a study is of little value if an observed consumer belief (either about what was communicated or about a specified product feature or outcome) cannot be causally attributed to the commercial rather than some pre-existing belief or faulty interviewing (e.g., leading questions).

32. As explained on page 7 of his report, Mr. Reitter's control condition departed from the test condition in only one way. He removed the AT&T map from the commercial. Doing so equates this map with the drug at issue in a drug efficacy test, in that the map is held to be the causal agent in producing deception. He then commits an error in logic by saying, "Therefore, any difference in the percentage of Test and Control group respondents who answer that AT&T has no coverage at all in certain parts of the country must be attributed to the misleading nature of the AT&T map and not to the survey format or question wording."

33. That is simply not correct. First, as discussed above, if people are not asked about 3G coverage comparisons in the survey (and they were not), their answers about either a lack of coverage or differences in coverage, do in fact result from a survey format and question wording problem. Further, differences between answers in the two groups are likely to result from removing the key point of comparison---the AT&T map. It should be obvious that respondents who are less likely to note differences in coverage <u>because they were not allowed to see AT&T's coverage map</u> should have less to say about AT&T's coverage and should have less clear beliefs about AT&T's coverage. Hence, the control is of no use in attempting to attribute misleading beliefs to the Verizon Wireless commercial.

34. Because I was curious about what people might volunteer when answering survey questions in the "absence of AT&T map" condition, I looked through the verbatims for that condition. Mr. Reitter's "explanation" (page 25) for the fact that many respondents in the "control" (i.e., no AT&T map) condition said that they saw <u>more than one map</u> is extremely unclear and unconvincing. People in this "control" condition should have only seen one map showing Verizon Wireless' coverage area. Yet here are some of the verbatims in that condition (Again, lining up answers with respondent numbers was not made easy, and comments recorded by interviewers contain many spelling and grammatical errors, so I am doing the best I can.):

    55777--- AT&T's map had a lot less coverage
    76403---The map that was covered in red compared to AT&T's map that had barely any blue spots
    60750---The maps from Verizon vs AT&T
    52941---They also displayed a map of there service areas and it wasn't as much as Verizon
    47823---The Verizon map covered in red juxtaposed to the AT&T map with few spots of blue

15487 or 15651---The two maps, one for Verizon and one for AT&T
81910---Seeing the red map versus the blue for AT&T
43317---It showed the blue map was not complete in every state
10287---The maps showed the difference Verizon and AT&T
94848---The two maps of the different coverage areas
59554---Showed a map of AT&T service compared to Verizon
43317---They showed the maps and showed the red map compared to the blue map
64899---Map in red that was for Verizon and the blue was AT&T
60750---Maps and AT&T maps

In addition to these 14 that clearly don't correspond to what people in the control condition should have seen, I counted about 20 others that were ambiguous, in that people referred to maps in the plural.

35.     Mr. Reitter (page 25) attempts to explain this strange set of responses by making the following points. In footnote 9 he states that it is not possible that respondents were shown the wrong commercial. However, he provides no support for this very strong assertion. Even with automated survey interviewing procedures (CAPI), there can be errors in programming and, depending on how the program was designed, data input. Unfortunately, since Mr. Reitter provides no details about the procedures he used, his assertion cannot be evaluated. For example, with so little information provided, I cannot evaluate the possibility that erroneous codes were assigned, placing some people in the control condition even though they may have been exposed to the test commercial. Obviously this would render the entire data analysis suspect.

36.     Instead, he opines that some people had <u>previously</u> seen the "real" Verizon commercial and were, counter to instructions, basing their answers on it rather than the control commercial they were shown. As far as I can tell, he has absolutely no basis in fact for this explanation. And, if that is the case, shouldn't such

people be disqualified and their answers not included? (I simply can't tell from his very unclear discussion in footnote 8 what was done with such respondents, and he seems to have only identified 4 respondents who answered in this manner.) It would be inappropriate for me simply to accept his "guarantee" that respondents were not shown the wrong commercial and that so many based their answers on an actual Verizon commercial they happened to see earlier. Further, it does not appear that he has identified all of the respondents whose answers suggest that they saw both maps (hence, they are not appropriate members of the control condition), and I can't follow his explanation as to what, if anything, he did to remove their data from the control condition.

