IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AT&T MOBILITY LLC,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>CELLCO PARTNERSHIP d/b/a<br>VERIZON WIRELESS,<br><br>　　　　Defendant. | Civil Action File<br>No. 1:09-cv-03057-TCB |

## REBUTTAL DECLARATION OF ROBERT N. REITTER

Pursuant to 28 U.S.C. § 1746, and in support of Plaintiff's Amended Motion for a Temporary Restraining Order, I, Robert N. Reitter, hereby declare as follows:

1. I am over 18 years of age, suffer from no legal disabilities, and am otherwise competent to make this rebuttal declaration. The matters set forth herein are true of my own personal knowledge. If called to testify, I could and would competently testify as to the facts set forth herein.

2. I submit this rebuttal declaration in response to the Declaration of Joel B. Cohen attached as Exhibits 1 to the Transmittal Declaration of Kenneth A. Plevan, and in support of AT&T's Motion and Amended Motion for a Temporary Restraining Order against Cellco Partnership d/b/a Verizon Wireless ("Verizon").

3. I have read the Declaration of Joel B. Cohen and considered his criticism of the Study to Measure Consumer Perceptions of Verizon Wireless

1

Advertising Containing Maps That Depict "3G" Coverage Areas for Verizon Wireless and AT&T (the "Study") that I designed, supervised and implemented. Below, is my rebuttal to Dr. Cohen's critique.

**The Proper Universe of Respondents**

4. In paragraph 15 of Dr. Cohen's Declaration, he takes the position that the universe of people studied should have been limited to those "who have ever heard of a "3G" network or know what it is." (Cohen Decl. ¶ 15).

5. The problem with Dr. Cohen's position is that includes an assumption that AT&T's concern about the map used in the advertisement is not valid. The very heart of AT&T's concern is that consumers are being misled by the broad swath of "white" or "blank" space in the map depicting AT&T's coverage into believing that AT&T lacks service throughout most of the country, despite Verizon's use of the term "3G" in the advertisement. Had the Study been limited to respondents who had some degree of familiarity with a "3G" network, it would not have produced an accurate reading of consumers', i.e. the individuals exposed to Verizon's advertisement through television viewing, perception of the message conveyed by the map depicting AT&T's "3G" coverage.

6. Dr. Cohen's reference to respondent 11305 in paragraph 15 of his declaration illustrates this point. As Dr. Cohen points out, this respondent was

2

confused by the advertisement because he did not "know what a "3G" network is." Dr. Cohen contends that this respondent should not have been included in the Study's universe because the advertisement was "not intended" for such consumers. (Cohen Decl. ¶¶ 15). Eliminating these individuals from the universe of respondents would only serve to skew the results of the Study. As it is, the broad universe of respondents is more accurately representative of the general public that views Verizon's advertisements on a regular basis. Confusion experienced by all consumers should not be overlooked simply because they are not the advertiser's purported intended audience.

7. It is also worth noting that had respondents been asked about their interest in and understanding of "3G" during the screening, as Dr. Cohen suggests, the advertising perception test would have been tainted. Because AT&T's concern is that consumers understand the broad swath of "white" or "blank" space in the map depicting AT&T's "3G" coverage to mean that AT&T lacks service throughout most of the country, without noticing or perceiving "3G" as meaningful, it would clearly be improper to focus on "3G" before showing the Control or Test advertisements to the respondents.

### Questions About "3G" Were Not Relevant to the Study

8. Similarly, Dr. Cohen's conclusion that the Study is fatally flawed because the questions asked did not included the word "3G" is not valid. (Cohen

3

Decl. ¶¶ 16 - 18, 27, and 28). Again, AT&T's claim is based on its concern that consumers are being misled by the broad swath of "white" or "blank" space in the map depicting AT&T's coverage into believing that AT&T lacks service throughout most of the country, despite Verizon's use of the term "3G" in the advertisement. The point of the Study is to test whether this is indeed the case. Mentioning "3G" in the questions, would have put "3G" into respondents' minds and undermined any ability to test whether it was already there.

