UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


AT&T MOBILITY, LLC,           )
                              )
      PLAINTIFF,              )
                              ) DOCKET NO. 1:09-CV-3057-TCB
      -VS-                    )
                              )
CELLCO PARTNERSHIP, DOING     )
BUSINESS AS VERIZON WIRELESS,)
                              )
      DEFENDANT.              )


TRANSCRIPT OF TEMPORARY RESTRAINING ORDER PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY C. BATTEN, SR.
UNITED STATES DISTRICT COURT JUDGE
WEDNESDAY, NOVEMBER 18, 2009


<u>APPEARANCES</u>:

ON BEHALF OF THE PLAINTIFF:

      DAVID L. BALSER, ESQ.
      NATHAN L. GARROWAY, ESQ.
      TRACY KLINGLER, ESQ.

ON BEHALF OF THE DEFENDANT:

      L. JOSEPH LOVELAND, JR., ESQ.
      KENNETH PLEVAN, ESQ.
      LAUREN AGUIAR, ESQ.
      H. JILL WASSERMAN, ESQ.


ELISE SMITH EVANS, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
ATLANTA, GEORGIA

<u>INDEX</u>

<u>Argument</u>
  By Mr. Balser                      4
  By Ms. Loveland                40
  By Mr. Balser                    67

<u>Ruling</u>                         69

1          (Wednesday, November 18, 2009; Atlanta, Georgia.)

2          THE COURT:  Good afternoon.

3          All right.  I'd like all the lawyers, if you'd

4     introduce yourselves to me, I'd appreciate it, starting with

5     counsel for the Plaintiff.

6          MR. BALSER:  Good afternoon, Your Honor.  David Balser

7     of McKenna Long & Aldridge on behalf of AT&T Mobility.

8          THE COURT:  All right, David.  Yes, sir.

9          MR. GARROWAY:  Nathan Garroway on behalf of AT&T

10    Mobility.

11         MS. KLINGER:  Judge, I'm Tracy Klinger here for AT&T

12    Mobility.

13         THE COURT:  Thank you.  All right.

14         MR. LOVELAND:  Good afternoon, Your Honor.  Joe

15    Loveland of King & Spalding on behalf of Verizon Wireless.

16         MR. PLEVAN:  Good afternoon, Your Honor.  Kenneth

17    Plevan from Skadden Arps Slate Meagher & Flom on behalf of

18    Verizon Wireless.

19         THE COURT:  Yes, sir.

20         MS. COYNE:  Good afternoon.  Mary Coyne with Verizon

21    Wireless, in-house counsel.

22         THE COURT:  Welcome.

23         MS. AGUIAR:  Your Honor, Lauren Aguiar for Verizon

24    Wireless.

25         MS. WASSERMAN:  Jill Wasserman of King & Spalding for

Verizon Wireless.

MR. KARNICK:  Jerry Karnick for Verizon Wireless, Your Honor.

THE COURT:  All right.  Thank you.

All right, Mr. Balser.  It's your motion.

MR. BALSER:  Thank you, Your Honor.  If it please the Court, in response to the enormous success of the iPhone, Verizon has embarked on a false advertising campaign to disparage AT&T's network.  Verizon's campaign launched in October was designed to mislead the public about the essential attribute of AT&T's network; the ability of AT&T's customers to use their wireless devices in fast areas of the country.  Verizon started the campaign with false advertisements stating that when an AT&T customer is not in the 3G coverage area, he or she is literally out of touch.

THE COURT:  Let me ask you.  I read what you're saying right now in your supplemental brief, which sounded like you were attempting to convey the notion that this was a new discovery on AT&T's part, that -- since the original filing.  At least, I sort of had that impression.  Certainly I did not read AT&T's original brief as conveying this notion that Verizon had crafted and implemented this pernicious campaign to under -- to attack the central 3G aspect of AT&T's coverage.  Was this something -- is this something very new that you just discovered?

MR. BALSER:  Your Honor, it is.  When we first filed --

1  when we filed our TRO papers originally, the only two ads that

2  were running were "College" and "Bench."

3           THE COURT:  So are you inferring the existence of this

4  campaign from the other ads that have been --

5           MR. BALSER:  Exactly, Your Honor.  We didn't know it

6  was to come.

7           THE COURT:  Okay.

8           MR. BALSER:  We didn't know that there was going to be

9  more behind it.  And when we first filed our papers, we thought

10 that we could -- if those are the only two ads that were running,

11 we thought that if the maps were portrayed accurately, we could

12 live with that campaign.  What we didn't know is that they were

13 seeding the market to run these three new ads behind it.  And

14 it's these three new ads that follow on the original ads that

15 give us the full picture of what Verizon set out to do.

16          And so when Verizon started this campaign with the

17 false advertisement stating that our customers are out of touch,

18 what that means, Your Honor, is that no coverage exists

19 whatsoever to send text messages, e-mails, or talk on the phone.

20 They actually use the phrase "out of touch."  That ad was false

21 and Verizon knew it was false.

22          Verizon is now running three new television

23 advertisements that, while they use different images and words,

24 convey the exact same message as the original out of touch ad

25 they ran.  We're here today seeking a TRO to prohibit Verizon

1  from falsely asserting that AT&T's wireless devices did not work

2  outside of a 3G coverage area and from depicting AT&T's wireless

3  data coverage with white or blank space.

4        Your Honor, we're shooting at a moving target, and I

5  think Your Honor's question points that out.  When we filed our

6  original papers, the only ads that were running were "Bench" and

7  "College."  Having considered our initial pleadings directed at

8  those ads, Verizon now says that they're not going to run those

9  ads anymore, and that as a result of our -- and that as a result

10 of that, our requests for a TRO as to those ads is moot.

11       Less than one week after we filed our original motion,

12 Verizon started running three new false and disparaging

13 television advertisements, "Naughty and Nice," "Christmas Blues,"

14 and "Island of Misfit Toys."  Now, we take Verizon at its word

15 that the "Bench" and "College" ads are off the table, and

16 therefore we're going to focus the majority of the hearing today

17 on the three new false advertisements that Verizon's running.

18       Your Honor, as we go through the analysis, one of the

19 key points that we want you to focus on is that 3G is all about

20 speed.  And Verizon's ads are not about doing things faster,

21 they're about being able to do them at all.  And Verizon cannot

22 reconcile that fact.

23       The fundamental service that wireless companies like

24 AT&T and Verizon provide is coverage to an able consumer to use

25 their wireless devices where they live and where they work.

Verizon and AT&T have each spent tens of billions of dollars
building nationwide networks that cover the vast majority of the
people in the United States.

Your Honor, here's a map of AT&T's current wireless
coverage.  What this shows is that our data network covers
approximately 97 percent of the U. S. population and is available
to approximately 303,000,000 people where they live and work.
And what this map -- how this map is comprised, Your Honor, is
the 3G coverage we have is in blue, our 2.5G EDGE coverage is in
orange, and our 2.0G coverage is in yellow, and the cup -- areas
that we have no coverage is in white.

The national coverage footprints of Verizon and AT&T
tell their customers where they can use their phones for wireless
calls, e-mails, text messages, emergency calls, and other
services.  And as Your Honor well knows, not all coverage is the
same.  Some coverage allows customers to do certain things
faster.  AT&T has the 2.5G EDGE network that covers 301,000,000
people or 96.7 percent of the country.  So that orange area, the
orange on this map, covers 301,000,000 people or 96.7 percent of
the U. S. population.  And that network provides customers with
the ability to browse the Internet and the full ability to
communicate with voice and data services, albeit slower for some
data applications.

AT&T has also built out a 3G network in major
metropolitan areas and population centers which provides AT&T

1  customers even more enhanced speed when performing data tasks.

2  AT&T has the fastest 3G network in the United States.  This 3G

3  network covers approximately 233,000,000 customers and 75 percent

4  of the U. S. population where they live and work.  So, again,

5  Your Honor, the blue on this map is where the 3G coverage exists.

6         Now, one way to look at and get at and understand where

7  the 3G coverage is in relation to where people are is to look at

8  a U. S. Census density map, which we have here.  Now, in this map

9  the darkest blue is the highest populated area.  So the dark,

10  dark blue is 300 or more people per square mile, the lighter blue

11  is 160 to 299, and so on.  So you can see from this map that

12  there are places in the United States where there are highly

13  dense concentrations of people, and obviously we build networks

14  for people.  And if we overlay our 3G coverage on this map, on

15  the density map, you can see, Your Honor, that our 3G coverage

16  exists in the high density populated areas in the United States.

17  And, then, if you lay the 2.5G coverage over that, you can see

18  that we're covering the vast majority of the population in the

19  United States with our coverage.

20         Now, AT&T does not dispute that Verizon has more

21  geographic 3G coverage than AT&T, but AT&T's 3G network covers

22  approximately 81 percent of the population that Verizon does on

23  its 3G network.  And that difference in coverage, which Verizon

24  can legitimately tout, exists in non-urban and rural areas, a

25  point which Verizon essentially concedes in their brief by

contending that the ads that we are challenging are set in

non-urban settings. Now, that contention is false. There's

nothing in the ads to suggest settings are non-urban, but it is

noteworthy that Verizon tries to make that distinction.

Now, Your Honor, for many years, in depicting coverage,

the convention of all of the major wireless carriers has been to

use white or blank space to show areas in which no coverage

whatsoever exists. Verizon knows that. Verizon knows that all

of the major carriers use white or blank space on their coverage

maps to depict areas in which no coverage exists. In fact, this

is a screen shot from Verizon's web site that shows that they

denote white space as being areas where there's no coverage,

similarly to --

THE COURT: Well, they don't have to follow that

convention?

MR. BALSER: They don't. But the point is, Your Honor,

that consumers who have been exposed to these maps over and over

and over, the coverage maps, and are familiar with them

understand that blank space and white space connotes area where

there is no coverage. Okay? That's the point.

THE COURT: The consumers have been educated to that

effect?

MR. BALSER: Well, that's the only maps they're able to

see. I mean, every coverage map that people see show -- uses

blank or white space to show areas where no coverage of any kind

1  exists.

2  　　　　Now, during the week of October 5th, Verizon began

3  running an integrated national false advertising campaign

4  disparaging AT&T's voice and data networks.  The initial tag line

5  phrase for that campaign was "there's a map for that."  And that

6  was a parody of the Apple iPhone ad that said there was a map for

7  that which touts the advantages of the Apple iPhone.  In radio

8  and television ads that launched the campaign, Verizon disparaged

9  AT&T by falsely stating that when AT&T customers are not in an

10 area with 3G coverage, they are "out of touch."  Verizon then

11 showed a map with huge swaths of white and blank space to denote

12 areas where AT&T customers are out of touch; that is, where they

13 could not use their mobile devices at all.

14 　　　　Now, let's look at the original "Bench" ad that Verizon

15 launched its campaign with.

16 　　　　(A video clip was played.)

17 　　　　MR. BALSER:  All right.  So let's look at what's going

18 on in this ad.  The ad starts with the Verizon customer texting

19 or e-mailing her friends to meet her at the sidewalk bistro.  Two

20 of her friends receive the e-mail and meet her at the bistro.