37. Since still further issues could come to light with a more complete presentation of study procedures (e.g., how data from people saying they had been shown two maps in the control condition was handled) and more detailed reporting of data, I reserve the right to comment further should that be necessary.

38. In summary, as discussed in detail above, this is a fatally flawed survey in virtually every respect from respondent selection criteria to control condition design and execution, and particularly the design of the questionnaire. The conclusions reached are not supported by the evidence. In my opinion it deserves to be given no weight whatsoever in any legal proceeding.


I declare under penalty of perjury that the foregoing is true and correct. Executed in Gainesville, Florida on November 12, 2009.

Joel B.  Cohen

# EXHIBIT A

# JOEL B. COHEN

## BIOGRAPHICAL INFORMATION

Address*:                   Home - 4622 N.W. 56th Drive
                                 Gainesville, FL 32606-4316
                                 Phone: (352) 373-9929
                                 E-mail: joel.cohen@cba.ufl.edu
                                 *(Home address is primary point of contact)

                   University- 208 Bryan Hall
                          University of Florida
                          Gainesville, FL  32611
                          Phone: (352) 273-3271
                          Fax:   (352) 846-0457

## EDUCATIONAL BACKGROUND

Ph.D. (Business Administration/Marketing) 1966 U.C.L.A.
                  Supporting Field: Social Psychology
                  Doctoral Dissertation: "Interpersonal Response Traits and Consumer Behavior"

MBA (Marketing) 1963 U.C.L.A.

B.S. (Business Administration) 1962 U.C.L.A.

## ACADEMIC AND PROFESSIONAL POSITIONS

2008 -                 Distinguished Service Professor Emeritus, University of Florida

Fall 2008:            Visiting Professor, Columbia University

1988 – 2007:          Distinguished Service Professor of Marketing and Adjunct Professor of Anthropology.  Director, Center for Consumer Research, University of Florida, Gainesville, Florida

1975 - 1988:          Professor of Marketing and Director, Center for Consumer Research, University of Florida

1974 - 1983:          Professor and Chairman, Marketing Department, University of Florida

1972 - 1973:          Vice President and Director, National Analysts Social and Behavioral Science Division of Booz, Allen & Hamilton

1970 - 1972:          Associate Professor of Business Administration, University of Illinois, Urbana-Champaign

1966 - 1970:          Assistant Professor of Business Administration, University of Illinois, Urbana-Champaign

Summer 1967:        Visiting Assistant Professor, Graduate School of Business Administration, U.C.L.A.

Summer 1965, 1966:  Instructor, Graduate School of Business Administration, U.C.L.A.

## PROFESSIONAL AFFILIATIONS

Association for Consumer Research
American Psychological Association (Division 8: Personality and Social Psychology)
American Marketing Association


## PUBLICATIONS

### Books

*Behavioral Science Foundations of Consumer Behavior*, New York: The Free Press, 1972.


### Chapters in Books and Edited Collections

"The Role of Personality in Consumer Decisions," in H.H. Kassarjian and T.S. Robertson (eds.), *Perspectives in Consumer Behavior*, Scott, Foresman, Glenview, Ill., 1968, pp. 220-234.

"Toward An Integrated Use of Expectancy-Value Attitude Models," in G.D. Hughes and M.L. Ray, *Buyer/Consumer Information Processing*, University of North Carolina Press, Chapel Hill, 1974, pp. 331-346.

"A Behavioral Science Look at Market Segmentation Research," (with William L. Wilkie) in Y. Wind and M.G. Greenberg (eds.), *Moving Ahead with Attitude Research*, American Marketing Association, Chicago, 1977, pp. 29-38.

"The Structure of Product Attributes: Defining Attribute Dimensions for Planning and Evaluation," in A.D. Shocker (ed.), *Analytic Approaches to Product and Marketing Planning*, Marketing Science Institute, 1979, pp. 239-256.

"Consumer Psychology," (with Dipankar Chakravarti) in M.R. Rosenzweig and L.W. Porter (eds.), *Annual Review of Psychology*, Vol. 41, 1990, pp. 243-288.

"Attitude, Affect and Consumer Behavior," in B.S. Moore and A. M. Isen (eds.), *Affect and Social Behavior*, Cambridge University Press, 1990, pp. 152-206.