9. Dr. Cohen also contends that the Study is flawed because the questions posed to the respondents did not include the term "3G" and therefore signaled to the respondents that the interviewer wanted them to discuss coverage in general terms only. (Cohen Decl. ¶ 17). On three different occasions, however, Respondents were asked about the main message and other messages of the advertisement. If Dr. Cohen were correct in his conclusion that it is "clear" that the advertisement was about "3G" coverage, respondents would have mentioned "3G" coverage in response to these questions.

10. Moreover, respondents were asked open-ended questions about what the advertisement conveys with respect to the Verizon's and AT&T's coverage. Dr. Cohen's suggestion that respondents would have said that the advertisement is about "3G" coverage had that term been included in one or more of the questions is not plausible given that the respondents consistently failed to mention "3G" when

4

answering up to five open-ended questions. Dr. Cohen's position that it was the interviewer's job to let respondents know that "3G" coverage was important to the Study is also misplaced. The fact that respondents did not notice the term "3G" and/or perceive it to be important on their own, is far more indicative of consumers' actual perception of the advertisement, than their responses would have been if the interviewers told the respondents to focus on "3G".

11. Dr. Cohen's view that this reasoning equally compels the conclusion that respondents were not misled about AT&T having "2.5G" coverage, is also without any logical foundation. (Cohen Decl. ¶ 21). The Study showed that the that the advertisement would not be perceived as limited to ANY specific type of coverage, but would be taken as applying to coverage in general. The respondents' failure to specifically mention "2.5G" is not the result of poor questioning, but is instead, further confirmation that consumers do not perceive the advertisement as limited to a particular type of coverage.

**Questions 6e And 6f Are Sound**

12. Dr. Cohen also makes several unjustified comments about questions 6e and 6f. (Cohen Decl. ¶¶ 22 - 28). First, Dr. Cohen states that because some respondents may know, or may have inferred, that AT&T does not have any coverage in certain areas of the country, they should not be included in the total number of respondents "misled" because this is an accurate fact. (Cohen Decl. ¶

5

23). Based on this, Dr. Cohen suggests that these survey respondents should not be considered misled by the advertisement. (Cohen Decl. ¶ 23). What Dr. Cohen fails to acknowledge, however, is that the Study controlled for this.

13. The advertisements shown the Control Group and the Test Group were identical, except that the advertisement shown the Control Group did not include the image of the map depicting AT&T's "3G" coverage map. In response to Question 6e, the Test Group answered that AT&T has no coverage at all in certain parts of the country at a substantially higher rate than the Control Group. Given that the only difference in the advertisements shown the Test and Control Groups was the exclusion of the map depicting AT&T's "3G" coverage in the Control advertisement, there is no basis to conclude anything but that the presence of the map depicting AT&T's "3G" in the Test advertisement caused the rate at which respondents answered that AT&T has no coverage at all to jump by 23.5%.

14. Dr. Cohen next states that Question 6e is of no value because it was asked separately from Question 6f, and because of possible order bias. (Cohen Decl. ¶ 25) The design and use of the Control Group, however, rules out the possibility that a problem with the structure of Question 6 caused the result reported. Respondents in both the Test and Control Groups were asked the same Questions with the same rotation of order. As stated the only difference in the Study's approach to the Test and Control Groups was the removal of the map

depicting AT&T's "3G" coverage in the advertisement shown the Control Group. Thus there is no basis to conclude anything but that the presence of the map depicting AT&T's "3G" coverage in the Test advertisement caused the rate at which respondents answered that AT&T has no coverage at all to jump by 23.5%. Thus Dr. Cohen's criticism of the overall structure and wording of the questions is irrelevant.

15. In analyzing Question 6f, Dr. Cohen once again completely changes his position to suit Verizon. After declaring in paragraph 25 that the structure and order of Questions 6e and 6f renders Question 6e "of no value", Dr. Cohen relies on the 76% of respondents who said in response to Question 6f that AT&T has no coverage of a particular type to argue that the Study shows that this group of respondent's understood the coverage claim properly. (Cohen Decl. ¶ 26). The obvious flaw in this argument, is that it ignores the fact that the large majority of these respondents also stated that the advertisement implied that AT&T has no coverage at all. Thus Dr. Cohen's reliance on only a portion of the responses to Questions 6e and 6f in order to undermine the results of the Study lacks credibility.

### 96% of Respondents Were Able to Identify Verizon And AT&T

16. Dr. Cohen also complains that it was improper to include those respondents who could not identify the sponsor of the advertisement (Verizon), or the subject of the advertisement's comparison (AT&T), in the Study's results.