21 Her friend who is an AT&T customer --

22 　　　　THE COURT:  Well, now -- well, wait a minute.  If the

23 ad purports to show this woman e-mailing meet me at the bistro, I

24 didn't see that.  Is that what it said?

25 　　　　MR. BALSER:  It does.  That's what it says.

1    THE COURT:  I mean, obviously I've watched all five of

2    these ads.

3    MR. BALSER:  Sure.

4    THE COURT:  I'll take your word for it.  I didn't know

5    that.

6    MR. BALSER:  It does.  And so -- and they do.  And,

7    see, even if you couldn't see it, you can -- the story line is

8    she's walking, she's texting, her friends meet her at the bistro,

9    but her AT&T friend, her friend who's an AT&T customer, stares at

10   the AT&T coverage map and is --

11   THE COURT:  Well, why do you --

12   MR. BALSER:  -- use her phone.

13   THE COURT:  Why is it necessary to infer that the woman

14   on the bench is unable to -- is being depicted as unable to

15   receive an e-mail or phone call from the first woman?

16   MR. BALSER:  She's alone.  She's looking at the map.

17   She's unable to meet her friends, all of whom are getting

18   together at the bistro.  She's sitting by herself looking at the

19   map.

20   THE COURT:  I got -- I got the part about her phone not

21   working the way she wants it to, but drawing the inference that

22   she's supposed to be receiving that message from the first woman,

23   you certainly wouldn't argue that's a necessary inference, would

24   you?

25   MR. BALSER:  Well, the point is, Your Honor, the point

1    is that she's by herself sitting on a bench, looking up at the

2    AT&T map with all the white space, blank space, and while her

3    friends are meeting at the bistro.  I mean, she --

4              THE COURT:  All right.

5              MR. BALSER:  -- and when you couple that with the tag

6    line --

7              THE COURT:  Are you saying she's a loser because she's

8    got a phone from --

9              MR. BALSER:  I think they're saying that you can't -- I

10   think what they're clearly saying is that when you're not in a 3G

11   coverage area, you're out of touch.  And that's what the tag line

12   says.  You want -- it says if you want to know why -- if you want

13   to know how to keep your friend out of touch, keep out of touch.

14             THE COURT:  That's the original --

15             MR. BALSER:  Out of touch.

16             THE COURT:  That's the first generation of that ad?

17             MR. BALSER:  That's right.  And that was the first ad

18   they ran.  That was the seed of the campaign, and I think that

19   it's very telling.  They know that that ad is false.  That ad --

20   they know that a person, an AT&T customer, who is not on 3 -- a

21   3G network is not out of touch.  You can use your phone.  You can

22   browse the Internet.  You can send texts.

23             And, you know, importantly, with respect to this ad, on

24   our 2.5G network, AT&T customers can do all of the activities

25   that are portrayed in this ad.  You can text, you can e-mail.

And this advertisement doesn't portray any activities in which having a 3G network would matter at all.

So after seeing this ad, we immediately contacted Verizon and requested they pull the ad because it was false. Verizon simply dropped the "out of touch" line and replaced it with a line referencing spotty coverage and put a small disclaimer at the end of the ad. Otherwise, the ad remained exactly the same with the same coverage maps and the same story.

Verizon's revised ad still falsely communicated that the woman sitting on the bench is out of touch when outside the 3G coverage area. She can't meet her friends at the sidewalk bistro because she's an AT&T customer without 3G coverage. Changing the words to spotty and adding a super doesn't change the false message conveyed by the ad.

Furthermore, the "Bench" advertisement doesn't promote what Verizon in its brief repeatedly claims to be the primary significant attribute of 3G coverage, which is speed. This ad, like the three new ads we're going to look at, is not about doing things faster, it's about whether you can do them at all. The AT&T woman is sitting alone on the bench unable to use her phone and meet her friends.

While Verizon claims that they're not going to run this ad anymore, the intent of the message that Verizon sought to convey that AT&T customers are out of touch when they are in a non-3G coverage area is the same message conveyed in the new ads

1  that Verizon started running a little more than a week ago.  On

2  or about November 8th, 2009, after AT&T had filed this lawsuit

3  and sought a TRO, Verizon began running three new false

4  television advertisements.  The new ads disparage AT&T voice and

5  data networks and convey the false message that AT&T customers

6  are out of touch.  In other words, they're unable to use their

7  wireless devices outside of the depicted coverage areas.

8         Now, the parties agree, Your Honor, that 3G is all

9  about speed.  Verizon says the new ads are about 3G, but they

10 have little if anything to do with -- what Verizon concedes 3G is

11 about, which is speed.  Now, I'm going to show you these three

12 ads.  We're going to walk through them.  And, Your Honor, when

13 you look at these ads, please ask yourself:  Do they convey the

14 message that things can be done faster or do they convey the

15 message that things cannot be done at all?

16        Let's look first at the "Naughty and Nice" ad.

17        (A video clip was played.)

18        MR. BALSER:  Does this ad convey the message that

19 things can be done faster with 3G or does it convey that AT&T

20 customers can't use their phone outside of the 3G coverage area?

21 The statement "good luck browsing the web with that one," coupled

22 with the image of the misleading map, the naughty label

23 associated with the iPhone, the blue box, and the power failure

24 when each of these appear on the screen conveys the unambiguous

25 message that AT&T's customers cannot use their wireless devices

1    to browse the Internet in vast areas of the United States.  This

2    is just like the out of touch message in "Bench."

3         The clear message is that an AT&T customer won't be

4    able to use the iPhone to browse the web in vast areas of the

5    United States, and that is false.  We've seen the coverage map

6    showing that 301,000,000 people are covered by our 2.5G EDGE

7    network.

8         THE COURT:  Well, how about those -- how about those

9    two maps?  Does your client agree that those two maps are

10   literally accurate?

11        MR. BALSER:  The depiction of our 3G coverage is

12   literally accurate on that map.  What we contend is that the --

13   by showing the non-3G coverage area as blank or white space, that

14   consumers are being misled.

15        THE COURT:  All right.

16        MR. BALSER:  Your Honor, in response to our request for

17   a TRO, Your Honor, Verizon now says that they're going to change

18   the tag line from "good luck browsing the web with that one" to

19   "get ready for spotty 3G coverage."  Now, again, Your Honor,

20   we're playing Whack-a-Mole here.  We point out the falsity of the

21   ads and Verizon makes a slight change.  Their changes here don't

22   fix the problem, however.

23        THE COURT:  Well, AT&T's done the same thing upon

24   demand by Verizon with AT&T's ad, hasn't it?

25        MR. BALSER:  There have been occasions in which --

1          THE COURT:  I --

2          MR. BALSER:  -- we made changes.

3          THE COURT:  Yeah.  That's part of the nature of the

4    industry.  That happens.  Somebody's got to have a reason for

5    these lawyers to be working in-house and sending e-mails back and

6    forth to each other.  And that's one of the reasons; right?

7          MR. BALSER:  Yes, sir.

8          THE COURT:  All right.

9          MR. BALSER:  Communicating that AT&T has spotty 3G

10   coverage when our -- when our 3G coverage covers 233,000,000

11   people and 81 percent of the people that Verizon's network covers

12   is --

13         THE COURT:  Well, now, wait a minute.  I don't know how

14   you can say that that's spotty necessarily means it can be -- or

15   should be defined the way you want to define it.  I mean, you

16   want to define it in terms against the context of the number of

17   people who are covered, as opposed to the geographic scope of

18   coverage, which is what Verizon says it's referring to, which to

19   me means that the advertisement is necessarily ambiguous in that

20   regard, can be reasonably susceptible -- is reasonably

21   susceptible to more than one interpretation.  Correct?

22         MR. BALSER:  On spotty?

23         THE COURT:  Yes.

24         MR. BALSER:  I would submit, Your Honor, that if you

25   ignore "people," if you ignore "where people live," I would agree

1  that you could -- you could reach that conclusion.  But the

2  purpose of a 3G network is to provide coverage where people are.

3  And the only way it's not true that if you consider where people

4  actually live and work, that our coverage is spotty.  If you --

5         THE COURT:  Well, you know, I looked at the map.  And

6  I'll tell you one thing, I take my family to Amelia Island

7  sometimes and I was curious -- and I have an iPhone.  And I was

8  curious as to, you know, where the coverage exists when you go

9  down there because, God forbid, you get off the highway sometimes

10  with some of these cell phones for any of these carriers, you

11  don't get coverage.  And sometimes even on the highways you

12  don't.

13         So I don't necessarily think that people associate the

14  word "spotty" when used in the context of the phrase "spotty

15  coverage" as being applied to where people are as opposed to

16  where land is.  I think it can be taken either way.

17         MR. BALSER:  Fair enough, Your Honor.  Let's look at

18  the second ad, "Christmas Blues."

19         THE COURT:  All right.  This is my favorite, by the

20  way.

21         (A video clip was played.)

22         THE COURT:  That's me before I became a Judge.

23         (The video clip continued playing.)

24         MR. BALSER:  The AT&T customer in this ad shakes his

25  phone four separate times.  Is this ad showing that somebody can

ELISE SMITH EVANS, RMR, CRR

do something faster or is it showing that somebody can't do

anything at all with their phone?  By shaking the phone, the

customer communicates its phone doesn't work.

THE COURT:  Well, you know, I tend to agree with that.

I think it tends to -- that would be the most common

interpretation by people, that the phone is not working, but

that's not the only reason people shake the phone.  And I didn't

need Dr. Cohen to tell me that.  You know, they could shake the

phone because it's going so darn slow.

MR. BALSER:  There's nothing in this ad, though, Your

Honor, that has anything to do with or depicting what this

gentleman's doing --

THE COURT:  Right.

MR. BALSER:  -- that would connote speed.  There's

nothing in the ad that communicates that you need a 3G network to

perform whatever task he's trying to accomplish.  We don't know

what he's trying to do.

THE COURT:  But the absence of any indication of what

the person in the advertisement is doing should not necessarily

be interpreted in your client's favor, should it?

MR. BALSER:  Well, Your Honor, I think the -- someone

doesn't shake their phone unless it's not working.  I mean,

that's why this guy is shaking the phone; it's not working.

There's no other reason to shake your phone four times.

THE COURT:  Well, what if he threw the phone?  I mean,

1   how -- what's the standard interpretation for that conduct?  What

2   would we -- how would we interpret -- and I'm serious.  How would

3   we interpret a person throwing a phone?

4           MR. BALSER:  That may be the next Verizon ad that we

5   challenge, Your Honor.  I don't know.  But I guess it would

6   depend on the tag line and whether they showed the maps and the

7   whole context of the ad.

8           But here, you know -- further, I mean, compounding, you

9   know, the problem of the guy shaking the phone is the fact that,

10  you know, they have this setting in a -- in a nondescript train

11  station and taxicab, which is false because AT&T likely has 3G

12  service in such an urban setting.  By failing to make clear here

13  that the coverage is limited to non-urban areas and, in fact, in

14  this ad by blurring the lines as to where this is occurring,

15  Verizon's falsely touting its coverage advantage because, you

16  know, we look back at the density maps and we -- we show that we

17  have coverage, you know, where 233,000,000 people are.  You don't

18  know where this is.  And it looks -- I mean, a train station,

19  taxicab.  Now, admittedly it's not downtown Manhattan, but it

20  also doesn't look like you're in the middle of a corn field in

21  Nebraska, which is one place where they would have, you know, a

22  3G coverage advantage.