"Charting a Public Policy Agenda for Cigarettes," in P.E. Murphy and W.L. Wilkie (eds.), *The Future of Marketing and Advertising Regulation: The Federal Trade Commission in the 1990s*, University of Notre Dame Press, 1990, 234-254.

"Affect and Consumer Behavior," (with Charles Areni) in T.S. Robertson and H.H. Kassarjian (eds.), *Handbook of Consumer Behavior,* Prentice-Hall, 1991, pp. 188-240.

"Reconceptualizing Alcohol Advertising Effects: A Consumer Psychology Perspective," in S.E. Martin (ed.), *The Effects of the Mass Media on the Use and Abuse of Alcohol*. Bethesda, MD: Department of Health and Human Services, Public Health Service, National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, 1995, pp. 245-249.

"The Dangers of Advertising Low Tar Cigarettes: Let's Understand what Consumers Understand," in M.E. Goldberg, M. Fishbein and S.E. Middlestadt (eds.), *Social Marketing: Theoretical and Practical Perspectives*, Hillsdale, NJ: Lawrence Erlbaum, 1997, pp. 245-264.

"A Motivational Perspective on Means-End Chains," (with Luk Warlop) in T. J. Reynolds and J. C. Olson (eds.), *Consumer Decision-Making: A Means-End Approach to Marketing and Advertising Strategy*, Hillsdale, NJ: Lawrence Erlbaum, 2001, pp. 389-412.

"Affect-Based Evaluation and Regulation as Mediators of Behavior: The Role of Affect in Risk Taking, Helping and Eating Patterns," (with Eduardo B. Andrade) in Roy Baumeister, Kathleen Vohs, and George Loewenstein (eds.) *Do emotions help or hurt decision making? A hedgefoxian perspective*. New York: Russell Sage Foundation, 2007, pp. 35-68.

"The Role of Affect in Consumer Judgment and Decision Making," (with Michel Tuan Pham and Eduardo B. Andrade) in Curtis P. Haugtvedt, Paul Herr, and Frank Kardes (eds.) *Handbook of Consumer Psychology*. Psychology Press, 2008, 297-348.

"When Brands Are Built From Within: A Social Identity Pathway to Liking and Evaluation," (with Americus Reed II and Amit Bhattacharjee) in Deborah MacInnis, C.Whan Park and Joseph Priester (eds.) *Handbook of Brand Relationships*. M.E. Sharpe, (Society for Consumer Psychology), 2009, 124-150.


**Articles in Journals and Proceedings**

"Cognitive Dissonance and Consumer Behavior" (with Harold H. Kassarjian). *California Management Review*, Vol. 8 (Fall, 1965), pp. 55-64.

"An Interpersonal Orientation to the Study of Consumer Behavior." *Journal of Marketing Research*, Vol. 4, (August, 1967), pp.270-278.

"Toward An Interpersonal Theory of Consumer Behavior." *California Management Review*, Vol. 11 (Spring, 1968), pp. 73-80.

"Self Concept Constraints Upon Dissonance Reduction." *Journal of Educational Research*, Vol. 62 (December, 1968), pp. 151-152.

"Product Choice and Consumer Response: Cognitive Theory vs. Reinforcement Theory," *The Public Opinion Quarterly*, Vol. 33 (Fall, 1969), pp. 479-480.  Abstract of paper presented at the 24th Annual Conference of the American Association for Public Opinion Research, May, 1969.

"The Dissonance Model in Post-Decision Product Evaluation," (with Marvin E. Goldberg). *Journal of Marketing Research*, Vol. 7 (August, 1970), pp. 315-321.

"Cognitive Consequences of Brand Loyalty," (with Michael J. Houston). *Journal of Marketing Research*, Vol. 9 (February, 1972), pp. 97-99.

"An Expectancy X Value Analysis of the Relationship Between Consumer Attitudes and Behavior," (with Olli T. Ahtola). In D.M. Gardner (ed.), *Proceedings: The Second Annual Conference, Association for Consumer Research*, 1971, pp. 344-364.

"The Nature and Uses of Expectancy-Value Models in Consumer Attitude Research," (with Martin Fishbein and Olli T. Ahtola). *Journal of Marketing Research*, Vol. 9 (November, 1972), pp. 456-460.