7

(Cohen Decl. ¶¶ 29 - 32). The basis for Dr. Cohen's criticism on this point is not clear. 192 of the 200 respondents (96%) did identify Verizon as the sponsor, and 163 of the 169 respondents (96.4%) identified AT&T as the subject of the advertisement's comparison. Therefore, the number of respondents who failed to identify AT&T or Verizon was negligible and does not undermine the Study's results.[1]

**The Control Cell Design Was Sound**

17. Dr. Cohen's criticism of the Control advertisement is also without merit. (Cohen Decl. ¶¶ 31 - 36). Dr. Cohen asserts that question wording, rather than the control condition, i.e. removing the map depicting AT&T's "3G" coverage from the control advertisement, could have caused the differences in the Test and Control Group results, but does not explain how this could be so. As noted above, Test and Control Group respondents were asked the same questions. Because the only difference in the advertisements shown the Test to Control Groups was the removal of the map depicting AT&T's "3G" coverage, only the map, rather than question wording, could cause the different results.

---

[1] Dr. Cohen criticizes the follow-up questions asked respondents who could not identify Verizon or AT&T as being leading. (Cohen Decl. ¶ 29). Only one out of fourteen respondents identified AT&T in response to the follow-up questions. Therefore, Dr. Cohen's criticism applies to a single respondent, and therefore begs the question, how leading could these questions have been given that they produced an answer only one of fourteen times asked?

8

18. Dr. Cohen also claims that the control condition would naturally cause respondents in the control group to "have less to say about AT&T's coverage" and "have less clear beliefs about AT&T's coverage." (Cohen Decl. ¶ 33). It is unclear why Dr. Cohen thinks this makes the control invalid. As Dr. Cohen seems to concede, it is the presence of the map in the Test advertisement and the lack of a map in the Control advertisement that explains the higher rate of confusion in the Test Group. By definition then, the Test Group result cannot be dismissed as the product of anything outside of the advertisement.

19. Dr. Cohen also points out something that the Study made explicit – that a number of respondents in the Control Group made references to the map depicting AT&T's "3G" coverage, which only appears in the Test advertisement. (Cohen Decl. ¶ 34). As explained, it is entirely plausible that some of the Control Group respondents had seen the advertisement on television before taking part in the Study, and inescapably answered the questions asked based on what they had seen on television rather than on what they saw during the Study.

20. Rather than acknowledging this plausible explanation, Dr. Cohen insists that some members of the Control Group were shown the wrong advertisement. This is simply not possible. The survey was programmed so that respondents were automatically shown the advertisement that corresponded to their

9

cell. Guideline checked the survey program thoroughly, running through it many times, and the correct advertisement always appeared.

21. Even if Dr. Cohen is correct about members of the Control Group being shown the wrong advertisement, this could only have undermined the ability of the survey to detect deception. Because the result of the survey rests on a clear difference in the pattern of results in the Test and Control Groups, any error that resulted in respondents being shown the wrong advertisement would have introduced noise that made it harder for a pattern to emerge. Therefore, the only thing remarkable about the Control Group is that a strong difference in the Test and Control Group patterns did emerge <u>despite</u> the fact that some respondents in the Control Group may have seen the advertisement on television.

I declare under penalty of perjury that the foregoing is true and correct.

This 18th day of November, 2009.

_Robert N. Reitter_
Robert N. Reitter

# CERTIFICATE OF SERVICE

This is to certify that on November 18, 2009, I electronically filed the foregoing **REBUTTAL DECLARATION OF ROBERT N. REITTER** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

> David L. Balser
> Nathan L. Garroway
> Tracy Klingler
> Harriet Jill Wasserman
> L. Joseph Loveland, Jr.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

> Kenneth A. Plevan
> Lauren E. Aguiar
> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, NY 10036

| | |
|---|---|
| McKenna Long & Aldridge LLP<br>303 Peachtree Street, Suite 5300<br>Atlanta, Georgia 30308<br>(404) 527-4000<br>(404) 527-4198 (facsimile) | /s/ David L. Balser<br>David L. Balser<br>Georgia Bar No. 035835<br><br>Attorney for AT&T Mobility LLC |