23          And so that's -- we believe that's false as well.  And,

24  I mean, the further point, Your Honor --

25          THE COURT:  But do you think the average person looking

1  at this thinks of all that?

2      MR. BALSER:  No.  But the point is they're responsible

3  for the -- they're responsible for making their ads accurate and

4  not misleading people or deceiving people.  And even if the train

5  station and taxicab here were intended to depict a location where

6  AT&T doesn't have any 3G coverage, the wireless device still

7  works on our EDGE network.  So, you know, separately you've got

8  the map, which is misleading and communicates that the AT&T

9  customer doesn't have coverage in the wider blank spaces.

10      And so we contend that the unambiguous message here is

11  the same as they set out to communicate in the original "Bench"

12  ad, which is when you're not in a 3G coverage area, you're out of

13  touch and you can't use your phone.  It doesn't work.  Now --

14      THE COURT:  And that's just not true?

15      MR. BALSER:  It's not true.

16      "Island of Misfit Toys."

17      (A video clip was played.)

18      MR. BALSER:  The other misfit toys don't understand why

19  the iPhone is on the island because it can download apps and

20  browse net.  And then the AT&T map pops up, the one that's

21  dominated by blank space falsely depicting no coverage, and the

22  phone literally turns off and falls over.  The unambiguous

23  message is that AT&T customers outside of a 3G coverage area are

24  out of touch; that is, they cannot use their iPhone to browse the

25  Internet or download applications.  That is the only plausible

meaning of the iPhone shutting off and falling over.

Now, Verizon tries to explain this advertisement by saying that the iPhone, and I quote, "fades with embarrassment."

THE COURT:  Yeah, that was pretty weak.

MR. BALSER:  This explanation borders on the ridiculous, Your Honor.

THE COURT:  I don't know if I would go that far, but --

MR. BALSER:  Your Honor, the phone turns off and wilts when the map pops up over it.  Just as it initially ran that false ad claiming that our customers are out of touch when they're outside of the 3G coverage areas, Verizon made a commercial that turns the iPhone off and has it fall over while displaying AT&T's coverage.

The message couldn't be clearer.  AT&T's iPhone and its customers who use the iPhone are out of touch when they're outside a 3G coverage areas; that is, the iPhone will not work. That is the only message one can rationally glean when the iPhone turns you have off and falls over.  And that's the same message that was conveyed in the "Bench" ad and it's false.  You can use your iPhone when you're not in a 3G coverage area.

Now, as Verizon acknowledges, we're heading into the fourth quarter holiday season.  It's the heaviest sales season of the year for wireless services.  The false and disparaging message which Verizon is deliberately conveying in its ads concerns the most critical service that AT&T provides, and that's

the ability for its customers to communicate on its network.  In
any of these ads, did you ever see an AT&T device that worked?
They're not showing that you can do things faster, they're saying
our customers are out of touch, that their phones won't work.
That is literally false, and AT&T is entitled to immediate
injunctive relief to stop these false ads from continuing to run
during this critical sales time period.

The Court obviously is very familiar with the TRO
standard.  Let's talk about the first prong, likelihood of
success on the merits.  AT&T has a substantial likelihood of
success on merits because the ads are literally false and the
maps are misleading.  As we have seen, each of these ads through
their visual and audio components is literally false based on
what they communicate to consumers, which is that AT&T's
customers cannot use AT&T's network when they're outside of the
depicted coverage area.

Further, the white or blank space on the maps
unquestionably conveys an inability to access information or
communicate.  All the carriers use white or blank space to depict
spaces where no coverage whatsoever exists, and consumers in the
condition understand that white or blank space means no coverage.
As we have shown, AT&T customers in fact have coverage in the
large white and blank spaces on Verizon's maps.  AT&T's data and
voice networks are available to approximately 303,000,000 people
across the United States.

1          Now, both parties cite the Court to the DIRECTV/Time

2   Warner case decided by the Second Circuit.  That case, I believe,

3   Your Honor, is instructive to the analysis that we're going to

4   ask the Court to conduct here.  In that case, Time Warner, which

5   is a cable company, sued DIRECTV alleging that a *Star Trek* parody

6   advertisement that didn't mention Time Warner by name and didn't

7   specifically claim that DIRECTV provided a better high definition

8   picture than cable was literally false because the entire context

9   of the ad necessarily implied the literally false message that

10  DIRECTV had a better HD picture quality.

11          I think it would be helpful, Your Honor, to look at

12  that ad and then look at some of the conclusions that the Second

13  Circuit drew.

14          (A video clip was played.)

15          MR. BALSER:  Okay.  So the ad that we just played is

16  the ad as it originally ran.  DIRECTV modified the voice-over in

17  the ad to say "For an HD picture that can't be beat, get

18  DIRECTV."  And then Time Warner continued with its suit to

19  challenge the advertised ad.

20          The Second Circuit, in analyzing the ad in its

21  entirety, held that it was a literally false comparative

22  advertisement because the statement that -- that Captain Kirk

23  makes, "settling for cable would be illogical," in the context of

24  the ad necessarily implied that DIRECTV offered an HD picture of

25  higher quality than Time Warner, which was false.

1    The *Star Trek* ad that the Second Circuit found to be

2    literally false is far less offensive than Verizon's ads in terms

3    of the false message to consumers.  The *Star Trek* ad, in contrast

4    to Verizon's ad, did not mention Time Warner by name and did not

5    falsely depict attributes of Time Warner's picture quality.  The

6    *Star Trek* ad is low key and humorous, yet the Second Circuit

7    nevertheless found it to be literally false and held that the ad

8    should be enjoined.

9    And in contrast to the subtle *Star Trek* ad, Verizon in

10   "Christmas Blues," "Naughty and Nice," and "Island of Misfit

11   Toys" uses multiple imaging statements to convey the false

12   message that AT&T's customers are out of touch when they're

13   outside of a 3G coverage area.  Verizon calls AT&T out by name

14   and shows one of our customer's repeatedly shaking his phone,

15   shows the iPhone turning off and falling over, and says "good

16   luck browsing the web with that one" about an iPhone, all

17   conveying the false message that our customers' phones will not

18   work outside of the 3G coverage area.

19   If the Second Circuit found that the *Star Trek* ad was

20   literally false and subject to being enjoined, I respectfully

21   submit, Your Honor, that this Court would be on very solid ground

22   holding that Verizon's far more egregious ads here are also

23   literally false and subject to being enjoined.

24   THE COURT:  Well, now, that ad, the *Star Trek* ad was

25   deemed literally false.  But would your client not agree that the

1  express content of this -- these ads in dispute are literally

2  true?

3          MR. BALSER:  Ask -- no, I don't think we would agree

4  with that, Your Honor.  And we would certainly --

5          THE COURT:  And what parts -- where is there a falsity,

6  an explicit falsity, not implied by necessity or otherwise?  An

7  explicit falsity.

8          MR. BALSER:  I guess we would say that the shaking of

9  the phone and the turning -- the iPhone turning off and falling

10 over and the statement that "good luck browsing the web with that

11 one" are -- are false statements in the context of the ads.

12         THE COURT:  Okay.  The first thing you identified was

13 an act, the shaking of the phone.  I'm interested in words.

14         MR. BALSER:  Okay.

15         THE COURT:  And you said that an example of that was

16 what -- what was the thing you said was an example of that?

17         MR. BALSER:  "Good luck browsing the web with that

18 one."

19         THE COURT:  Okay.

20         MR. BALSER:  Right.

21         THE COURT:  But Verizon's taken that part off, so

22 that's moot, that's off the table.

23         MR. BALSER:  Okay.

24         THE COURT:  Is there anything else about the ads that

25 is literally false, because I think the ads are literally true.

1 It doesn't mean they are -- as a matter of law can't be

2 misleading.  But that to me seems to be the difference with this

3 and the *Star Trek* case.

4       MR. BALSER:  Well, if I may, Your Honor, I think

5 there's a distinction --

6       THE COURT:  All right.

7       MR. BALSER:  -- that can be drawn, and I think it's a

8 very, very important one.  What -- and I agree, Your Honor, that

9 there isn't -- there isn't an explicit statement in these ads

10 that says AT&T customers cannot use their -- their iPhones when

11 they're off a 3G coverage area.  I acknowledge that.  And what

12 the -- but that doesn't mean that the ads are not literally

13 false.  And when you look -- and just bear with me here; okay?

14 If you look at the -- the decision in the DIRECTV case, again

15 there was no explicitly false statement, but what the court held

16 was that the ads -- that ad was literally false by necessarily --

17 necessary implication; that is, literally false.

18       THE COURT:  I got you.  But what they said was it was

19 literally false and that it was necessarily literally false,

20 there was no other plausible or possible interpretation.  How can

21 you say that these ads have but one interpretation necessarily

22 false?

23       MR. BALSER:  Well, Your Honor, I think we've gone

24 through it.  And I think -- I mean, there is no --

25       THE COURT:  Well, now, you've gone through what you

1  contend the interpretation is.

2      MR. BALSER:  Sure.

3      THE COURT:  But we haven't discussed why or whether

4  that is the only possible interpretation of the ads.

5      MR. BALSER:  Let's take the "Island of Misfit Toys."  I

6  mean, what other possible explanation is there for the iPhone

7  turning -- a plausible, reasonable interpretation of the iPhone

8  turning off and falling over when the map pops up?  The best they

9  could do was that it was embarrassed.  That's what they came up

10 with.  I mean, that's not plausible.  That's not reasonable.

11      So the only logical, reasonable, plausible

12 interpretation of that ad is literally false by necessary

13 implication.  Okay?  And so the -- you know, in addition, Your

14 Honor, in addition to the fact that, you know, we contend that

15 these are literally false either through the acts or by necessary

16 implication in the context of the ads, the use of the coverage

17 maps in which AT&T's non-3G area is depicted as white or blank

18 space is misleading consumers.  The maps in the three new ads are

19 identical to the maps in the "Bench" ad.  We have offered

20 uncontroverted evidence the coverage maps in "Bench" are

21 misleading to consumers.  The maps in the new ads are the same as

22 the ads in "Bench," and a new study of the same maps is not

23 necessary to show that those maps are misleading.

24      THE COURT:  Well, how can you say that that evidence is

25 uncontroverted?  Did you get -- did they serve you with a copy of

ELISE SMITH EVANS, RMR, CRR

1    Dr. Cohen's declaration or affidavit, whichever it was?

2         MR. BALSER:  Well, Your Honor, they -- what I mean by

3    uncontroverted is they have no -- they have put no evidence in

4    the record to establish or to -- or to contradict Reitter's

5    conclusion that the ads are misleading.  They've been studying

6    these ads.  They've had our papers for more than two weeks.

7    Where is their survey evidence?  They're looking at -- I mean,

8    they test these ads all the time.  They know what consumer

9    perceptions are of these ads.  Where's their evidence?