"Informational Social Influence and Product Evaluation," (with Ellen Golden). *Journal of Applied Psychology*, Vol. 56 (February, 1972), pp. 97-99.

"Testing the Value of Adding any Third Component to Fishbein's Expectancy-Value Model," (with Olli T. Ahtola). *Proceedings of the Business and Economic Statistics Section of the American Statistical Association*. 1975.

"An Extended Expectancy-Value Approach to Contraceptive Alternatives," (with Lawrence J. Severy and Olli T. Ahtola). *Journal of Population*, Vol. 1 (Spring, 1978), pp. 22-41.

"New Directions in Attitude Research: A Critical Evaluation," in H.K. Hunt (eds.), *Advances in Consumer Research*, Vol. 5 (1978), pp. 370-376.

"Exploring Attitude Construct Validity: Or Are We?" in W.L. Wilkie (ed.), *Advances in Consumer Research*, Vol. 6 (1979), pp. 303-306.

"Isolating Attitudinal and Normative Influences in Behavioral Intentions Models," (with Paul W. Miniard). *Journal of Marketing Research*, Vol. 16 (February, 1979), pp. 102-110.

"Information Integration: An Information Processing Perspective," (with Paul W. Miniard and Peter R. Dickson). In J.C. Olson (ed.), *Advances in Consumer Research*, Vol. 7 (1980), pp. 161-170.

"Promoting Interdisciplinary Consumer Research: Institutional and Discipline-Based Criteria and the Faculty Reward Problem," in J.C. Olson (ed.), *Advances in Consumer Research*, Vol. 7 (1980), pp. 46-48.

"An Examination of the Fishbein Behavioral Intentions Model's Concepts and Measures," (with Paul W. Miniard). *Journal of Experimental Social Psychology*, Vol. 17, (1981), pp. 309-339.

"The Role of Affect in Categorization: Toward a Reconsideration of the Concept of Attitude," in A. Mitchell (ed.), *Advances in Consumer Research*, Vol. 9 (1982), pp. 94-100.

"Modeling Personal and Normative Influences on Behavior," (with Paul W. Miniard). *Journal of Consumer Research*, Vol. 10 (September 1983), pp. 169-180.

"Involvement and You: 1000 Great Ideas," in R.P. Bagozzi and A.M. Tybout (eds.) *Advances in Consumer Research*, Vol. 10 (1983), pp. 325-328.

"Does the Emperor Ride Again?" in T.C. Kinnear (ed.) *Advances in Consumer Research*, Vol. 11 (1984), pp. 367-368.

"Alternative Models of Categorization: Toward a Contingent Processing Framework," (with Kunal Basu). *Journal of Consumer Research*, Vol. 13 (March, 1987), pp. 455-472.

"An Over-Extended Self?" *Journal of Consumer Research*, Vol. 16 (June 1989), pp. 125-128.

"Counting Advertising Assertions to Assess Regulatory Policy: When It Doesn't Add Up," *Journal of Public Policy and Marketing*, Vol. 8, 1989, pp. 24-29.

"Research and Policy Issues in Ringold and Calfee's Treatment of Cigarette Health Claims," *Journal of Public Policy and Marketing*, Vol. 11, No.1 (May 1992), pp. 82-86.

"Abbott and Costello Meet Frankenstein: An ACR Retrospective," in S.K. Barnett (ed.), *Advances in Consumer Research*, Vol. 22 (1995), pp. 545-547.

"Smokers' Knowledge and Understanding of Advertised Tar Numbers: Health Policy Implications," *American Journal of Public Health*, Vol. 86, No. 1 (January 1996), pp. 18-24.

"Playing to Win: Marketing and Public Policy at Odds Over 'Joe Camel'," *Journal of Public Policy and Marketing*, Vol.19, No.2 (Fall 2000), pp. 155-167.

"Affect-Monitoring and the Primacy of Feelings in Judgment," (with Michel T. Pham, John W. Pracejus and G. David Hughes). *Journal of Consumer Research*, Vol. 28 (Sept. 2001), pp. 167-188.

"When Communications Collide with Recipients' Actions: Effects of Post-Message Behavior on Intentions to Follow the Message Recommendation," (with Dolores Albarracin and G. Tarcan Kumkale). *Personality and Social Psychology Bulletin*, Vol. 29, No. 7 (July 2003), pp. 834-845.