10        All they can do is they try to attack Reitter.  And as

11   you see from the declaration of Reitter that we filed this

12   morning, he's got answers for everything that Cohen said.  Now,

13   of course, what they don't point out in their critique of Reitter

14   is that Dr. Reitter's had his surveys accepted by many courts,

15   including as recently as last month by a federal court in -- in

16   Illinois.  And, of course, what they also don't tell you is

17   that --

18        THE COURT:  But rejected -- his opinions have been

19   rejected by other district courts?

20        MR. BALSER:  They have, as has Dr. Cohen's.  Of course,

21   they don't tell you that.  There's a case in the Middle District

22   of Florida in which a federal judge, and I quote, threw out

23   his -- threw out his survey or substantial parts of his survey,

24   finding that the methodology was, and I quote, "irretrievably

25   flawed."  Okay?  So these guys have been in the business a long

1   time.  They've done a lot of surveys.  They have a lot of them
2   accepted.  Sometimes they -- there are portions of them that get
3   rejected.

4            But when you look at Dr. Reitter's conclusions, and if
5   we can put his study results up, he found a 23.5 net deception
6   level on the point that the ad communicated that AT&T has no
7   coverage in certain parts of the country.  Now, the test ad
8   showed that 53 percent of the people who watched the commercial,
9   that is, the actual commercial, think that AT&T consumers have no
10  coverage at all in certain parts of the country.  The control ad,
11  which was the same as the real ad except the AT&T maps were
12  removed, shows that 29 percent of the people who saw that ad
13  thought that AT&T consumers have no coverage at all in certain
14  parts of the country.

15           So to get the most accurate view of the level of
16  deception of consumers who saw the ad with the AT&T maps, Mr.
17  Reitter appropriately subtracted the percentage of respondents
18  who are misled by the control from the percentage who are misled
19  by the actual ad.  And that way we know that the confusion is
20  attributed to the one thing that wasn't in the control ad that's
21  in the test ad, which is the maps.

22           Now, courts have used various confusion rates as
23  thresholds, 7 and a half, 10 percent, 15 percent, as thresholds
24  to support injunctive relief.  A 23 and a half percent net
25  deception level fully supports the finding that Verizon's maps

are deceiving consumers and is well above the thresholds that
courts have used to support injunctive relief.

And we don't have to take, you know, the statistics as
sole proof.  If you look at the verbatims of what some of these
people who responded to these open-ended questions said, you can
tell that they're being misled.  I mean, they say the lady
sitting on the bench, looking sad, not being able to use her
phone.  That their cell -- their cell phones, meaning Verizon,
are better and it shows you maps of where you can use your phone.
That they -- that AT&T has very little coverage throughout the
country.  The map with very little blue areas that show the
coverage areas.  It's like you're out of the loop if you're not
with Verizon.  They showed the girl with AT&T just chilling in
the park with no service.

I mean, this is what people are saying that the ad
meant to them.  And it's obvious that some people, a substantial
number of people, are confused by these maps.  Now --

THE COURT:  I'm amazed that somebody would look at that
map or would just think or presume that AT&T's coverage generally
nationally would be so small.  I mean, that just is surprising to
me.  The second -- I'm referring to the second person who stated,
"They have very little coverage throughout the country."

MR. BALSER:  Yeah.  I mean, people are being confused
by these ads and indeed by the maps.

And so, you know, to wrap up the point, Your Honor,

1   because the "Naughty and Nice" and "Blue Christmas" and "Island

2   of Misfit Toys" ads we contend are literally false by necessary

3   implication, and because Mr. Reitter's survey conclusively

4   demonstrates that Verizon's maps are deceiving consumers, we

5   satisfy the first prong of the TRO standard, which is that we're

6   substantially likely to succeed on the merits.

7           Let's turn to the second prong, irreparable harm.  Your

8   Honor, you can presume irreparable harm because AT&T and Verizon

9   are competitors and these are false comparative advertisements.

10  Now, Verizon cites eBay.

11          THE COURT:  Right.

12          MR. BALSER:  And they cite the Eleventh Circuit opinion

13  in Axiom, and they argue that these cases stand for the

14  proposition that you can no longer presume harm in false

15  advertising cases.

16          Those cases don't stand for that proposition.  Here's

17  what happened in Axiom.  Axiom was the traction case.  This was a

18  case in which Axiom had a device that helps people with back

19  problems with traction.  And they falsely advertised that NASA

20  had somehow been involved in the development of the traction

21  device.  And Judge Camp enjoined, preliminarily enjoined, that ad

22  campaign when a plaintiff, who was not mentioned in the ads, but

23  a competitor, sued them.

24          The case went up to the Eleventh Circuit.  The Eleventh

25  Circuit affirmed all of Judge Camp's findings except with respect

1    to irreparable harm because Judge Camp had presumed irreparable

2    harm relying on the Energy Four case, which is a Judge Forrester

3    decision.  What the Eleventh Circuit said is because this was not

4    a comparative advertising case, but was -- it was a case in which

5    the other -- the plaintiff's products were not mentioned, we're

6    going to remand for consideration both in light of eBay and

7    whether or not a presumption of irreparable harm matters.  But

8    what they said, and I'm quoting the Eleventh Circuit in Axiom,

9    they said:  Proof of falsity is generally only sufficient to

10   sustain a finding of irreparable harm when the false statement is

11   made in the context of comparative advertising between the

12   plaintiff's and defendant's products.  That's what we have here.

13          So Axiom actually makes clear that in those cases in

14   which there's false ads and there are comparative ads, that the

15   presumption still exists.  Here, of course, Verizon calls itself

16   by name and compares our network with their network, which wasn't

17   the case in Axiom.

18          But even if the Court were to determine that there is

19   no presumption of harm or that we're not entitled to a

20   presumption of harm, our survey evidence establishes that

21   consumers are being misled.  And based on some of the cases that

22   we have cited, including the Coca-Cola case, the survey evidence

23   that shows people are being misled provides a causative link

24   between the ads and AT&T's irreparable harm.  There is consumer

25   confusion in the marketplaces, as the survey evidence shows, and

AT&T's goodwill will be lost if these ads continue to run.

This loss of goodwill is especially present here where the advertisements go to the heart of what AT&T provides to its customers, which is the ability to communicate throughout the United States. And as this Court has previously held in the PepsiCo case, and I understand that was a trademark case, not a false advertising case, but this Court I think correctly said: Unfair competition by its very nature results in irreparable injury since the attendant loss of goodwill, reputation, and business cannot adequately be quantified and victims cannot be compensated adequately. Balance of the harms.

Your Honor, the harm to AT&T of having these false messages continue to be played far outweighs the harm to Verizon of being required to truthfully advertise in its commercials. There's a public interest in fair and truthful advertising and making sure that consumers are not misled into believing that AT&T does not have any wireless coverage in large parts of the United States.

Now, Verizon requests a bond.

THE COURT: Yeah. How did you like the amount they asked for, $50,000,000?

MR. BALSER: Well, we have no problem posting an appropriate bond. We note that in the more than 100 pages of declarations that they filed, there is no evidentiary support at all for the $50,000,000 figure that they request we post. We

1  think a bond in the range of $1,000,000 to $5,000,000 would be

2  appropriate, and we're prepared to post such a bond promptly.

3          All right, Your Honor.  In conclusion, being out of

4  touch is the absolutely worst thing that you can say about a

5  company whose entire existence depends on its customer being in

6  touch.  Verizon designed an ad campaign to falsely communicate

7  the message that AT&T's customers are out of touch when they're

8  outside of the 3G coverage area.

9          (A video clip was played.)

10         MR. BALSER:  They've continued to disseminate that

11  false message with "Naughty and Nice" by saying "good luck

12  browsing the web with that one."

13         (A video clip was played.)

14         MR. BALSER:  They've conveyed the same message with

15  "Christmas Blues" by showing our customer repeatedly shaking his

16  phone.

17         (A video clip was played.)

18         THE COURT:  Play that again.

19         (A video clip was played.)

20         THE COURT:  I just like it a lot.  I don't want them to

21  pull these ads.  They're --

22         MR. BALSER:  Your Honor --

23         THE COURT:  I'm kidding.

24         MR. BALSER:  You can play the DVD in chambers as much

25  as you want.

1    And it's the same false message with "Island of Misfit

2  Toys" by having the iPhone turn off and wilt.

3    (A video clip was played.)

4    MR. BALSER:  These ads clearly communicate that AT&T's

5  customers are out of touch and cannot use their phones when

6  they're outside of a 3G coverage area.  That message is literally

7  false.  Verizon should be prohibited from communicating that AT&T

8  customers are out of touch in vast areas of the United States

9  when the undisputed evidence shows that AT&T covers 97 percent of

10  the country with its data and voice networks.  These commercials

11  do not show that you can do things faster with Verizon's network.

12  They falsely communicate that AT&T's customers cannot use their

13  phone on AT&T's network.

14    Now, Your Honor, this is an unusual TRO hearing --

15  okay -- in that --

16    THE COURT:  I've got about 25 Tech students in here, I

17  think.

18    MR. BALSER:  And that makes it unusual, too.  But the

19  thing that I was going to comment on that I find very unusual,

20  it's not like many that we've all experienced where you file your

21  papers in the morning and you argue your motion in the afternoon.

22    THE COURT:  Right.

23    MR. BALSER:  Verizon's had our papers for two weeks.

24  They've had the opportunity to retain an expert.  They've

25  submitted substantial evidence.  There's been a full round of

1   briefing.  The record is really more akin to a preliminary

2   injunction record than it is to a TRO record.

3           The point is, Your Honor, that the Court really has a

4   full record and ample record upon which it can grant a temporary

5   restraining order and interim injunctive relief.  And based upon

6   this record, we respectfully request that the Court enter a TRO

7   enjoining Verizon from running these false advertisements and

8   from depicting AT&T's non-3G coverage areas as white or blank

9   space.

10          THE COURT:  All right.  I've got a question for you.

11  Isn't each map on all of these ads accompanied by a clear,

12  explanatory text to the effect that Verizon is selling it -- that

13  what Verizon is selling is the vastness of its 3G network and not

14  every type of cell phone network?

15          MR. BALSER:  Well, we don't think that's the message

16  that people are getting.  And I think the Reitter survey

17  demonstrates that.

18          THE COURT:  But I'm just asking you to acknowledge that

19  each -- the burden's a little higher for you in that each ad

20  includes express text, it includes words that can be read that

21  constitute clear, explanatory language to the effect that what

22  Verizon is selling is the vastness of its 3G network and not

23  every different type of cell phone network.

24          MR. BALSER:  Well, I certainly would acknowledge that

25  there's a text that says AT&T 3G coverage under the map.  Okay?

1    I mean, that's -- I mean, I'm certainly not going to --

2              THE COURT:  I mean, and they explicitly state the core

3    message that the geographic scope of Verizon's 3G network is five

4    times greater than that of AT&T's 3G network.