"Affective Intuition and Task-Contingent Affect Regulation" (with Eduardo Andrade). *Journal of Consumer Research*, Vol. 31 (Sept. 2004), pp. 358-367.

"Choice Based on Goals," (with Stijn Van Osselaer, Suresh Ramanathan, Margaret C. Campbell, Jeannette K. Dale, Paul M. Herr, Chris Janiszewski, Arie W. Kruglanski, Angela Y. Lee, Stephen J. Read, J. Edward Russo and Nader T. Tavassoli), *Marketing Letters*, (2005) Vol.16:3/4, pp. 335-346.

"A Multiple Pathway Anchoring and Adjustment (MPAA) Model of Attitude Generation and Recruitment" (with Americus Reed II). *Journal of Consumer Research*, Vol.33, (June 2006), pp. 1-15. **

Perspectives on Parsimony: How Long is the Coast of England? A Reply to Park and MacInnis (2006), Schwarz (2006), Petty (2006), and Lynch (2006) Joel B. Cohen, Americus Reed II, *Journal of Consumer Research*, Vol.33, (June 2006), pp.28-30.

"Does Marketing Products as Remedies Create 'Get Out of Jail Free Cards'?" (with Lisa E. Bolton and Paul N. Bloom). *Journal of Consumer Research*, Vol.33, (June 2006), pp.71-81.

"On the Consumption of Negative Feelings" (with Eduardo Andrade). *Journal of Consumer Research,* Vol. 34, (October 2007), pp.283-300.

"Using Visualization to Alter the Balance Between Desirability and Feasibility During Choice" (with Julia Belyavsky and Tim Silk), *Journal of Consumer Psychology*, Vol. 18, Number 4, 2008, pp. 270-275.

   ** Winner of the *Journal of Consumer Research* 2009 Best Article Award.


**Book Reviews, Technical Reports, Working Papers**

"An Interactive Consumer-Product Typological System: A Progress Report and Partial Evaluation," (with Arnold Barban). The Pennsylvania State University Working Paper Series in Marketing Research, 1970.

"An Experimental Study of Directory Assistance Usage" (with Terry G. Vavra and Paul R. Winn). Technical Report, Illinois Bell Telephone Company, 1970.

"The Structure of Consumer Attitudes: The Use of Attribute Possession and Importance Scores," (with Michael J. Houston). University of Illinois, College of Commerce and Business Administration Working Paper, 1971.

"Effectiveness of Safety Belt Warning and Interlock Systems," (with A. Suzanne Brown). U.S. Department of Transportation, 1973.

"Consumers' Response to the Vega Radio Advertisement." Federal Trade Commission, 1973.

"Presidential Address."  Association for Consumer Research Newsletter, Vol. 3 (January 1973), pp. 3-5.

"An Evaluation of Twin Response Bias" (with E. Henderson). Epidemiology Branch, The National Heart and Lung Institute, National Institutes of Health, 1974.

"A Study of Attitudinal and Normative Factors Leading to Partners' Contraceptive Decisions," (with Olli T. Ahtola, Michael B. Mazis and Lawrence J. Severy).  National Institutes of Health, 1976.

"The Marketing Researcher Goes to Washington -- or Does He?" (with William L. Wilkie).  *Marketing News*, Vol. 9 (January 16, 1976), pp. 9ff.

Review of *The Social Animal*, 2nd Edition, by Elliot Aronson, *Journal of Marketing Research*, Vol. 14 (November, 1977), pp. 622-623.

"An Overview of Market Segmentation: Behavioral Concepts and Research Approaches," (with William L. Wilkie). Marketing Science Institute, 1977.

"An Experimental Investigation of Detergent Performance Labeling," (with William L. Wilkie and Albert R. Wildt). Federal Trade Commission, 1978.

"Applying Expectancy-Value Models to Liking, Preference and Choice," American Marketing Association Attitude Research Series, 1980.

"Information Processing Issues Involved in the Communication and Retrieval of Cigarette Warning Information," (with Thomas K. Srull).  Federal Trade Commission, 1980.

"Preservation of Consumers' Claims and Defenses: Consumer Reactions to Alternative Texts," Federal Trade Commission, 1980.

"Consumer Behavior Energy Conservation Travel Questionnaire:  A Handbook and Demonstration Study," (with Lawrence J. Severy).  Florida Department of Transportation, 1982.