5              MR. BALSER:  Yeah.  But what's interesting about that,

6    Your Honor, is that, you know, notwithstanding that text and

7    notwithstanding the super that they put on at the end, if you

8    look at what people are saying in those verbatims and you look at

9    the conclusions that Mr. Reitter drew, the vast white space and

10   blank space in these maps is leading people to believe that we

11   don't have coverage of any kind in vast areas of the United

12   States.

13             THE COURT:  But why --

14             MR. BALSER:  The space -- that blank and white space is

15   so overwhelming --

16             THE COURT:  Yes.  It's very effective for Verizon's

17   advertisements to take advantage of this convention.  But why

18   should they be prohibited from taking advantage of this

19   convention if the advertisement includes explicit text that's

20   unambiguous, that explains that we're only talking about the

21   scope of 3G coverage and that coverage is available outside of

22   the 3G coverage area?

23             MR. BALSER:  Well, if we're focusing just on the maps,

24   it's because the maps are misleading people.  And even if they --

25   I mean, the law is clear that even if they try to convey a

1  message, if the message is misleading to people --

2          THE COURT:  Well, the law --

3          MR. BALSER:  -- then it needs to be enjoined.

4          THE COURT:  Is the law not also clear that just because

5  an advertisement is misunderstood, that doesn't mean that it's

6  misleading?

7          MR. BALSER:  Sure.  Of course.  And we're not -- we're

8  not saying it's mis -- that it's just misunderstanding.  What

9  we're saying, if you look at the Reitter study, people are taking

10 away from the blank space and the white space on these maps the

11 false message that they cannot use their phones outside of the 3G

12 coverage area.  And that is false.  And Verizon set out from the

13 beginning to convey that false message.  That's why they said

14 "out of touch."

15         These are very smart, very sophisticated people.  They

16 know you are not out of touch when you're out of a 3G coverage

17 area, but they said it.  And these other ads, combined with these

18 maps, are designed to mislead people into believing that they

19 don't have coverage when they're outside of a 3G area.  And

20 that's what's happened.

21         THE COURT:  Well, where should the Court draw the line

22 when the ad is admittedly true, when the words that are spoken

23 are admittedly true, the words that are displayed are admittedly

24 true?  I mean, it seems to me that the only way you can overcome

25 that truthfulness and reach a -- and land on a finding of falsity

1  is if there's no other construction of the -- of the

2  advertisement and -- let me ask you.  Would you, first all agree,

3  with that --

4        MR. BALSER:  I do.

5        THE COURT:  -- that that's the standard?

6        MR. BALSER:  For literal falsity, that's true, Your

7  Honor.  It's either an explicit statement or the -- the

8  construction is in -- kind of inescapable.

9        THE COURT:  Right.  Like in the *Star Trek* ad.  I mean,

10  basically what they were saying was that our HD coverage -- or

11  our HD picture is better.

12        MR. BALSER:  But they didn't say it.  But they didn't

13  say the words.

14        THE COURT:  Right.  But it was only -- that conclusion

15  was inescapable.  It was the only conclusion that the

16  advertisement allowed the viewer to reach.

17        MR. BALSER:  Right.

18        THE COURT:  And what I'm suggesting to you or what I'm

19  asking you is:  Is it not in fact the case that this

20  advertisement, or these four advertisements at issue, are

21  susceptible to more than one interpretation?  They are reasonably

22  susceptible to more than one interpretation?

23        MR. BALSER:  We don't believe so.

24        THE COURT:  Okay.

25        MR. BALSER:  We don't.

```
1              THE COURT:  All right.

2              MR. BALSER:  And I think the --

3              THE COURT:  You think the combination of all the

4    factors, the color, the music, what's -- everything that's

5    explained, the explicit message, the implied message compels the

6    conclusion?

7              MR. BALSER:  I do, and I think --

8              THE COURT:  The falsity?

9              MR. BALSER:  I think the best example of that is

10   "Island of Misfit Toys."

11             THE COURT:  Okay.

12             MR. BALSER:  I mean, the best they can come up with is

13   the iPhone's embarrassed.  I mean, that's weak, to use your

14   phrase, and I agree with it.

15             THE COURT:  All right.  Thank you, sir.

16             MR. BALSER:  Thank you.

17             THE COURT:  All right, Mr. Loveland.

18             MR. LOVELAND:  Thank you, Your Honor.  Your Honor, may

19   I have one moment, please?

20             THE COURT:  All right.

21             (A pause in the proceeding was had.)

22             MR. LOVELAND:  May it please the Court?  Your Honor,

23   AT&T asks this Court to stop an advertising campaign that's been

24   running for well over a month, that had run for almost a month

25   before they filed suit.  And they ask this Court to do that
```

despite conceding, and Mr. Balser conceded once again, that the core of the campaign is true, that in fact, by geographic scope, Verizon has five times more 3G coverage than does AT&T.

The Court asked a moment ago: Isn't there a point in each ad at which Verizon disguises exactly what it's saying? This is the map that appears at the end of every television ad. Verizon Wireless, AT&T. Five times more 3G coverage. Comparison based on square miles covered with 3G. Voice and data services available outside 3G coverage area. That is a literally true statement. There's no dispute about it.

This is the prep ad. And interestingly, Your Honor, what AT&T asks was not that the Court stop these five ads. What AT&T asked was that no ad using these maps could be shown. That's what they asked. How can anyone conclude that this map -- want five times more 3G coverage than AT&T? There's a map for that. Red, code, Verizon Wireless 3G coverage. Blue, AT&T 3G coverage. Browse the web and download music and apps at 3G speed in five times more places than AT&T -- and they admit that's true. Great deals on advanced 3G phones.

The entire message is that you have more widespread 3G connectivity with Verizon than with AT&T. That is true. They ask this Court to take the drastic and extraordinary measure of knocking ads off of television, off of the print, off of radio, doing that before there's any discovery, and where the only evidence that they have suggested supports the notion that any of

1  this is misleading is a study, which is just remarkable in one

2  key feature, and that is this.  Look at the questions asked.

3  There were seven of them.  The word "map," the word "3G" is never

4  used in any question.

5          Remarkably, AT&T suggests that you can conclude from

6  questions that never mention maps and never mention 3G that

7  people were misled that maps discussing 3G means something other

8  than what they say.  And no one was ever asked the first question

9  about that.

10          And they ask that the Court do this without any

11 discovery into the methods.  We still haven't seen the control.

12 We haven't had the data.  And as late as 11:00 this morning,

13 we're provided with a new rebuttal declaration which provides new

14 conclusions that Mr. Reitter says he's based on data we still

15 haven't seen.  And we still haven't seen the control which we

16 question.  And they want this without an evidentiary hearing or

17 trial.  And frankly, with due respect to Mr. Balser, this is not

18 the same record as a preliminary injunction.  We have not had

19 cross-examination.  We have not had opportunity to develop a full

20 record on any of the things that are critical here.

21          And finally, Your Honor, what AT&T asks this Court to

22 do runs directly contrary, directly contrary, to what the law

23 says.  *Thompson vs. Western States Medical*, the Supreme Court

24 rendered:  If the First Amendment means anything, it means that

25 regulating speech should be the last, not the first, resort.

1     We are now dealing with truthful speech.  Truthful

2  speech has been acknowledged.

3     In the *United Industries vs. Clorox* case, the Eighth

4  Circuit ruled -- said, excuse me:  The burden on the moving party

5  is particularly heavy when granting the preliminary injunction

6  will give the Movant substantially the relief it would obtain

7  after a trial on the merits.

8     As Mr. Balser says, this is all about their effort to

9  get these ads off during the holiday season.  And if the Court

10  were to grant that TRO, they'd get everything they wanted and

11  we'd never had any discovery, we never would have cross-examined

12  the first person.

13     And perhaps most importantly, Your Honor, picking up on

14  legal framework of two of the points the Court just asked.  Is it

15  the same thing if something can be misunderstood as it being

16  false or misleading?  And the answer is clearly no.  The Seventh

17  Circuit made exactly that point in the Mead Johnson case.

18  Section 43(a)(1) forbids misleading as well as false claims, but

19  interpreting misleading to include factual propositions -- which

20  this clearly is -- that are susceptible to misunderstanding would

21  make consumers as a whole worse off by suppressing truthful

22  statements that will help many of them find superior products.

23     And the Court also asked the question:  Well, do you

24  have to take all of this context together?  Don't you have to?

25  And Mr. Balser said yes.  You've got to take the words, you've

1  got to take the pictures, you've got to put all that together.

2  And when you do that, he says it's false.  But here's what the

3  Eighth Circuit said in the United Industries case on exactly that

4  point.  The greater the degree to which a message relies upon the

5  viewer or consumer to integrate its components and draw the

6  apparent conclusion, however, the less likely it is that a

7  finding of literal falsity will be supported.

8          If you take everything that Mr. Balser said, if you

9  give them every inference, which you should give them none of at

10 this stage, but if you gave them inferences in their favor, it

11 says that they think some people might misunderstand.  But let me

12 go finally to the one point he says.

13         He says the blank space on the maps inherently means no

14 coverage, and it simply doesn't, through anything I'm aware of.

15 There's no rule of that.  The question was never asked in the

16 survey.  There is absolutely no support for that proposition in

17 front of this Court that that's what it means.  In fact, if the

18 Court looks at the AT&T web site on the Internet, you'll find

19 that they have five or six different kind of maps you can click

20 on.  They have a voice map, they have a data map, they have a

21 GoPhone map, they have two or three others.

22         And if you click on those and go through -- if you

23 click on the GoPhone, it doesn't have the situation -- we don't

24 have the whole thing.  If you went over to GoPhone or Smart

25 Limits and clicked on those, Your Honor, you'd find a map that

1   shows a whole bunch of white for AT&T.  They've got all sorts of

2   other coverage in there, but that's not the point they wanted to

3   make.  The point they wanted to make was:  Where is the GoPhone

4   coverage?

5           THE COURT:  But they made that point singularly without

6   diluting it with any other message that would arguably be

7   inconsistent or deceptive.  In other words, that particular

8   message showing that particular map, no one could question it.

9   There was nothing about it that was inherently misleading or

10  susceptible to being misinterpreted.

11          MR. LOVELAND:  Any more than you can inherently

12  conclude that this map showing AT&T 3G coverage necessarily means

13  anything other than 3G coverage.

14          THE COURT:  Well, now, wait a minute.  What about the

15  fact that anybody looking at that map for the first time would

16  be -- it's -- it would not be ludicrous to suggest that the

17  average person looking at that map for the first time who's not

18  really paying attention to the ad is going to assume that the

19  blank spots mean blank coverage, that there's -- that there's no

20  coverage in the blank spots.  Isn't that -- I mean --

21          MR. LOVELAND:  Your Honor, I'm not suggesting it would

22  be ludicrous for someone to conclude that.  I'm not saying that

23  someone might not conclude that.

24          THE COURT:  Right.

25          MR. LOVELAND:  What I'm saying is if you read this, all

it talks about is 3G coverage.  It makes no statement about

anything else.

THE COURT:  I think what has happened here is that

Verizon's ad agency has come up with a -- a nifty plan for

creating an impression of something that is not exactly accurate,

and Verizon has simultaneously provided cover by providing the

language necessary to avoid an attack that the ad is deceptive or

misleading.  I think the ad is saved by some subtly.