"Postdecision Consistency Enhancing Processes," (with Dan L. Moore).  University of Florida Center for Consumer Research Working Paper, 1988.

"Public Policy and Regulatory Issues in the Marketing and Advertising of Cigarettes."  University of Florida Center for Consumer Research Working Paper, 1989.

"How Cigarette Advertising Affects Consumer Behavior," in *Tobacco Issues: Part I*, pp. 187-199, U.S. Government Printing Office (Technical Report to Accompany Testimony).  1989.

"Issues in the Role and Design of Copy Tests," in *Advances in Claim Substantiation*, pp. 151-159, Proceedings, NAD Workshop III, Advances in Claim Substantiation, Council of Better Business Bureaus, Inc. 1991.

"Validating a Dial-Turning Instrument for Real-Time Measurement of Affective and Evaluative Responses to Advertising," (with Michel Pham and G. David Hughes).  Marketing Science Institute. 1993.

Review of *Smoking: Making the Risky Decision*, by W. Kip Viscusi, *Journal of Public Policy and Marketing*, Vol. 13 (Spring 1994), pp. 170-173.

Review of *The Psychology of Attitudes*, by Alice H. Eagly and Shelly Chaiken, *American Scientist*, Vol. 83 (January-February 1995), pp. 93-94.

"The Direction of Post-Decision Thinking: Looking Forward Rather Than Looking Back," (with Lisa Bolton). In C. Pechmann and S. Ratneshwar (eds.), Society for Consumer Psychology: 1997 Winter Conference Proceedings, 1997, pp.57-61.

"If You Believe in Ghosts," Invited comment in *Regulation: The CATO Review of Business and Government*, Vol. 20, (1997) No. 4, pp. 6-7.


# POLICY ASSESSMENT RESEARCH ACTIVITIES

## Smoking and Health

Evaluation of Cigarette Warning Messages for the Federal Trade Commission and United States Senate Commerce Committee, 1980-1982.

Reviewer 1989 Surgeon General's Report on Smoking and Health, Department of Health and Human Services.

Evaluation of Cigarette Advertising in Relation to the Tobacco Products Control Act and Expert Witness, Attorney General of Canada v. R.J.R. Macdonald Inc. and Imperial Tobacco Ltd., Government of Canada 1988-89.

Invited Testimony, "The Protect Our Children From Cigarettes Act of 1989," United States House of Representatives, 1989.

Author of Chapter 9, "Consumer/Smoker Perceptions of FTC Ratings," in National Cancer Institute    Monograph 7: The FTC Cigarette Test Method for Determining Tar, Nicotine, and Carbon Monoxide Yields of U.S. Cigarettes. Also presented to the Ad Hoc Committee of the President's Cancer Panel, at the NCI Conference on this issue, Bethesda, Maryland, December 1994.

Reviewer for National Cancer Institute's Smoking and Tobacco Control Monograph 13: Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine, 2001.

Research consultant, Competition Bureau, Canada (Re: Imperial Tobacco; Rothmans; Benson & Hedges; JTI-MacDonald), 2005-2007.

Volume Reviewer, National Cancer Institute (NCI) Tobacco Control Monograph 19, *The Role of the Media in Promoting and Discouraging Tobacco Use*, 2008.


## Federal Trade Commission Activities

On behalf of the Federal Trade Commission evaluated proposed industry-wide trade regulation rules, supervised and reviewed consumer research or served as an expert witness in each of the following (1972- ):

Proposed trade regulation rule regulating the sale of used motor vehicles
Proposed trade regulation rule concerning advertising claims for over-the-counter drugs
Proposed trade regulation rule concerning advertising for over-the-counter antacids
Proposed trade regulation rule regarding nutritional advertising claims for food products
Proposed trade regulation rule on detergent performance labeling
Proposed trade regulation rule regarding communication of consumers' rights in credit contracts
Federal Trade Commission vs. General Motors (Chevrolet Vega)
Federal Trade Commission vs. Thompson Medical (Aspercreme)

Federal Trade Commission vs. Figgie International (Heat Detectors)
Federal Trade Commission vs. American National Cellular (Cellular Telephones)
Federal Trade Commission vs. Campbell Soup Company
Federal Trade Commission vs. R.J. Reynolds Tobacco Company (Several cases including "Joe Camel")