MR. LOVELAND:  Well, Your Honor, with all due respect,

and I understand the Court's thinking, but let me perhaps put

this in context.

THE COURT:  All right.

MR. LOVELAND:  And I think we need to back up.

THE COURT:  Okay.

MR. LOVELAND:  Because it's not just Verizon that talks

about 3G coverage or makes that point.  And I think it's

important to point this in context.  I'd like to say, Your Honor,

we have four basic points that I'm going to make, and I gave a

little legal framework, but let's show the four points, if we

could.

The first point is:  3G service has been the focal

point of national advertising and the wireless market for over a

year.  Not just by Verizon, by everyone.

Second point:  Verizon's ads are true and convey an

accurate message about the comparative geographic scope of 3G

1   coverage, which is what they're designed to do.

2          Third point:  AT&T certainly has not come close to

3   meeting the very high standard it has for the extraordinary and

4   drastic relief it seeks.

5          And the fourth point:  Granting the relief would do

6   more harm than good both to Verizon and the public.

7          Let's go to the first point on 3G service.  Fundamental

8   to everything AT&T says is that it's unfair for Verizon to talk

9   only about the 3G network.  Mr. Balser shows this map.  It's got

10  the 2.0 and the 2.5 networks.  He says you have to talk about

11  those when you're talking about connectivity.  That's just as

12  important as 3G.

13         AT&T may be entitled to advertise those networks.

14  They're entitled to say whatever they want to about their 2.0 and

15  their 2.5 networks.  But the fact is AT&T, Verizon, and all

16  carriers have advertised and focused on 3G as distinct and

17  separate from anything else.  And the principal reason, as Mr.

18  Balser says, is speed.  That's the principal reason.  AT&T has

19  been one of the most active in doing that.

20         Could we go to Exhibit 27?

21         This is from AT&T's web site.  Why 3G?  3G provides

22  accelerated data speeds and simultaneous voice and data

23  capabilities for an amazing wireless voice and data experience.

24  And then they explain:  You can access CD for faster on-demand

25  viewing of high quality video.  You can service the wireless

Internet faster and significantly lower your wait for page loads.

Why is the guy shaking the phone? Have you ever had one? You're waiting for the download. You get frustrated when you're waiting for the download. When you don't have the 3G, you get frustrated, you shake, you wait for the download.

You multi-task while you're on the call. You get more done with faster access to e-mail.

Now, AT&T just doesn't say it on its web site. Could we go to the print ad, please?

AT&T has the nation's fastest 3G network. Two things emphasized. Nation, fastest -- three things. Nation, fastest, 3G. No description of anything else, no discussion of anything else. That's what they're focused on.

And finally, they've made a huge deal of this in their ads. There's the iPhone ad. Nation's fastest 3G network.

Could we go to Exhibit 9, please, the Curtis/Roddick?

This is the -- one of their storyboards, Your Honor, emphasizing speed. Speed is critical. Bill Curtis: At 155 miles per hour, Andy Roddick has the fastest serve in the history of professional tennis. IPhone the court to challenge his speed on the Internet. I'll be using the 3G AT&T LaptopConnect Card, he won't. So I can book travel plans faster, I can do these things. I'm Bill Curtis. I'm faster than Andy Roddick. Nation's fastest 3G network. Voiceover: Switch to the nation's fastest 3G network and get the AT&T LaptopConnect Card for free.

1      So what they're saying is we have 3G speed, it's

2  critical.

3      Go to the Phelps ad, please.  Michael Phelps, the same

4  thing with Bill Curtis.

5      Can you get it?  Let's skip that.

6      Go to Exhibit 5, if you can.  This, Your Honor, is from

7  AT&T's submission to the National Advertising Division of the

8  Better Bureau --

9      THE COURT:  Yeah, I read that last night.

10     MR. LOVELAND:  Okay.  Obviously what they're saying is

11  3G's important.  It gives a better customer experience because

12  it's faster.

13     But speed is not all.  Mr. Balser's wrong.  Speed is

14  half of the picture.  The other half of the picture is having

15  access to the speed.  You have to have the connectivity as well

16  as the speed.

17     How do you know that?  AT&T has said it better than

18  anybody.

19     Could you go to the 2008 Annual Report, please?  This

20  is what they said in their 2008 Annual Report.  Fast connections

21  in a wireless word.  Today's consumers expect two things; they

22  want to stay connected wherever they are, they want to do that at

23  broadband speed.  So mobility and speed are the cornerstones of

24  the consumer wireless business.  It starts with the best wireless

25  coverage available in more than 210 countries.  It continues with

1   the nation's fastest 3G network.

2         You want to have it fast and you want to get it

3   wherever you are.  They want to do that wherever they are.  Your

4   Honor wants to do it when you go to Amelia Island.  People want

5   to do it when they go to Destin, they want to do it wherever they

6   go.  You want to have it and you want to have it there.

7         So we know that the groundwork is there.  So how does

8   AT&T make that point?

9         Can you do the sidecar commercial?  This is another one

10   of the AT&T ads.  This one not only talks about speed, we're

11   going to show how you can get it anywhere.

12         THE COURT:  It's no problem if you can't see it because

13   I'm very familiar with that ad.

14         MR. LOVELAND:  Okay.  If you've seen it, that's fine.

15         THE COURT:  Including the depiction that in a rural

16   location --

17         MR. LOVELAND:  Right.

18         THE COURT:  -- of the availability of service.

19         MR. LOVELAND:  And that's what the sidecar --

20         THE COURT:  That Verizon has complained about.

21         MR. LOVELAND:  Yeah.  That's what the sidecar ad

22   specifically shows.  It shows Bill Curtis sitting in a motorcycle

23   sidecar in the middle of nowhere talking about he's got the

24   Internet at 3G speed using his AT&T LaptopConnect.

25         So once again, the point is not just speed, it's speed

1  and connectivity put together.  And that is exactly what the

2  Verizon ads speak to.  They speak to 3G speed across the nation.

3  And that is a very, very legitimate point.

4          So where are we, Your Honor?  The maps themselves.

5  They admit the maps are literally true.  They are an accurate

6  depiction of the relative 3G networks.  The one that's on every

7  television ad specifically says it's geographic.  Specifically

8  says there's other voice and data services available outside the

9  3G service area.  The maps are true, the maps convey exactly what

10  they want to.

11          What does AT&T say, remarkably?  AT&T says but, you

12  know, they're only 50,000,000 people that live in this other area

13  in the white, you know.  There's -- most people live where the

14  blue is.  Of course they travel where the white is, and that's

15  the point they make.  They want to stay connected wherever they

16  go.  And there are 50,000,000 people who live out here.  And

17  we're entitled to advertise both to the people who want to go to

18  the white areas and to the people who live in the white areas

19  that the AT&T network is not as big geographically.

20          They want to talk about population, have at it.  They

21  want to advertise that they've got 76 percent of the people

22  covered by their 3G network, have at it.  You will not find one

23  ad run by AT&T, Mr. Balser certainly hasn't pointed to one, where

24  they say let us tell you about our 2.0 and 2.5 network, how fast

25  it is or how it's an adequate substitute for 3G, because their

1   entire $200,000,000 campaign has been based instead on the

2   nation's fastest 3G network.  So the maps are not misleading.

3          The second thing --

4          THE COURT:  But are they taking advantage of the

5   average person's ignorance?  Most people don't know what the 3G

6   network is.  My wife doesn't know.

7          MR. LOVELAND:  Your Honor --

8          THE COURT:  Does your wife know, does your best friend

9   know?  I mean --

10         MR. LOVELAND:  I guarantee you, Your Honor, that, A, my

11  kids know.  B, my former wife knew.  She bought an iPhone far

12  before I ever heard of one.

13         THE COURT:  You pay for that?

14         MR. LOVELAND:  I pay for a lot of things, Your Honor.

15         So they certainly know about 3G and know that -- you

16  know, when it got a 3G -- when iPhone got a 3G, guess what they

17  did?  They came up with an iPhone 3G right away and became the

18  new focal point of the campaign.  But here's what's interesting.

19         THE COURT:  Well, see, I think a lot of people look at

20  this ad and at first blush they don't -- they don't know.  Of

21  course, most people watching the television are semi-catatonic or

22  something.  They're in a state where they're not fully alive.

23  And when they watch the TV and they see this, they assume this

24  map is like all the other maps, that the white part shows where

25  there's no coverage and the colored part show where there is

1  coverage, and --

2         MR. LOVELAND:  It does show -- I'm sorry, Your Honor.

3         THE COURT:  Well, I just was saying that I -- I wonder,

4  would it not be fair to at least describe the ads as sneaky?

5         MR. LOVELAND:  Oh, I certainly don't think so, Your

6  Honor.  I really do believe -- and it's a fundamental issue, and

7  it goes also to the Reitter survey.  It's a fundamental issue of

8  who they're directed to.  These ads are directed to the

9  tech-savvy people who are interested in buying these smart phones

10  for the specific reason -- I mean, look at them.  They want them

11  for the specific reason so that they can download these video,

12  you know, music things.

13         THE COURT:  Yeah.  These ads are targeted for the

14  savvy, younger -- typically younger consumer.

15         MR. LOVELAND:  Right.  The people who want 3G service

16  and who know exactly what it is.

17         THE COURT:  Right.

18         MR. LOVELAND:  And that's exactly where AT&T's ads are

19  focused.

20         THE COURT:  Right.

21         MR. LOVELAND:  The nation's fastest 3G service.  That's

22  what they're all focused on is those people who want these

23  devices to do the things they need them to do.

24         THE COURT:  I'm still working on mastering Donkey Kong.

25         MR. LOVELAND:  Well, Your Honor, we actually at one

1  point were saying that 2.0 is kind of like the old Atari Pong

2  game.  And 3G is much more like some of the --

3        THE COURT:  Pac-Man.

4        MR. LOVELAND:  Yeah.  The ghetto things -- the attack

5  things they have now, which my son does which I can't even

6  describe.

7        So the description, the maps, and that.  So let's talk,

8  then, about -- because that's where they start.  They say you

9  should -- all of that's bad, all of -- that it's true, but it

10 somehow is misleading, and no one -- here's the critical thing.

11 No one was ever asked a question about these maps.  No one has

12 ever said:  What do you think the map means?  What do you think

13 3G means?  Do you know what 3G coverage is?  What does this map

14 tell you about 3G coverage?  None of those questions ever asked.

15 And as Dr. Cohen says, it's absolutely improper not to do that if

16 you're trying to get that sort of information.

17       So let's then talk about the television ads.  Could we

18 go, please, to the "Bench" ad that was run?

19       (A video clip was played.)

20       MR. LOVELAND:  Stop there.  Yeah.  Can you back it up

21 just a little bit?  Sorry.

22       (The video clip continued playing.)

23       MR. LOVELAND:  Stop.  This is a tweet ad.  It's not a

24 text message.  It's on Twitter.  Twitter is one of the things you

25 get through the Internet.  So that's where you go to the tweet.

1  It's a social networking site that you need 3G for.

2          Keep going.

3          (The video clip continued playing.)

4          MR. LOVELAND:  Again, part of the 3G network using the

5  fancier devices for communication.