**Other Public Policy Activities**

National Academy of Sciences, Consultant on Research Design to Panel on the Impact of Drug Use and Misuse, 1972-1973

Congress of the United States, Consultant to Office of Technology Assessment, 1976

Member, Working Group on the Effects of the Mass Media on the Use and Abuse of Alcohol, National Institute on Alcohol Abuse and Alcoholism, 1992

Organized and chaired "Special Session: Information Gaps in Public Policy: Things I Have Been Told But Don't Quite Believe--Can Consumer Researchers Help?"(*Advances in Consumer Research*, Vol. 23 (1996), pp. 312-316) at the 1995 Association for Consumer Research Annual Conference, bringing together (among others) the Deputy Commissioner for Policy at the Food and Drug Administration, the Director and Associate Director of the Bureau of Consumer Protection at the Federal Trade Commission, and a former FTC Commissioner.


# PROFESSIONAL AND SERVICE ACTIVITIES

**Service for Scholarly Journals**

Editor, *Journal of Public Policy & Marketing* (2001-2006)
Editorial Board: *Journal of Consumer Research* (1974 -)
*Journal of Public Policy & Marketing* (1998-2009)
*Journal of Marketing* (1979 - 1987)
Multi-year reviewer for: *Journal of Marketing Research*, *Journal of Consumer Psychology*, *Addictive Behaviors*

**American Marketing Association**

Program Chairman, 1975 National Educators' Conference
Doctoral Dissertation Awards Committee (several years)
Doctoral Consortium Faculty (numerous years)
Reviewer, Competitive Paper Sessions (numerous annual conferences)

**Association for Consumer Research**

Program Chairman, 1970 National Conference
Treasurer, 1971
President, 1972
Presentations and/or discussant participation at annual conferences (virtually every year)
Reviewer, Annual Conferences

**American Psychological Association**

Professional Practices Committee, Division 23, 1973
Affiliate Affairs Committee, Division 23, 1973

**Service to College and University of Florida**

Development of Interdisciplinary Graduate Program in Consumer Psychology
(received 1981 Exxon Award from the American Assembly of Collegiate Schools of Business, "For educational innovation in graduate education for business administration and management").

Committee memberships include: Chairman, State of Florida Marketing Common Course Committee, University Curriculum Committee, University Educational Policy Committee, College Promotion and Tenure Committee, College Long Range Planning Committee, College Undergraduate Committee, Division of Sponsored Research/Graduate School Summer Research Awards Committee

**Doctoral Students**

Served as the primary or co-advisor to each of the following:

| | | | | | |
|---|---|---|---|---|---|
| Marvin Goldberg | (1972) | Robert Burnkrant | (1974) | Kunal Basu | (1987) |
| Spencer Tinkham | (1973) | John Vann | (1980) | Michel Pham | (1994) |
| Olli Ahtola | (1973) | Paul Miniard | (1981) | Americus Reed II | (2000) |
| Herbert Hupfer | (1973) | Peter Dickson | (1981) | Eduardo Andrade | (2004) |
| Richard Lutz | (1973) | Raymond Burke | (1985) | | |
| Michael Munson | (1973) | Alain d'Astous | (1985) | | |

# EXHIBIT B



**TITLE: "MAP FOR THAT VERSA-REV" :30**
**PRODUCT: BRAND**

**CODE NO.: YVWN-9055000**



**ANNCR VO:** If you wanna know why your 3G coverage



works so great



on Verizon Wireless,



there's a map for that.



Or why you can make plans



on the go at 3G speed.



There's a map for that.



And if you want to know why



your friend's 3G coverage is so spotty,



there's a map for that, too.



Yep. With 5X more 3G coverage than AT&T,



there's lots of reasons to switch to Verizon Wireless.

**SUPER:** Comparison based on square miles covered with 3G. Voice & data services available outside 3G coverage area.



Now get great deals



on 3G phones



like the LG Versa for $49.99.

**SUPER:** $149.99 2 yr. price - $100 mail-in rebate debit card. New 2 yr. activation req'd.
**SUPER:** Subject to Customer Agmt, Calling Plan, up to $175 early termination fee, other charges & restrictions.
Coverage not available everywhere. Network details & coverage maps at vzw.com. Screen images simulated.