6          Keep going.

7          (The video clip continued playing.)

8          MR. LOVELAND:  One of the most amazing things about

9  this case, Your Honor, is that after the ad first ran, the one

10  Mr. Balser ran -- talked about, and had out of touch in it, AT&T

11  contacted Verizon.  They complained.  They said out of touch,

12  what are you saying?  And Verizon said, okay, we'll take it out.

13  And they took it out within a matter of days.  That's the ad

14  that's been running ever since, and AT&T never said a word.

15  Didn't say it's still wrong, it's still false, it's misleading,

16  anything like that.  They waited, they sat back, they filed suit,

17  and they tried to get a hearing in one day.  That's what they

18  did.  They didn't make a claim that that ad was wrong.

19          That ad, if the Court will watch it or watch the

20  storyboards, which you have, has nine references to 3G, oral or

21  visual references to 3G.  It has 3G -- if you want to know why

22  your 3G coverage works so good on Verizon Wireless, there's a map

23  for that with 3G on the map.  Or, why you make plans while on the

24  go at 3G speeds.  Interestingly, in AT&T's papers, they misquote

25  this.  They say, oh, you can make plans on the go, but you can --

1  but they drop the "at 3G speed," which is again a -- there's a

2  map for that.  Again 3G.  You want to know why your friend's 3G

3  coverage is so spotty, there's a map for that.  The map, again

4  3G.

5          Five more 3G coverage underneath it.  Yeah, with five

6  times more 3G coverage than AT&T.  Then the Verizon map, five

7  times more 3G coverage.

8          The map, everything about it says one thing.  If you

9  want to be in 3G connectivity in more places, we have the way to

10  do it.  And it doesn't say a word about anything else.

11          Now, please go to "College."

12          (A video clip was played.)

13          MR. LOVELAND:  Keep going.

14          (The video clip continued playing.)

15          MR. LOVELAND:  Stop.  Watching video.  It's a YouTube

16  video download.  This is -- so you want to download, you want it

17  to download quickly, you want to be able to watch it as you want

18  to watch it.  3G is critical to that.

19          Keep going.

20          (The video clip continued playing.)

21          MR. LOVELAND:  None -- these ads don't come close to

22  saying that an AT&T device doesn't work outside of the area.  It

23  comes close to saying you want better 3G coverage in more places,

24  you use Verizon.  The map then proves why and documents it by 3G

25  reference.

1    THE COURT:  Well, you know, there's a tendency, I

2  think, as you watch these ads repeatedly to be more appreciative

3  of the fact that their subject is strictly the 3G coverage area,

4  whereas when first watching the ad, I don't think the average

5  person walks away with that impression as much.

6    What do you think?

7    MR. LOVELAND:  Your Honor, I think you may be correct

8  in that, and let me tell you why that's important.  Because

9  anyone will tell you, as we've explained in the papers, these ads

10  in an advertising campaign of this nature build on itself.  You

11  reinforce the message.  They don't show these ads once or twice.

12  They show the ads, as you've seen if you're watching the football

13  game --

14    THE COURT:  I have.

15    MR. LOVELAND:  -- time after time after time, you see

16  the ads.  And the reason is they want to reinforce the message,

17  and the message is 3G, 3G, 3G, 3G.  It's said nine times in each

18  of those ads.  3G is either shown or said nine times.

19    THE COURT:  Well, what do you think about the attack

20  that AT&T has launched to the effect that this is a pernicious

21  campaign to destroy everything that AT&T has built up by falsely

22  depicting AT&T's coverage area?  I mean, is that what's going on

23  here or is this just hardball, bare knuckle business, American

24  style?

25    MR. LOVELAND:  Your Honor, as Mr. Balser said, when

they introduced the iPhone, they got a great advantage.  Okay?
And as the Court can see from the public record and everything
else, the one big criticism they had was you got a great phone,
you got a weak network.  All right?  So what has Verizon done?
It's made a deliberate choice to say, well, then let's focus on
the network.  Let's make our advertising campaign address the
weakness.

Is there anything wrong with that?  No.  I mean, it's
good, smart, savvy advertising.  They've got a device that the
world loves.  "Misfits" makes it clear, you know, everybody will
love you is what the plane says.  Of course everybody loves the
device.  The network has the weakness, and that's what this ad
goes to.  It doesn't give that much coverage.  And AT&T has
accurately said you got to have speed and you got to be able to
connect.

So let's look at, Your Honor, then, the Reitter survey,
which Mr. Balser comes back to.  The Reitter survey, Your Honor,
simply is flawed in many ways.  Number one, it's the wrong
universe.

Now, these ads that we just put up are directed towards
people who are interested in 3G.  Mr. Reitter didn't survey
people who were interested in 3G.  Not only did he not survey, in
his supplemental declaration which he submitted this morning, he
admits in paragraphs 5 and 6 that if he had studied people who
were interested in 3G, he would have gotten a different result.

1    What he says was is it "would have skewed the result."  That

2    means it would have been a different result.

3         So if you study the target audience, his survey would

4    give you a different result, and he admits that.  And the case

5    law says you have to study -- if you're going to do a legitimate

6    survey, you have to study the people who are interested in the

7    service that's being proffered.  And that's 3G service.  And he

8    didn't -- he affirmatively said I wanted to avoid finding out if

9    they even knew about 3G.  You know, I wanted everybody -- if they

10   had any intention of buying a cell phone in the next six months

11   or using one, I wanted them in the survey.  So it's the wrong

12   universe under the legal standards.  And we cited the case law to

13   that.

14        Secondly, he asked the wrong questions.  As I said, he

15   somehow, through some sort of survey alchemy, concludes that when

16   I ask people questions that don't say anything about maps for 3G,

17   I can discern answers about what they think white space means on

18   a map.  The survey doesn't say blank.  It doesn't say white.  It

19   doesn't say map, and it doesn't say 3G.  And there is simply, as

20   Dr. Cohen says, no way in the world you can extrapolate from

21   questions that don't talk about those things any meaningful

22   answer about those things.

23        And, finally, it has flawed methodology.  And I won't

24   bore -- go through that.  But as we saw, there were issues in the

25   control -- and we still haven't seen the control ad or how it

1    supposedly does.  We haven't seen that.  But even with that,

2    there clearly were people in his control group that must have

3    seen the AT&T map because they're referring to it.  And they're

4    in the control even though it says the control never showed them

5    an AT&T map.  So we don't have the data.  We haven't been able to

6    go through it in that regard.  But it is clearly flawed in all of

7    those ways.

8          If there's one thing you can say about the surveys, and

9    one thing you can say about Dr. -- Dr. Cohen and Mr. Reitter is

10   before this Court could do anything close to the analysis that

11   the *Smith vs. Wal-Mart* case indicates it needs to do, or before

12   frankly you could even do a Daubert analysis, we'd need cross

13   examination, we'd need to see the data, we'd need to assess all

14   of those things.  And the notion that that survey with these

15   flaws would be the basis for saying let's take a million upon

16   million dollar advertising campaign off the air is simply

17   unfounded and cannot be supported by any of the case law.

18          So then we have the three holiday commercials.  Let's

19   quickly talk about those.  Can we go, please, to -- this is the

20   false by necessary implication as the Court said.  That's the

21   only thing they -- they challenge these.  They say they're false

22   by necessary implication.  And the Court is absolutely right.

23   What that means is it has to be the only plausible interpretation

24   and it has to be false.  So let's look at "Blue Christmas."

25          (A video clip was played.)

1          MR. LOVELAND:  Now, Mr. Balser says that ad shows the

2    device simply doesn't work.  It doesn't show that at all.  It

3    shows the guy's frustrated with it.  Why?  Our interpretation of

4    that is he's frustrated with it because he's getting slow service

5    when he's outside of the 3G area.  He's shaking it because why?

6    He's not getting the fast downloads that AT&T says he wants.

7    He's not getting the fast video that AT&T in their Annual Report

8    says is critical.  He's not getting the satisfying consumer

9    experience that in order to get, as AT&T says, you have to have

10   3G speed wherever you go.  That's what that ad shows.  And then

11   he sits -- gets up, he sees the box with the Verizon map with the

12   broader geographic coverage and the disclaimer, and says I'm

13   happy.

14          So let's go, then, to "Naughty Nice."  Do you have the

15   new "Naughty Nice"?

16          Before you show it, as Your Honor pointed out, as we've

17   said, we changed -- "Naughty Nice" is changed.  So let's show

18   what it is.

19          (A video clip was played.)

20          MR. LOVELAND:  Look how many 3G coverage maps are up

21   there.

22          (The video clip continued playing.)

23          MR. LOVELAND:  As with out of touch, Your Honor,

24   Verizon's interested in the consumer here and doesn't want to do

25   anything other than provide the accurate information.  That line,

```
 1   I think AT&T was right, it may not have been misleading.  It may
 2   not have been wrong, but frankly there was a better way to get
 3   our message across.  The message that Verizon wants to get across
 4   is spotty 3G coverage, you get better 3G coverage in more places
 5   with Verizon, and that's what that ad means.
 6              Finally, go to "Misfits."
 7              (A video clip was played.)
 8              MR. LOVELAND:  Stop right there.  What -- Mr. Balser
 9   said two things.  One, the phone fell down.  It doesn't fall
10   down.  It sort of lowers its head.  I mean, that is parody; okay?
11   I mean, it's --
12              THE COURT:  It droops.
13              MR. LOVELAND:  It droops.  It's a parody.  I don't know
14   about you, but I tend to droop when I get embarrassed, you know.
15   Why does he get embarrassed?  He's embarrassed because he's got
16   AT&T 3G coverage.  That's why it's embarrassed.  It doesn't say
17   it doesn't work and it doesn't turn off.
18              If Your Honor has an iPhone, you may know, if you don't
19   touch it, it goes off and then it comes back on.  That's
20   exactly -- this came back on in two seconds.  The light's back
21   on, the screen's back lit.  It just drooped for two seconds and
22   it came back.
23              So keep going.  So what does it say there?
24              (The video clip continued playing.)
25              MR. LOVELAND:  That's the end of the video, Your Honor.
```

1    THE COURT:  Doesn't look like --

2    MR. LOVELAND:  That's right.  Keep going.

3    (The video clip continued playing.)

4    MR. LOVELAND:  So that's that ad.  Again, comes down to

5  Verizon Wireless, 3G coverage.

6    As the Court indicated, the standard here is -- there's

7  no survey that's ever been done on these ads.  The only standard

8  here is a standard that says:  Is there no plausible

9  interpretation other than the one that Mr. Balser wants the Court

10 to have?  And the answer is yes, there is definitely a plausible

11 interpretation.  In fact, we believe it's the correct

12 interpretation, which is you want 3G coverage in more places

13 that's better than you get Verizon.  And that's the message that

14 all three of those ads make.

15    So if those are the message of the ads, let's

16 compare -- Mr. Balser says compare it to DIRECTV.  I think the

17 Court noted exactly what DIRECTV stands for.  The thing that's

18 said there, we would be settling for cable.  In light of the high

19 quality picture of our DIRECTV, it would be illogical -- the

20 great Mr. Spock line, it would be illogical to settle for cable.

21 There is no conclusion that's possible other than that the cable

22 picture is not as good as the DIRECTV picture, and that was a

23 false statement and the court said that.

24    The better comparison, frankly, is the *United*

25 *Industries vs. Clorox* case.  And that case is more or less dead

on point for the comparative advertising.  And what the court
said again is you look at all of it.  Okay.  They try to say,
well, look at these animated roaches dancing in the kitchen.  I
mean, that's obviously bad for us and that's false.  There aren't
really roaches dancing in the kitchen.  And the court says, yes,
but that's the point of the ad is that this one kills roaches in
24 hours and this one doesn't, and that's the message that comes
across taken as a whole.  And that's the court, of course, that
stands for the proposition that when you want to look at context,
when you want to take it all and put it together, then in that
environment you reach the conclusion that is very difficult to
conclude literal falsity on the necessary implication standard.
The rest of the cases the Court has and certainly can review, the
Novartis and all of them that deal with that.

It is an extraordinarily exacting standard.  Dr. Cohen
in his supplemental declarations explained, under the consumer
psychology nature, other interpretations that are not only
possible, but logical and more plausible than the ones that AT&T
urges.

Your Honor, finally, let's go back to the law for a
moment.  The critical points on likelihood of success on the
merits we've talked about, and I think have been woven into all
of this, which is the survey doesn't support misleading on any of
the key attributes.  It's highly questionable to begin with.
Using it at this stage would be wrong.  And when you get to the

necessary implication standard, it's an extraordinary exacting standard they have not met.

Nor have they met the standard for irreparable harm. They've really offered no evidence of harm. What they've said is, well, you should use the presumption. And we say after eBay, that presumption is highly questionable. And, again, it may be a time when this Court has heard some real evidence that the Court can make an informed judgment about presumption, non-presumption, I've heard enough, et cetera, but we are not at that stage. There is literally nothing for this Court to evaluate in terms of real evidence or testimony on any harm that's being sustained.

But what the Court does know, and it's fourth point we made, is that if the Court were to grant this TRO, there is direct immediate harm. This isn't preserving the status quo. This is asking the Court to do something that dramatically changes the competitive landscape in this area by knocking these ads off the television. And to do that -- and out of the print and other things. And doing that is simply not supported.

The public is entitled, and we go through all the cases, to hear the truthful advertising. As the Seventh Circuit said, the fact that someone may misunderstand it doesn't mean the people who are interested in it shouldn't hear the facts and shouldn't be able to make their informed judgments. If I'm interested in 3G, this is important to me, and I'm entitled to have that information when I make a decision on 3G.

AT&T, Your Honor, in the final analysis can't have it both ways. They can't go out and trumpet to the world that they have the nation's fastest 3G network and then contend that when Verizon shows that the emperor has no clothes in most of the country geographically, that that's misleading. They're the ones who say the nation's fastest 3G network. They're the ones that say you have to have speed and connectivity wherever people go. And we're entitled to advertise to exactly the same points and do so effectively.

This is a case, Your Honor, where I believe the evidence is not remotely close to supporting the drastic, extraordinary remedy that AT&T seeks at this point. We would request that a TRO be denied.

If the TRO were to be granted, the bond -- we have a millions upon millions of dollars. And as the Court knows, if the Court were to enter a restraining order, the limit of the damages we could collect is the amount of the bond. And the Seventh Circuit, again, in the Mead Johnson case points out that you better set -- you should set the bond higher, not lower, because it's going to set the ceiling of what we can possibly get. If AT&T wants to take its major competitor and say knock out holiday ads off the television, that is a millions upon millions upon millions of dollars proposition, and the Court should not do that lightly. We think the Court, of course, should not do it at all under these circumstances.

1    I appreciate Your Honor's time and patience.  Thank

2  you.

3    THE COURT:  Thank you.

4    All right, Mr. Balser.  Just a few minutes.

5    MR. BALSER:  I'll be brief.

6    Why did they start their campaign with the tag line

7  "out of touch"?  They obviously know how to say more accurately

8  or what they now say more accurately depicts a message that they

9  want to disseminate.  That's not how they started their campaign.

10 They started by saying out of touch.  And they've built on that

11 same message over and over and over in these ads.

12    If you look at the "Island of Misfit Toys," that

13 phone -- when the map pops up, the light turns off and it --

14 whether it falls over, bows, whatever it does, it wilts, it

15 droops.  And the -- under the test in the Second Circuit's

16 decision in DIRECTV, the only logical, plausible explanation of

17 what's going on in that ad is that that phone doesn't work, can't

18 download apps and you can't browse the net when you're outside of

19 the 3G coverage area.  That is false and nothing Mr. Loveland

20 said contradicts that.  He didn't touch the fact that -- or

21 dispute the point, because he can't, that our 2.5G coverage area,

22 our EDGE coverage, provides the ability to browse the net.  It

23 can be done.

24    Now, who are they directed to?  Who are the ads

25 directed to?  Well, they say the ads are being directed to young

people, savvy people, 3G -- 3G savvy people.  But look where they're running the ads?  Look at the demographics of the people who watch the shows where these ads are running.  They're running on Monday night football.  Okay?  They're running where -- those aren't targeting young people or tech-savvy people.  And this goes to the criticism that they have of Reitter.  Okay?

They criticize Dr. -- Mr. Reitter for saying that he should have limited questions only to people who are savvy about 3G.  And, of course, this Court well knows they're not showing the ads only to people who are knowledgeable about 3G.  In fact, they're banking on the fact that most people are not knowledgeable about 3G and that those people will be misled into believing that we have no coverage at all in vast portions of the United States.  That is what they are trying to do and that's what Mr. Reitter's survey demonstrates the take-away of this overwhelmingly powerful blank space in these maps is communicating in these ads.

You have a record, Your Honor, upon which you can grant interim relief.  And, really, I think it does come to -- down to balance of the harms.  When you look at the message that's being pounded and pounded and pounded into the consciousness of people that our phone -- our iPhone doesn't work outside of the 3G coverage area, that it falls over and turns off, and that wide areas of the country are shown in blank space or communicating that people have no coverage at all, and you balance that against

the fact that Verizon can easily amend these ads as we've seen. They have done it now three times. And that they can -- they're about to launch and they're in the processing of launching Droid. They're going to spend a hundred million dollars on their Droid ads. It's very easy to substitute ads in that are proper and that aren't -- that aren't misleading people and that aren't false. We ask the Court to grant the relief we seek. We'd be prepared to move expeditiously for a preliminary injunction hearing afterward.

THE COURT: All right. Well, counsel, I want to begin by thanking you. The lawyers on both sides have done an outstanding job in this case so far. I've read everything that's been filed, and it's been first class and top notch all the way on both sides.

I think that a person with a sceptical bent of mind might call Verizon's ads sneaky, as I indicated earlier. I think a more sanguine view is that they are simply clever. Either way, however, they are literally true. And the Court holds that AT&T has failed to carry its burden of showing that they are nevertheless misleading.

The Court further finds that AT&T has failed to adduce competent evidence of deception. And even if AT&T had, the fact that an advertisement is misunderstood is not necessarily indicative or -- of a finding that the advertisement is misleading. I don't have any doubt that a lot of people who have

watched these advertisements have been misled -- or a better way
to say it is that I don't have any doubt that a lot of people who
have watched these ads have misunderstood.  I didn't mean to say
have been misled, but they have misunderstood what was
communicated.

However, the fact that some people misunderstand the
ads does not mean that the ads are misleading and are entitled to
protection or -- excuse me, are vulnerable to recrimination under
the Lanham Act.  It's particularly significant to the Court that
we're dealing here with an issue of speech and the -- of course,
the sacredness of that right.

And, therefore, for all of these reasons, the Court
finds that AT&T has failed to show a substantial likelihood on
prevailing on the merits of any of its claims.  Accordingly,
AT&T's Motion for a Temporary Restraining Order and/or a
Preliminary Injunction is hereby denied.

And I will go one step further and say, counsel, that
while I will continue to have an open mind, in all candor it is
the Court's impression that it is going to be very difficult for
AT&T to survive a motion for judgment as a matter of law, whether
that's a motion to dismiss or a motion for summary judgment,
based on the evidence that has been presented so far.  I suppose
that additional evidence could be adduced that might change the
Court's mind.  And I assure AT&T that I have an open mind about
any evidence that it may present in this -- from this point

1   forward.  But I felt like it was appropriate to let you know that

2   because that's the direction I see the case heading in and I felt

3   like I should say that.

4          All right.  Is there anything else, counsel?

5          MR. BALSER:  Yes, Your Honor.  In light of the Court's

6   ruling, would -- can we discuss a schedule for a preliminary

7   injunction proceeding so that we can take evidence?  We haven't

8   taken any discovery, obviously, either.  And we would -- we would

9   want to have the opportunity to take discovery from Verizon and

10  conduct further survey evidence in light of the Court's ruling

11  with respect to these three new ads.

12         THE COURT:  All right.  Mr. Loveland, what do you say,

13  sir?  How does your Thursday of next week look?

14         MR. PLEVAN:  That was Thanksgiving.

15         MR. LOVELAND:  I know.  I got you.

16         Your Honor, I would respectfully submit that there

17  should be discovery, obviously.  And I would suggest that there

18  should be some discovery and then an opportunity for the Court to

19  hear, if the Court is inclined to, a preliminary injunction with

20  a trial on the merits at this point.  We've had a substantial

21  amount of time, effort, and energy.  The Court has given a pretty

22  fair, I think, indication of what the Court views so far.  And we

23  believe that if we're going to have another hearing, let's --

24  let's tee it up.  But it's going to take some time.  They're

25  going to do surveys and we're going to do surveys, and they can't

1  be done overnight.  And we're going to want to examine their

2  survey experts and they're going to want to examine ours.  So

3  we're talking about --

4            THE COURT:  Mr. Balser, how long --

5            MR. LOVELAND:  -- that situation.

6            THE COURT:  Yeah.  How much time are you talking about?

7            MR. BALSER:  We would like to have the hearing

8  obviously -- I mean, if these ads, these holidays ads are running

9  in the critical season, so I would -- I mean, it makes no sense

10  for us to delay or defer a preliminary injunction hearing till

11  after the holidays.  We -- we think we can be ready by December

12  11th.

13            THE COURT:  That's a Friday, isn't it?

14            MR. BALSER:  Yes, sir.

15            THE COURT:  Okay.  Let's set it for the following week,

16  Julee.

17            (An off-the-record discussion was had.)

18            THE COURT:  Let's set it for 9:30 a.m. on Wednesday the

19  16th.

20            MR. BALSER:  Thank you, Your Honor.

21            THE COURT:  Okay.  All right.  We'll be in recess.

22            (End of proceedings.)

23                                *****

24

25

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF GEORGIA

3  CERTIFICATE OF REPORTER

4

5

6          I do hereby certify that the foregoing pages are a true

7  and correct transcript of the proceedings taken down by me in the

8  case aforesaid.

9          This the 19th day of November, 2009.

10

11

12

                                    _____
13                                  ELISE SMITH EVANS, RMR, CRR
                                    OFFICIAL COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25